# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2905 | **DATE** | January 10, 2001 |
| **CASE TITLE** | Boim vs. Quranic Literacy Institute, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Defendants; Motions to Dismiss, Motions for Rule 11 Sanctions

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    The court denies defendants' motions to dismiss [34-1] [43-1].  The court denies defendants' motions for Rule 11 sanctions [35-1] [38-1] [42-1].  Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | JAN 10 2001 |
| | Notified counsel by telephone. | date docketed |
| ☒ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | JAN 10 2001 |
| SLB | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number

64

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STANLEY BOIM, Individually and as
Administrator of the Estate of DAVID BOIM,
deceased, and JOYCE BOIM,

    Plaintiffs,

v.

QURANIC LITERACY INSTITUTE, HOLY
LAND FOUNDATION FOR RELIEF AND
DEVELOPMENT, ISLAMIC ASSOCIATION
FOR PALESTINE, AMERICAN MUSLIM
SOCIETY, d/b/a/ ISLAMIC ASSOCIATION FOR
PALESTINE IN CHICAGO, AMERICAN
MIDDLE EASTERN LEAGUE FOR PALESTINE,
UNITED ASSOCIATION FOR STUDIES AND
RESEARCH, MOHAMMED ABDUL HAMID
KHALIL SALAH, a/k/a ABU AHMED, MOUSA
MOHAMMED ABU MARZOOK, a/k/a ABU
OMAR MUSA, AMJAD HINAWI, Palestinian
Authority, Estate of KHALIL TAWFIQ
AL-SHARIF, and JOHN DOES 1-99,

    Defendants.

00 C 2905

Judge George W. Lindberg

CORRECTED
JAN ... 2001

## MEMORANDUM OPINION AN ORDER

Plaintiffs Stanley and Joyce Boim, American citizens living in Jerusalem, bring this action for injuries arising from the murder of their seventeen-year-old son, David Boim, by Hamas terrorists. The plaintiffs bring this action pursuant to 18 U.S.C. §2333 against the Hamas terrorist agents who killed their son as well as against various organizations and individuals that plaintiffs allege solicited, financed, and provided material support for the attack. All but one of the defendants that have been served in the case have filed motions to dismiss, which the court addresses below.

## Jurisdiction and Venue

This Court has subject matter jurisdiction over this action under 18 U.S.C. §§ 2333(a) and 2338, which authorize a private damages action in any appropriate United States District Court by a United States national who has been injured "in his person, property or business by reason of an act of international terrorism." Subject-matter jurisdiction is also conferred by 28 U.S.C. §§ 1331 and 1332(a)(1)-(3).[1] Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 2334(a).

## Statement of Facts

The following statement of facts is based on the allegations contained in plaintiffs' complaint. Stanley and Joyce Boim are the parents of the decedent, David Boim. Both are U.S. nationals and were legal residents of the State of New York at the time of their son's death. The Boims were living in Jerusalem at the time of their son's death.

David Boim was born in Brooklyn, New York, on March 27, 1979, and was, at the time of his death, a citizen of both the United States and Israel. In 1996, David was studying at a yeshiva in Israel. On May 13, 1996, David was waiting with other students at a bus stop near

---

[1] One of the bases for defendants' motion to dismiss the complaint is that because plaintiffs incorrectly classify the applicable statute in several paragraphs of the complaint as the "Antiterrorism Act of 1990," which was repealed in its entirety in March 1991 (effective November 5, 1990), this court has no subject-matter jurisdiction over the plaintiffs' claim. Although it is true that the Antiterrorism Act of 1990 was repealed, it is also true that it was essentially reenacted under a different title. It is also clear that the complaint alleges that the court's jurisdiction is based on 18 U.S.C. § 2333 and 2338, which are current and valid statutory sections. It is not a citation to the popular title of the statute that confers jurisdiction to this matter, it is the Congressional grant of jurisdiction as indicated in § 2338: "(t)he district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter."

Beit El in the West Bank when he was struck by gunshot fired from a passing car. His two attackers were Hamas terrorists who first opened fire on a civilian bus and injured two passengers on the bus. They then traveled a few hundred yards and fired on David and the other students at the bus stop. One student, Yair Greenbaum, was wounded in the chest. David was shot in the head and was pronounced dead within an hour. The terrorists then sped away from the scene and lost control of their car, which crashed. They fled on foot towards Jalazun, in territory controlled by the Palestinian Authority.

The two operatives who carried out the shooting were Amjad Hinawi and Khalil Tawfiq Al-Sharif. Both were apprehended and temporarily imprisoned by the Palestinian Authority in early 1997. After his release, Al-Sharif joined two other Hamas suicide bombers in a suicide bombing on September 4, 1997, on Ben Yehuda Street in Jerusalem. Five civilians were killed in that attack, and 192 persons were wounded.

Defendant Amjad Hinawi ("Hinawi") is a Hamas terrorist operating in Israel, the West Bank and Gaza. Hinawi is one of two Hamas agents who carried out the attack on David Boim. He was convicted of participating in David Boim's murder by a Palestinian Authority court and sentenced to ten years' imprisonment on February 17, 1998.

Defendant Khalil Tawfiq Al-Sharif ("Al-Sharif") was a Hamas terrorist operating in Israel, the West Bank and Gaza. Al-Sharif was one of the two Hamas agents who carried out the fatal attack on David Boim. Defendant Al-Sharif died on September 4, 1997, as a Hamas suicide bomber who carried a bomb that was exploded on Ben Yehuda Street in Jerusalem. Five civilians were killed in that attack, and 192 persons were wounded.

Defendant Hinawi confessed to participating in the shooting of David Boim. He was tried in a court of the Palestinian Authority, where his confession was read in open court. He was convicted of participating in David Boim's murder. On February 17, 1998, Hinawi was sentenced to ten years in prison at hard labor.

In the same month, Hinawi was granted leave from prison for the Muslim holiday of Id Al-Fitr. He did not return to prison at the end of his leave and was missing for several months. According to public testimony from Martin Indyk, presently U.S. Ambassador to Israel, Hinawi is now back in a Palestinian Authority prison. The Government of Israel requested Hinawi's transfer to Israeli authorities on September 22, 1997. The Palestinian Authority has not responded to that request.

Both Hinawi and Al-Sharif were known members of the military wing of Hamas. Hamas is an extremist Palestinian militant organization that seeks to establish a fundamentalist Palestinian state. It is organized into two branches: one military and one political. The military branch receives orders and material support from the political branch. Hamas' central purpose is to advance political objectives through acts of terrorism. According to plaintiffs, Hamas seeks to undermine the Middle East peace process through violent attacks against civilians. Its tactics include shootings and bombings to intimidate and kill civilians.

By Executive Order 12947, signed on January 23, 1995, and entered into the Federal Register on January 25, 1995,[2] President Clinton designated Hamas a "foreign terrorist

---

[2]     The Federal Register from January 25, 1995, reads:
"On January 23, 1995, President Clinton signed Executive Order 12947, 'Prohibiting Transactions with Terrorists Who Threaten To Disrupt the Middle East Peace Process' (the 'Order'). The Order blocks all property subject to U.S. jurisdiction in which there is

organization," as defined in 8 U.S.C. § 1189, that was threatening to disrupt the Middle East peace process.

Hamas' organizational presence is global. Terrorist operatives in Gaza and the West Bank receive their instructions, as well as the funds, weapons, and practical support they need to carry out their missions, from Hamas organizers throughout the world. Upon information and belief, Hamas currently has command and control centers in the United States, Britain, and several Western European countries. The leaders of these control centers coordinate fund-raising from sympathetic parties in these countries, they launder and channel money to Hamas operatives in the West Bank and Gaza, they arrange for the purchase of weapons and the recruitment and training of military personnel, and they work with local commanders in the West Bank and Gaza to plan terrorist attacks.

The organization's military wing depends on foreign contributions solicited by these overseas control centers. Approximately one-third of Hamas' multi-million dollar annual budget comes from fund-raising activity in North America and Western Europe. Hamas' other sources of funding include local contributions and support from several Middle Eastern governments.

---

any interest of 12 terrorist organizations that threaten the Middle East peace process as identified in an Annex to the Order. The Order also blocks the property and interests in property subject to U.S. jurisdiction of persons designated by the Secretary of State, in coordination with the Secretary of Treasury and the Attorney General, who are found (1) to have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process, or (2) to assist in, sponsor or provide financial, material, or technological support for, or services in support of, such acts of violence." 60 Fed. Reg. 5084.

Defendants assert that Hamas became a designated terrorist organization in October 1997 (HLF's reply at 3 and Amicus Brief at 1 (citing 62 Fed. Reg. 52,649-51 (October 8, 1997))) or in October 1999 (IAP/AMS/AMELP's reply at 3 (citing 64 Fed. Reg. 55112 (October 8, 1999))).

Hamas' presence in the United States is significant but covert. It conducts its affairs

through a network of front organizations that ostensibly have religious and charitable purposes.

Upon information and belief, the organizational defendants in this case are Hamas' main fronts

in the United States. These organizations' purportedly humanitarian functions mask their

mission of raising and funneling money and other resources to Hamas operatives to support their

terrorist campaigns.[3]

Defendant Quranic Literacy Institute ("QLI") is a not-for-profit organization incorporated

in the State of Illinois with offices in Oak Lawn, Illinois. QLI translates and publishes sacred

Islamic texts, but, upon information and belief, QLI was and is also engaged in raising and

laundering money for Hamas.

Defendant Mohammed Abdul Hamid Khalil Salah ("Salah"), a/k/a Abu Ahmed, is a

naturalized U.S. citizen born in Jerusalem and currently residing in Illinois. Salah is the admitted

U.S.-based leader of the military branch of Hamas. Salah has been prosecuted for channeling

money to Hamas and recruiting, organizing, and training terrorist operatives in Israel. He was

incarcerated in Israel from January 1993 to November 1997, during which period he admitted

channeling money for Hamas operations. He returned to the United States after his release.

Salah is named on the list of Specifically Designated Terrorists compiled by the U.S. Treasury

---

[3]     The National Coalition to Protect Political Freedom, which has filed an amicus
curiae brief, points out that Hamas also "devotes extensive human and financial resources to its
widespread social welfare programs. Hamas provides Palestinians in the Occupied Territories of
the West Bank and Gaza with economic assistance, health care, and education." Written
testimony of Mary A. Ryan, Assistance Secretary for Consular Affairs, U.S. Dept. of State,
before the Subcommittee on International Law, Immigration and Refugees of the House
Judiciary Committee (Feb. 23, 1994).

Department's Office of Foreign Assets Control, and he was recently the subject of a major FBI investigation. Pursuant to that investigation, the United States initiated a civil forfeiture action to seize funds it alleged "were transferred to financial institutions within the United States from abroad with the intent to support the international terrorist activities of the HAMAS organization in violation of the Money Laundering Control Act of 1986." *See United States v. One 1997 E3J Ford Van,* 50 F.Supp.2d 789 (N.D.Ill. 1999) (granting in part and denying in part claimants' motions to dismiss).[4]

Salah was nominally employed by QLI as a computer analyst. There are, however, no records of regular periodic payments to Salah, and QLI now denies having employed him at any time. The FBI has been investigating QLI since 1989 as part of a larger nationwide terrorist money-laundering probe. In June 1997, FBI agents confiscated $1.4 million in cash and property from Salah.

Defendant Mousa Mohammed Abu Marzook ("Marzook"), a/k/a Abu Omar Musa, is a native of Gaza who resided in the United States from 1973 to 1993. He received permanent resident alien status in 1990. Marzook served for many years as the admitted leader of the political wing of Hamas in the United States. Marzook traveled between the United States and the Middle East, appointed Hamas military commanders, and used his personal bank account to distribute funds to these Hamas operatives. From 1993 to 1995, Marzook resided principally in

---

[4]        In *United States v. One 1997 E3J Ford Van, et al.* (case number 98 C 3548), the United States has seized funds of defendants Quranic Literacy Institute and Mohammed Salah. Plaintiffs have attached the verified complaint and affidavit of Special Agent Robert Wright from that case to their complaint. Documents attached to a complaint are incorporated into it and become part of the pleading itself. Fed.R.Civ.Proc. 10(c).

Jordan, which deported him in June 1995 for his involvement in Hamas. In July 1995, U.S. Customs Service and U.S. Immigration and Naturalization Service officials arrested Marzook, at the request of the Israeli government, as he attempted to reenter the United States. In May 1996, a United States District Court ordered Marzook's extradition to Israel to stand trial for offenses connected to Hamas-sponsored terrorism, including murder, attempted murder, and conspiracy. The Israeli government thereafter dropped its request for extradition. Marzook was deported to Jordan in 1997. In 1999, he was deported from Jordan when Jordan's King Abdullah closed the Hamas Political Bureau headquarters in Amman and deported the leadership of the movement, including Marzook. Upon information and belief, Marzook is currently living in the United Arab Emirates or Syria.

Defendant Holy Land Foundation For Relief and Development ("HLF") is a California corporation with a branch office in Illinois and a certificate to conduct business within Illinois. HLF was originally incorporated in California in 1989 under the name "Occupied Land Fund." HLF's American base of operations is currently in Texas.

HLF also operated an office in Jerusalem. The director of that office admitted HLF had provided funds to Hamas. In the United States, HLF is organized as a not-for-profit charitable organization whose ostensible mission is to fund and conduct a variety of humanitarian relief and development efforts. Upon information and belief, however, HLF also functions as a front organization for Hamas. Upon information and belief, HLF is actively involved in raising and channeling funds to Hamas agents to finance terrorist activities in Israel.

Defendant Islamic Association For Palestine ("IAP") is a Texas corporation. IAP was originally incorporated in Illinois in 1981, but it was dissolved in 1991 for failure to file an

annual report. IAP was also incorporated in California in 1986, but its corporate status there was frozen in 1988 for failure to pay a franchise tax. IAP incorporated as a separate entity in Texas in 1993. IAP is a not-for-profit organization ostensibly dedicated to disseminating information on and promoting discussion of the Israeli-Palestinian conflict. Upon information and belief, these activities serve as a cover for IAP's function as a major fund-raiser and financier for the network of front organizations which support Hamas's terrorist activities.

Defendant American Muslim Society ("AMS") is an Illinois corporation that functions as the Chicago branch office of IAP. AMS incorporated in Illinois in 1993. In 1994, AMS applied for the name of "Islamic Association for Palestine in Chicago." Upon information and belief, AMS has been an active participant in the network of front organizations that provide funds to Hamas terrorists.

Defendant American Middle Eastern League For Palestine ("AMELP") is a Texas corporation that operates in conjunction with IAP. Prior to its incorporation in 1990, AMELP operated as the Texas branch office of IAP. When AMELP incorporated separately in 1990, it applied for two names: the "IAP Information Office" and the "Islamic Association for Palestine in North America." AMELP thereafter remained under the control of IAP and now provides services and support to IAP in Texas. Upon information and belief, these activities include participation in IAP's fund-raising and channeling of money to Hamas operatives.

Defendant United Association For Studies and Research ("UASR") is an Illinois corporation incorporated in 1989. In 1992, UASR incorporated in Virginia, where its headquarters are now located. UASR conducts research on Mideastern and Islamic topics. Upon

-9-

information and belief, these activities serve as a cover for UASR's function as the political command center of Hamas in the United States.

Defendants Mohammed Salah and Mousa Mohammed Abu Marzook have coordinated Hamas' fund-raising and money-laundering operations in the United States. As head of the political wing of Hamas operating from the United States, defendant Marzook issued instructions to Salah, the head of the military wing, for raising and channeling money to Hamas terrorists. Marzook admitted in a Preliminary Statement appended to his Petition for Writ of Habeas Corpus filed on November 16, 1995, that he is the leader of the political wing of Hamas and that he has raised money for Hamas. Evidence presented in *Matter of Extradition of Marzook*, 924 F. Supp. 565 (S.D.N.Y. 1996), established that Marzook (a) transferred funds to Salah, (b) recruited Salah to organize Hamas military fund-raising in the U.S., (c) knew that Hamas operatives were carrying out terrorist attacks in Israel, and (d) gave one of the organizers of these terrorist operations a book of blank signed checks to finance Hamas' operations. Statements Salah made to Israeli authorities corroborated these conclusions.

Defendant Salah's role in the fund-raising and money-channeling scheme was investigated and described in detail by FBI agents in *United States v. One 1997 E35 Ford Van*, a civil forfeiture action also pending in the Northern District of Illinois. The FBI affidavit in that action declares that from 1988 until his arrest by Israeli authorities in January 1993, defendant Salah 1) actively recruited Hamas terrorists, 2) arranged for and directly financed their training, 3) served, at defendant Marzook's request, as a financial conduit for Hamas operations directed from the U.S., 4) paid for plane tickets to transport trained terrorists from the U.S. to the Middle

East, and 5) gave approximately $100,000 to another Hamas operative for the express purpose of procuring weapons.

In the proceedings in *United States v. One 1997 E35 Ford Van*, the United States alleged that defendants Marzook and Salah employed a number of charitable organizations in the United States to raise and launder money for Hamas. Salah told Israeli authorities that he received money from 31 charitable organizations that solicited contributions on behalf of Hamas, as well as from a network of mosques in Chicago. The identities of all Hamas front organizations are not known at this time, but upon information and belief, the named defendant organizations HLF, IAP, AMELP, and AMS are among them. These front organizations are linked by interlocking directorates, and have ties to defendants Salah and Marzook. Upon information and belief, the following links have been established to date:

IAP and AMELP: IAP and AMELP have the same telephone number and the same registered office listing in incorporation records. AMELP distributes IAP's publications and it serves as the tax-exempt conduit for IAP and as the means by which the IAP files IRS Form 990 (Return of Organization Exempt from Income Tax). AMELP's Form 990 lists a telephone number and mailing address for AMELP that is identical to IAP's telephone number and mailing address. Additionally, two past presidents of IAP, Yasser K. Salah Bushnaq and Omar Ahmad, are currently on the board of AMELP.

IAP and AMS: The previous president of IAP, Rafeeq Jaber, is the current president of AMS. AMS works closely with IAP in coordinating events and publications. The editor of IAP's publication *Al-Zaituna-Chicago* is a member of the board of AMS. IAP holds its convention in Illinois and uses AMS's phone number as the contact.

<u>IAP and HLF</u>: Ghassan Elashi, served as the incorporator for both IAP in California in 1986 and HLF in California in 1989. He also served as treasurer of HLF from 1988-1993. HLF's Secretary and Executive Director, Shukri Abu Baker, served as a member of IAP's advisory board. Kifah Mustapha, HLF's registered agent in Illinois, organized the programming for IAP's 1999 Annual Conference.

<u>HLF and AMELP</u>: HLF's Director of Health, Ahmed Agha, is member of the board of AMELP.

<u>IAP and Marzook</u>: Marzook served as a member of IAP's advisory board and served as its chairman in 1988-90.

<u>UASR and Marzook</u>: Marzook served as an original Director of UASR and as its president in 1990-1991.

<u>AMELP, Marzook, and Salah</u>: Marzook shared a joint bank account with a member of the Board of Directors of AMELP, Ismael Elbarasse, whom Salah named in his statement to the Israeli authorities as a Hamas operative. During Marzook's extradition proceedings, evidence was presented that funds were transferred from this joint bank account to Salah while Salah was rebuilding Hamas units in the West Bank and Gaza. *See Marzook*, 924 F. Supp at 587, 592.

<u>QLI and Salah</u>: Salah says that he is employed as a computer analyst at QLI. QLI has been identified by the FBI as the vehicle through which Salah channeled hundreds of thousands of dollars to Hamas operatives outside the United States between 1991 and 1993.

Money flows from American contributors to Hamas terrorist operatives in the West Bank and Gaza through a three-step process: 1) the front organizations solicit contributions; 2) the leaders arrange for the money to be laundered and wired overseas; 3) Hamas operatives in the West Bank and Gaza use the money to finance terrorist activities.

The front organizations solicit contributions directly and through mosques in heavily Islamic areas in Illinois and Texas. HLF also solicits donations over the Internet.

Because it is illegal to provide financial support to recognized terrorist groups, the collected money flows through a complicated series of transactions, changing hands several times and typically being commingled with funds from the front organizations' legitimate business and charitable dealings before being transferred overseas.

Defendant Marzook instructed Salah as to which units, operatives, and activities in the West Bank and Gaza were to receive the funds. Marzook also acted, in some cases, as an originator of funds, transferring them to Salah to be laundered and sent overseas.

Various means are used to launder money. One method of generating income and laundering money is real-estate deals. Other money-laundering transactions involved direct transfers from Marzook's bank account to Salah's. Money was also transferred via Swiss bank accounts. Upon information and belief, the money transferred in this manner included funds raised by the defendant front organizations. The organizations sometimes transferred funds directly into Salah's U.S. accounts without using any Swiss intermediary.

Salah sent money to Hamas operatives in the West Bank and Gaza through an unlicensed money-changer in Chicago. Upon information and belief, funds collected in the United States were sent to Hamas operatives for the purpose of financing terrorist activities. Defendant

Marzook signed blank checks and gave them to Hamas military commanders appointed by him, with instructions to use them to finance their operations. Defendant Marzook also opened local bank accounts in the Middle East to which Hamas operatives had access. Salah delivered money to Hamas military operatives for the express purpose of procuring weapons. The attached FBI affidavit describes travel by Salah to the West Bank in December 1992 at Marzook's request to carry out five Hamas missions. Shortly before Salah's departure, according to the FBI affidavit, hundreds of thousands of dollars were transferred into Salah's account from an account jointly held by Marzook and Ismael Elbarasse of AMELP. These funds were used for terrorist activities.

The final step in the process is for Hamas operatives in the West Bank and Gaza to use the money wired from the United States to buy weapons and carry out terrorist attacks, including the attack on David Boim. Funds were drawn from a pool of such funds by Hamas military organizers to finance training, weaponry, lodging, false documentation/identification, communications equipment, facilities, lethal substances, explosives, personnel, transportation, and other material support. Money from this pool also went to pay stipends to the families of Hamas terrorists "killed in action" to encourage others to volunteer for suicide missions. Upon information and belief, among the expenditures paid for by this pool of money were the vehicle, machine guns, and ammunition used to kill David Boim, and the training of Hinawi, Al-Sharif, and other Hamas operatives involved in this attack. The funds were also used to provide a stipend for Al-Sharif's family.

### Plaintiff's Claim

Plaintiffs bring this action in their own right and on behalf of the Estate of David Boim and David's heirs-at-law, in accordance with 18 U.S.C. § 2333(a), seeking treble damages for

their injuries and other relief, including an injunction against defendants ordering them to cease

collecting funds for Hamas. Plaintiffs claim that the defendants are civilly liable under 18 U.S.C.

§ 2333 for the murder of David Boim, which occurred in the course of terrorist activities outside

the United States. They claim that while defendants Hinawi and Al-Sharif actually committed

Boim's murder, these two defendants were, on information and belief, aided, abetted, and

financed by the other defendants named in this complaint. Plaintiffs allege that the organizations

named in the complaint provided material support or resources to Hamas as defined in 18 U.S.C.

§§ 2339A and 2339B.

All of the defendants who have been served with process in this case except one[5] have

moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure on

the grounds that the federal statute that was invoked by the plaintiffs–18 U.S.C. § 2333–does not

render them liable for the murder of an American citizen committed abroad by international

terrorists unless they have participated directly in that murder.

### Standard for Motions to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)

When ruling on a motion to dismiss, the court must consider "whether relief is possible

under any set of facts that could be established consistent with the allegations." *Pokuta v. Trans*

*World Airlines, Inc.*, 191 F.3d 834, 839 (7th Cir.1999) (citing *Conley v. Gibson*, 355 U.S. 41,

45-46 (1957)). In other words, if it is possible to hypothesize a set of facts, consistent with the

---

[5]     The defendants filing motions to dismiss include Mohammed Salah (Salah), Quranic
Literacy Institute (QLI), Holy Land Foundation for Relief and Development (HLF), Islamic
Association for Palestine (IAP), American Muslim Association (AMS) and American Middle
Eastern League for Palestine (AMELP). We refer to these defendants collectively in this brief as
"defendants." Defendant United Association for Studies and Research has been served but has
not filed a motion to dismiss.

allegations in the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate. *See Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir.1995). "(A) plaintiff in suit in federal court need not plead facts; he can plead conclusions," although "the conclusions must provide the defendant with at least minimal notice of the claim." *Jackson v. Marion County*, 66 F.3d 151, 153-54 (7th Cir.1995) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160 (1993)). "The only function the pleadings must serve is to give notice of the claim; the development of legal theories and the correlation of facts to theory come later in the process." *International Marketing, Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 733 (7th Cir.1999). The court need not, however, accept conclusory legal allegations as true. *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 730 (7th Cir.1994). A plaintiff may supplement her complaint with additional facts in an affidavit or brief to defeat a motion to dismiss if these facts are consistent with the allegations in the complaint. *Hentosh v. Herman M. Finch University*, 167 F.3d 1170, 1173 n. 3 (7th Cir. 1999); *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997).

Although defendants vigorously deny the plaintiffs' allegations and stress the legitimate and humanitarian purposes of their organizations, at this stage of the proceedings, the court tests only the sufficiency of the allegations in the complaint. With the above-quoted standards in mind, the court turns to the defendants' motions to dismiss.

### Motions to Dismiss

Defendants claim that plaintiffs' cause of action against them is based on a theory that they "aided and abetted" acts of international terrorism under 18 U.S.C. § 2333. Defendants maintain that § 2333 does not support such a cause of action and that plaintiffs' suit is foreclosed

by the U.S. Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S. Ct. 1439 (1994).[6]

In *Central Bank*, the U.S. Supreme Court addressed whether a private right of action was available under § 10(b) of the 1934 Securities Exchange Act against defendants who had allegedly aided and abetted a violation of the Act but who were not themselves charged with primary violations. The Court found that Congressional intent for a civil cause of action for aiding and abetting could not be found in the text of the statute. To the extent that lower courts had found an implied private right of action for aiding and abetting in § 10(b), the Court found that they had gone beyond the statute's plain language. *Id.* at 170, 1444. Nor had Congress "enacted a general civil aiding and abetting statute" for suits by private parties. *Id.* at 182. Therefore, there could be "no general presumption that the plaintiff may also sue aiders and abettors." *Id.*

Defendants assert that the allegations in the complaint make clear that plaintiffs' only theory of liability is that the defendants aided and abetted David Boim's murder. They argue that the text of § 2333, which provides for a civil cause of action for those injured by an act of international terrorism, does not mention liability for aiding and abetting. They claim that plaintiffs' action is therefore an attempt to go beyond the plain language of the statute and read into § 2333 an implied right to sue those who are not direct participants in international terrorism. The defendants conclude that the complaint must be dismissed because it does not allege that Salah "participated directly in the murder," that "an employee of the [QLI] pulled the

---

[6]     In fact, defendants are so certain that plaintiffs' cause of action is legally unwarranted that they have also filed Fed.R.Civ.P. 11 motions for sanctions.

trigger" of the gun that killed David Boim, or that HLF, IAP, AMS or AMELP actually participated in the murder. Because, according to defendants, *Central Bank* bars the court from finding that an implied aiding and abetting cause of action exists, plaintiffs complaint must be dismissed.

Plaintiffs respond that the defendants are incorrect that their sole theory of recovery is one for aiding and abetting principals Hinawi and Al-Sharif in the murder of David Boim. They argue that according to the text of 18 U.S.C. §§ 2331, 2333, any participant in "international terrorism" is liable for the consequences of such "international terrorism," whether or not that participant directly committed or suborned the violent act that caused the harm. They claim that they are alleging that all of the defendants have themselves directly committed an "act of international terrorism" that harmed the plaintiffs. In other words, plaintiffs are asserting that the funding of a terrorist organization is itself an act of "international terrorism" under § 2331. In addition, plaintiffs respond that the text of § 2333 does in fact extend civil liability to aiders and abettors of "international terrorism."

### The Definition of International Terrorism

The court will first address plaintiffs' two-fold theory that funding terrorists or terrorist groups is itself a direct act of "international terrorism." Section 2333 states:

> [a]ny national of the United States injured in his or her person, property or business by reason of an act of international terrorism ... may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

Plaintiffs maintain that they have been injured "by reason of an act of international terrorism" and are bringing a civil action "therefor." The term "international terrorism" is defined in 18 U.S.C. § 2331(1). The definition reads, in full, as follows:

> The term "international terrorism" means activities that—
> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
> (i) to intimidate or coerce a civilian population;
> (ii) to influence the policy of a government by intimidation or coercion; or
> (iii) to affect the conduct of a government by assassination or kidnaping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.[7]

To discern Congressional intent as to what it intended to constitute "international terrorism," the court must begin its analysis with the plain language of the statute itself. *U.S. v. Wagner*, 29 F.3d 264, 266 (7th Cir. 1994) (citing *United States v. Rosado*, 866 F.2d 967, 969 (7th Cir.1989) (citations omitted). The court must therefore examine the pertinent phrase

---

[7] The defendants do not dispute plaintiffs' assertion that the activities alleged in the complaint meet the prongs (B) and (C) of the definition of "international terrorism" under § 2331. Plaintiffs state that providing material support to achieve Hamas' goals in "undermin[ing] the Middle East peace process through violent attacks on civilians" is "intended to coerce a civilian population" and "influence the policy of [the Israeli] government." 18 U.S.C. § 2331(1)(B). Likewise, the transmission of funds to Hamas from the United States to the West Bank, often using Swiss banks as intermediaries "transcends national boundaries in the means by which they are accomplished." 18 U.S.C. § 2331(1)(C).

"activities that—involve violent acts or acts dangerous to human life." *Merriam-Webster's Collegiate Online Dictionary*, http://www.m-w.com/dictionary.htm., defines "involve" as: "to engage as a participant" or "to oblige to take part." The question the parties have presented to the court is: how far removed from a violent act can an action be and still be an activity "involved" in that violent act?

"Attempts to reach a fixed, universally accepted definition of international terrorism have been frustrated both by changes in terrorist methodology and the lack of any precise definition of the term 'terrorism.' *See, e.g.*, U.S. Dept. of State, *Patterns of Global Terrorism* [1995 (April 1996)] at vi, 1, 17; Louis Rene Beres, *The Meaning of Terrorism–Jurisprudential and Definitional Clarifications*, 28 Vand. J. Transnat'l L. 239 (1995). Therefore, the United States characterizes rather than enumerates acts for the purposes of designating foreign state sponsors of terrorism and defining criminal terrorist offenses under federal law." *Flatow v. The Islamic Republic of Iran*, 999 F.Supp. 1, 17 (D.D.C. 1998) (discussing definitions of "terrorism" in the U.S. Code, including that contained in § 2331(1)).

Plaintiffs claim that nothing in the definition of international terrorism requires that the act itself be a violent act, such as murder, and that Congress clearly included actions besides the violent act itself in the definition. Rather, they claim, the language of the statute addresses all *"activities that . . . involve* violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States." 18 U.S.C. § 2331(1)(A) (emphasis added). According to plaintiffs' theory, sponsoring violence by providing money or other material support that facilitates the recruiting and training of terrorists, enables the purchase of weapons or provides "compensation" to the families of terrorists who die in the attacks–knowing that the support will

enable the terrorists to plan and carry out the bombing or shooting of others–is an "activity" that *"involves* violent acts" that are a violation of federal law and therefore meets the definition of "international terrorism" in § 2331(1)(A). David Boim's murder was a violent act that transgressed 18 U.S.C. § 2332, which prohibits the killing of a United States national while outside the United States. Therefore, according to plaintiffs, the defendants' provision of money and other resources to set up the infrastructure used to recruit and train Boim's murderers, buy their weapons, and compensate the family of one of the murderers "involves" his murder, and, under the plain language of § 2331(1)(A), constitutes an act of international terrorism.

Defendants respond that neither the language of the statute itself nor the Congressional Record provide support for the argument that § 2333 should apply to anyone other than the "known terrorists who committed the injury." They claim that Senator Tom Daschle proposed the Act to reach *"terrorists'* assets and seize them" and that this statement is evidence that only the actual terrorist who committed the injury can be reached by § 2333. 137 Cong. Rec. S4511 (April 16, 1991) (emphasis added). Of course, that is only true if Senator Daschle had in mind the same definition of "terrorist" that defendants do, a question his comment does not answer. "This domestic legislation attempts to thwart terrorism by realizing the twin objectives of attacking the financial apparatus of terrorist groups and enhancing the power of private citizens as combatants in the war against international terrorism." *The Antiterrorism Act of 1990: Bringing International Terrorists to Justice the American Way,* Jennifer A. Rosenfeld, 15 Suffolk Transnat'l L.J. 726, 728 (1992) (noting that "international terrorists derive a vast amount of their violent strength and capability from financial sponsorship").

Defendants further claim that plaintiffs' interpretation would expand the application of § 2333 to supporters of terrorist organizations without requiring that support to have been made "knowingly." They claim that this could result in the following scenario: "an American charitable organization could be found to support terrorism, and, therefore, be liable for the acts of a terrorist attack since that charitable organization may provide money to a foreign charity that, in turn, gives the money to a person who, in turn, gives the money to a terrorist." Defendants also point out that Congress would not have needed to amend the statutory scheme, adding sections that prohibit providing support or resources to terrorists or terrorist organizations, if § 2331(1)(A) on its face included such activity.

The court simply does not read plaintiffs' interpretation of § 2331(1)(A) as one that would allow a contribution to an organization that is, unbeknownst to the contributor, funding a terrorist group to result in a finding that the contributor committed an act of terrorism. Nor does it view plaintiffs' complaint as failing to specify that defendants' actions were knowing and intentional.[8] The court is concerned, however, that plaintiffs' interpretation of "activities involving" is so broad that it provides little guidance to courts concerning where to draw limits or as to what behavior Congress intended to falls under it. Contributions from the United States to a foreign organization, without a further allegation of participation, appear too far removed to constitute direct acts of international terrorism.

On the other hand, however, the court finds that defendants' narrow interpretation of the statute–that only the perpetrators of the violent act itself are covered–renders the words

_____

[8] Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Fed.R.Civ.P. 9(b).

Defendants further claim that plaintiffs' interpretation would expand the application of § 2333 to supporters of terrorist organizations without requiring that support to have been made "knowingly." They claim that this could result in the following scenario: "an American charitable organization could be found to support terrorism, and, therefore, be liable for the acts of a terrorist attack since that charitable organization may provide money to a foreign charity that, in turn, gives the money to a person who, in turn, gives the money to a terrorist." Defendants also point out that Congress would not have needed to amend the statutory scheme, adding sections that prohibit providing support or resources to terrorists or terrorist organizations, if § 2331(1)(A) on its face included such activity.

The court simply does not read plaintiffs' interpretation of § 2331(1)(A) as one that would allow a contribution to an organization that is, unbeknownst to the contributor, funding a terrorist group to result in a finding that the contributor committed an act of terrorism. Nor does it view plaintiffs' complaint as failing to specify that defendants' actions were knowing and intentional.[8] The court is concerned, however, that plaintiffs' interpretation of "activities involving" is so broad that it provides little guidance to courts concerning where to draw limits or as to what behavior Congress intended to falls under it. Contributions to a foreign organization that come from the United States, without a further allegation of participation by the contributor, appear too far removed to constitute direct acts of international terrorism.

On the other hand, however, the court finds that defendants' narrow interpretation of the statute–that only the perpetrators of the violent act itself are covered–renders the words

---

[8] Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Fed.R.Civ.P. 9(b).

"activities involving" in the sentence "activities involving violent acts or acts dangerous to human life" surplusage. "That is an impermissible construction that conflicts with the maxim that we are to give effect, if possible, to every clause and word of a statute." *Wagner*, 29 F.3d at 266 (citations and internal quotations omitted). If Congress had intended such as effect, it could have written the statute as: "international terrorism means violent acts or acts dangerous to human life." It did not. Defendants' conclusion that "terrorist" means only the individual who throws the bomb or shoots the gun is therefore not supported by the text of § 2331(1).

The parties cite no case law for their respective positions and the court has found only one case in which the court directly addressed the question of how far the definition of "international terrorism" in § 2331(1)(A) reaches. One court has grappled with the question of what type of activity involving violent acts constituted domestic "terrorism." In *U.S. v. Wells*, the defendant was convicted of 12 counts of mail fraud, conspiracy to commit bank fraud, interference with Internal Revenue Service officials, and conspiracy to commit interstate transportation of stolen property. *U.S. v. Wells*, 163 F.3d 889, 892 (4th Cir. 1998), *cert. denied*, 528 U.S. 841, 120 S.Ct. 109 (Oct. 04, 1999). The district court had imposed an upward departure from the sentencing guidelines because of the defendant's acts of terrorism. *Id.* at 898-900. The defendant appealed, arguing as defendants do here that his activities did not amount to terrorism because they were not "violent."

Because there had been no specific sentence enhancement for "domestic terrorism" at the time the acts were committed (the district court had relied on the catch-all provision to increase Wells' sentence), the Fourth Circuit explicitly relied on § 2331(1)'s definition of "international terrorism" to determine whether the defendant's activities indeed qualify as terrorist acts.

-23-

Although Wells had been affiliated with the Montana Freemen Organization, an anti-government

group, he claimed that "the statute does not contemplate plans or schemes, but 'acts.'" *Id*. at 899.

He argued that although the Freemen had discussed violence toward government officials, they

had not carried through with their plans.[9]

The Fourth Circuit disagreed. The court rejected Wells' contention that his actions did

not qualify as "terrorism" because he committed no violent acts. *Id*. It found that the following

did constitute "international terrorism": participating in a grand jury of the "court" the Freemen

established to try officials; buying a Chevrolet Suburban that was to be used to abduct

government officials, who would later be hanged; actively participating in the Freeman group,

despite knowing its violent goals; and helping the group prepare. *Id*. at 899. The court found

that the defendant "knew of the Freemen's plans [and] was involved in them." *Id*.

This interpretation of the statute, which comports with this court's analysis of it, reaches

beyond the violent act itself to the individuals who knew about the violent act and participated in

the preparation of the plan to commit the violent act. With the exception of defendant Salah,[10]

who plaintiffs allege has channeled money to Hamas; recruited, organized, and trained terrorist

operatives in Israel; and given substantial amounts of cash to another Hamas operative for the

express purpose of procuring weapons, the actions of the organizational defendants do not rise to

the level of involvement in terrorist activities that the Fourth Circuit found to have occurred in

*Wells*. The court finds that as to the remaining defendants, therefore, allegations of contributions

---

[9]     Wells argued that he was being punished merely for being a member of the
Freemen organization, which he contended violated his First Amendment rights.
[10]     Keeping in mind that the court is considering only the defendants that have filed
motions to dismiss.

to foreign terrorists groups, without more direct dealing with the group, does not constitute an

"activity involving violence acts or acts dangerous to human life."

Defendants' previous pointed out that Congress amended the statutory scheme, adding

provisions that prohibit providing material support or resources to terrorists or terrorist

organizations. This leads the court to plaintiffs' second basis for arguing that defendants' alleged

conduct constituted direct acts of "international terrorism" under § 2331(1)(A). Congress added

§ 2339A in 1994 and § 2339B in 1996. Section 2339A, entitled "Providing material support to

terrorists," states:

> Whoever, within the United States, provides material support or resources[11] or conceals
> or disguises the nature, location, source, or ownership of material support or resources,
> knowing or intending that they are to be used in preparation for, or in carrying out, a
> violation of section . . . 2332 of this title . . . shall be fined under this title, imprisoned not
> more than 10 years, or both.

Section 2339B, entitled "Providing material support or resources to designated foreign terrorist

organizations" states:

> Whoever, within the United States or subject to the jurisdiction of the
> United States, knowingly provides material support or resources[12] to a
> foreign terrorist organization, or attempts or conspires to do so, shall be
> fined under this title or imprisoned not more than 10 years, or both.

---

[11]      Section 2339A(b) defines "material support or resources" as:
currency or other financial securities, financial services, lodging, training,
safehouses, false documentation or identification, communications equipment,
facilities, weapons, lethal substances, explosives, personnel, transportation, and
other physical assets, except medicine or religious materials.


[12] This section explicitly adopts the definition of "material support or resources" from
§ 2339A. 18 U.S.C. § 2339B(g)(4).

Plaintiffs maintain that when Congress amended the statutory scheme to criminalize providing material support or resources to terrorists and terrorist organizations, it clarified that this was indeed an activity that *involved* violent acts or acts dangerous to human life under § 2331(1). Therefore, defendants' alleged acts constitute acts of international terrorism because § 2331(1) must be read in conjunction with the other provisions of the statutory scheme. Further, § 2333, which allows a civil cause of action for acts of international terrorism, allows those injured by such acts to sue those who violated §§ 2339A or 2339B.

Although the court found that the language of § 2331, standing by itself, does not clearly include the organizational defendants' alleged actions, it agrees that Congress did provide additional guidance in the these sections of the statutory scheme. "The meaning of a statutory section cannot be ascertained when considered apart from related sections. The appropriate context of statutory interpretation includes the statutory scheme and the real-world situation to which the language pertains." *American Society of Cataract and Refractive Surgery v. Shalala*, 94 F.Supp.2d 914, 924-25 (N.D.Ill. 2000) (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 1223 (1998) (language, structure, subject matter, context, and history of a statute help determine its objectives and illuminate its text)).

Further support for the position that Congress viewed the provision of material support and resources to terrorists as "international terrorism" can be found when examining other statutory provisions addressing international terrorism. Congress repealed the jurisdictional immunity of a foreign state that has been designated a state sponsor of terrorism when the state is sued for personal injury or death caused by the country's provision of material support or resources to terrorists as defined in § 2339A. 28 U.S.C. § 1605(a)(7). "The state sponsored

terrorism exception to immunity of foreign states was enacted as part of a comprehensive legislative initiative to squelch international terrorism." *Flatow*, 999 F.Supp. at 17. Considering Congress has permitted foreign states that have been designated state-sponsors of terrorism to be sued in United States courts for violating § 2339A, it is hard to argue that Congress did not intend to include such violations in its definition of "terrorism" under the statutory scheme. The court finds that §§ 2339A and 2339B clearly indicate that Congress did view such violations as "activities involving violent acts or acts dangerous to human life." "If the court determines Congress' intent is clear, that is the end of the matter." *American Society*, 523 U.S. at 925.

Nor is there any merit to defendants' argument that §§ 2339A and 2339B cannot apply here because plaintiffs are asking the court to imply a civil cause of action from a criminal statute. Although they are correct that § 2333 does not itself contain the prohibitions of §§ 2339A and 2339B, and states only that those injured by an act of international terrorism may sue for damages, the court has just established that violations of §§ 2339A and 2339B fall under the definition of "international terrorism." A plaintiff who has been injured by an act of international terrorism can sue "therefore" pursuant to § 2333. Also, §§ 2339A and 2339B require that the support had to have been both "knowing" and "material." This avoids the consequence defendants foresee of any financial contributor to Hamas being liable for the injuries Hamas causes, in perpetuity, no matter how small the original contribution was.

Defendants further contest the validity of plaintiffs' claim because §§ 2339A and 2339B were not in effect during the time plaintiffs have alleged that defendants were funding Hamas. They claim that plaintiffs cannot rely on these provisions to support a cause of action under

§ 2333 against the organizational defendants for actions that allegedly occurred in 1991-93. Because Hamas was not designated a terrorist organization until 1997,[13] defendants maintain that they cannot be held liable for material support to Hamas until after that date and therefore cannot be liable for David Boim's murder because it occurred before that date.

Although applying a statute to conduct that occurred before its enactment is traditionally disfavored, the exception to foreign-state immunity established in § 1605(a)(7) explicitly had retroactive effect. *See Flatow*, 999 F.Supp. at 13. There is no indication that Congress intended §§ 2339A and 2339B to have the same retroactive effect when applied to individuals. *See U.S. v. McVeigh*, 153 F.3d 1166, 1193 (10th Cir. 1999), *cert. denied*, 526 U.S. 1007, 119 S.Ct. 1148 (Mar. 8, 1999) (applied the provisions of § 2332a(a)(2) as they had existed in 1995, when the terrorist act took place). Plaintiffs, however, deny that their allegations concerning defendants' contributions to Hamas are limited to 1991-93. They assert first that their allegations concerning contributions that occurred in 1991-93 permit an inference that such funding continued after that date. Also, the plaintiffs stress that the allegations in the complaint concerning funding are clearly not limited to the period from 1991-1993. Rather, they allege in the complaint, for example, that "QLI was *and is* [] engaged in raising and laundering money for Hamas" (emphasis added).[14] Section 2339A could also apply here as it was enacted in 1994, before David Boim's death.

---

[13] The defendants have not addressed plaintiffs' contention that Hamas was designated a terrorist organization in 1995 or whether § 2339B applied immediately to organizations that had already been so designated.

[14] As previously noted, the complaint contains allegations of more extensive involvement regarding defendant Salah.

## Liability for Aiding and Abetting International Terrorism

To directly reach the organizational defendants' actions that occurred before 1994, however, plaintiffs would have to succeed on a theory of aiding and abetting liability under §§ 2331 and 2333. Plaintiffs' state that the plain language of the statute supports such a theory.

Again, defendants rely on the Supreme Court's holding in *Central Bank* to counter this assertion and to support their position that the Supreme Court specifically found that Congress had not attached aiding and abetting liability to all federal civil statutes. "(W)hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.*, 511 U.S. at 182, 114 S.Ct. at 1450-51.

In *Central Bank*, however, the Supreme Court did not, as defendants suggest, hold that aiding and abetting is generally precluded from federal civil causes of action. It noted that "Congress instead has taken a statute-by-statute approach to civil aiding and abetting liability." *Id.* A statute's plain language must be examined to determine whether Congress intended to include a civil cause of action for aiding and abetting the primary violation. In fact, the Supreme Court listed a variety of statutes under which a civil cause of action for aiding and abetting was permitted. *Id.* So while a court may not presume such a cause of action, the statute itself may indeed provide it. *See, eg., Damato v. Hermanson*, 153 F.3d 464 (7th Cir.) (the Commodities Exchange Act permitted a private cause of action for aiding and abetting).

The statutory section at issue in *Central Bank*, as well as other statutes the court cited, contained a detailed provision for private rights of action that specified what conduct was prohibited. Because §10(b) detailed specific violations but did not contain language prohibiting

aiding and abetting those violations, the Supreme Court rejected the attempt to imply such a such a cause of action when Congress could easily have included it. *Id.* at 177. The main difference between this statutory structure and the many the Supreme Court noted in *Central Bank* is that those schemes had separate statutory sections that detailed what actions could be targeted in a private right of action. *Id.* at 182-183. To the contrary, § 2333 contains no language specifying private rights of action but refers only to those injured by an act of "international terrorism," which, as discussed, is defined in § 2331(1). The civil cause of action Congress established with § 2333 therefore does not contain its own prohibitions, but instead tracks the definition of "international terrorism" in § 2331(1). The court finds that any action that falls under the definition of "international terrorism" in § 2331(1) may therefore be the basis for a civil cause of action brought under § 2333. Although no court has previously addressed whether § 2331 and § 2333 are coextensive, commentators examining the statutory scheme have assumed this was the case. Rosenfeld, 15 Suffolk Transnat'l L.J. at 740 ("(t)he same jurisdictional reach given to American criminal law is now afforded to the civil law in combating international terrorists" (citing 136 Cong. Rec. S4592 (April 19, 1990))).

Aiding and abetting acts of international terrorism, which is itself a criminal violation, is certainly an activity that "involves violent acts or acts dangerous to human life." *See McVeigh*, 153 F.3d at 1193 (defendant was charged with aiding and abetting the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a and 18 U.S.C. § 2). Plaintiffs may therefore bring a cause of action under § 2333 that is based on a theory that defendants aided and abetted international terrorism.

Again, the elements of aiding and abetting plaintiffs will be required to prove, including knowledge and intent, rebut defendants' contention that unknowing contributions to organizations could result in liability. *United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir.1991) (citations omitted), *aff'd*, 506 U.S. 534, 113 S.Ct. 933 (1993) (elements of aiding and abetting include: "knowledge of the illegal activity that is being aided and abetted, a desire to help that activity succeed, and some act of helping").

## Insufficient Factual Allegations Against Particular Defendants

Several of the organizational defendants have moved to dismiss because plaintiffs have not pled facts supporting their contention that they raises and channels funds to Hamas agents or were involved in the murder of David Boim. They claim that dismissal is mandatory because plaintiffs fail to plead the "operative facts" upon which their claims are based and that the complaint contains no specific allegations as to how, when or where the defendants solicited, financed or provided material support or agreed with others to provide material support that caused the death of David Boim. Although plaintiffs attached to the complaint the affidavit of Special Agent Robert Wright of the FBI, defendants claim that only QLI is mentioned in Wright's affidavit. The remaining organizational defendants maintain that the complaint contains no other allegations concerning them except to generally allege that the defendants are all "Hamas' main fronts in the United States" with a "core mission of raising and funneling money and other resources to Hamas operatives in support of their terrorist campaigns."

Under Fed.R.Civ.P. 8's notice pleading requirements, plaintiffs are not required to "plead law or match facts to every element of a legal theory." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir.1998). "(A) complaint is not required to allege all, or any, of the facts logically

entailed by the claim . . . A plaintiff does not have to plead evidence." *Id.* (quoting *American Nurses' Assn. v. Illinois*, 783 F.2d 716, 727 (7th Cir.1986)).[15] The "how, when and where" details of the defendants' alleged funding are therefore not yet required.

The court finds that plaintiffs have pleaded sufficient facts to allow the defendants to understand the gravamen of the claims against them. *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir.1996). Unlike the plaintiff's complaint in *Kyle v. Morton High School*, which defendants cite, the conclusions plaintiffs plead do not "fail to give notice of the claim." 144 F.3d 448, 455 (7th Cir. 1998). The plaintiffs allege in the complaint that defendants' ostensible missions are covers for fund-raising and financing Hamas's terrorist activities and that defendant Salah admitted to Israeli authorities that he received money from 31 charitable organizations in the United States. The complaint contains additional details concerning the interrelationships among the defendants, which allows an inference that the organizations share goals or activities. Plaintiffs 'need not plead facts; [they] can plead conclusions." *Jackson v. Marion County*, 66 F.3d 151, 153-54 (7th Cir.1995).

The allegations contained in the complaint detail David Boim's murder by two Hamas terrorists, Hamas' fund-raising activities in the United States and abroad, defendant Salah's organization of Hamas' military wing in the United States, the interrelationships among the organizational and individual defendants, and the conclusion that the defendants provide material support and resources to Hamas. Plaintiffs claim that defendants violated §§ 2339A and 2339B by funding Hamas' terrorist activities, and that defendants' actions led to the death of their son.

---

[15] According to the Seventh Circuit, an employment discrimination complaint could adequately state: "I was turned down for a job because of my race." *Bennett*, 153 F.3d at 518 .

Therefore, defendants are liable to plaintiffs under § 2333. This provides defendants with more than "minimal notice" of the claim plaintiffs are bringing against them.

## Causation

Defendants also move to dismiss the complaint because plaintiff has failed to allege causation–a connection between the funds they allegedly donated to Hamas and the harm done to David Boim. Plaintiffs are required to allege and ultimately prove, according to defendants, that the defendant organizations "caused in fact" the death of David Boim and that their acts were the proximate cause of his death. *See Mendelowitz v. Vosicky*, 40 F.3d 182 (7th Cir. 1994). They claim that even if it were true, as plaintiffs allege in the complaint, that they sent money to Hamas between 1991 and 1993, plaintiffs have alleged no connection between this funding and the murder of their son in 1996. The complaint contains allegations that Hamas receives funds from the United States, Great Britain and additional Western European countries, local contributions, and Middle Eastern governments. These donations "flow() through a complicated series of transactions, changing hands several times and typically being commingled with the funds from the front organizations' legitimate and charitable dealings, before being transferred overseas." Defendants assert that the only specific contribution that plaintiffs have alleged is unknown amounts of monies given to Hamas in 1993, and that they have not asserted that these funds were a material element or substantial factor in causing David Boim's death. Defendants further claim that plaintiffs' additional allegations that the donated funds were used to purchase "the vehicle, machine guns, and ammunition used to kill David Boim" are based on "information and belief" and not made in good faith. It was simply not foreseeable, according to defendants, that money allegedly raised in 1991-93 would be used in 1996 to kill David Boim.

-33-

First, as noted above, plaintiffs allege in the complaint that the defendants' funding continued beyond 1993. Also, §§ 2339A and 2339B indicate that Congress believed that funding terrorists or terrorist organizations causes the harm of the terrorists' subsequent actions. The requirement under the language of the statute that the aid be "material" provides the causation link to the injury from the terrorist act. "(A)s nothing in 18 U.S.C. § 2339A or 28 U.S.C. § 1605(a)(7) indicates otherwise, this Court also concludes that a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises." *Flatow,* 999 F.Supp. at 18; *see also Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62, 68 (D.D.C. 1998) (court held that plaintiffs established a prima facie case of tortious injury against Iran of in part because the terrorist acts were perpetrated by a group receiving material support from Iran); *Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1136 (9th Cir. 2000) ("(i)t follows that all material support given to such organizations aids their unlawful goals"). Although the contributions Iran had made to the terrorist group that claimed responsibility for the bombing in *Flatow* were considerable, plaintiffs here will have to prove that the funding at issue in the instant case was "material."

Defendant Salah claims that because he had been in an Israeli prison for three years by the time David Boim's murder occurred, plaintiffs will be unable to prove causation as to him. This ignores the allegations in the complaint concerning Salah's organizing and training of Hamas terrorist operatives, which can itself constitute an activity involving acts of international terrorism. § 2339A(b) (training listed as a form of material support or resources); *Flatow,* 999 F.Supp. at 18 (another basis for causation was that Iran had provided the terrorist group with training); *Wells,* 163 F.3d at 899.

## First Amendment Issues

Amicus, The National Coalition to Protect Political Freedom (Coalition), claims that this case raises First Amendment issues because the plaintiffs are attempting to impose civil liability on the defendants based only on the defendants' political associations. It claims that the plaintiffs do not allege that defendants planned, funded, intended or participated in David Boim's murder and that plaintiffs' claim therefore infringes the First Amendment right of free association. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409 (1982). Defendants protest that plaintiffs' interpretation of "activities that involve violent acts or acts dangerous to human life" would result in individuals who unknowingly make contributions to Hamas at any point in time being liable in perpetuity for every violent act ever committed by a member of Hamas.

"For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne*, 458 at 920, 102 S.Ct. 3409. As the Coalition points out, the Supreme Court has held that neither civil nor criminal liability may be imposed when support is provided to a political organization, such as Hamas, that is engaged in a wide range of both lawful and unlawful activities, *in the absence of a showing of specific intent to further the organization's unlawful ends* (emphasis added). *Id.* The court has already found that the complaint contains extensive allegations concerning the alleged funding to Hamas and does not seek to impose liability for mere political association or belief. This is especially true considering plaintiffs will have to establish violations of §§ 2339A or 2339B, or prove that defendants aided and abetted terrorist acts. Plaintiffs face quite a high hurdle to prove that the

-35-

defendants had specific intent, before it became illegal to make contributions to Hamas, to fund Hamas' military wing when making contributions to Hamas. They have, however, sufficiently alleged that such is the case, and at this stage of the proceedings that is all they are required to do. Although the Coalition claims that the plaintiffs have not alleged that defendants provided funds to Hamas with the intent to further the organization's illegal activities, the detailed allegations in the complaint concerning Hamas' terrorist activities and how the funding is alleged to occur, do support an inference that defendants knew they were funding terrorist activities. "(T)here is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives." *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000).

Nor is there any indication that plaintiffs are attempting to hold members of the defendant organizations liable for the alleged violations. Plaintiffs are not suing the individuals who have donated to the defendants, they are suing the organizations themselves for intentionally raising and directing funds to groups that commit terrorist activities for the purpose of funding those activities. As is the case in suits against foreign countries sued pursuant to § 1605(a)(7), before liability can be established, plaintiffs must prove that a director, supervisor or agent of the organization knowingly made the decision. *See* 28 U.S.C. § 1605(a)(7); *Cicippio*, 18 F.Supp.2d at 68, fn.6 (plaintiffs had to establish that the provision of material support was engaged in by Iranian officials, employees, or agents acting within the scope of their office, employment, or agency). Defendants' First Amendment rights are protected by these requirements.

## Conclusion

For the foregoing reasons, the court finds that plaintiffs have adequately pleaded a cause of action against the defendants under 18 U.S.C. § 2333. It therefore denies defendants' motions to dismiss in their entirety. In addition, it denies defendants' Rule 11 motions for sanctions against plaintiffs for filing the complaint, and awards plaintiff fees and costs related to the preparation of the response to those motions.

**ORDERED:** The court denies defendants' motions to dismiss. It also denies defendants' motions for Rule 11 sanctions.

ENTER:

George W. Lindberg
United States District Judge

DATED: ___JAN 1 0 2001___