# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2905 | **DATE** | 11/10/2004 |
| **CASE TITLE** | Boim vs. Quaranic Literacy et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiffs' Motions for Partial Summary Judgment on Liability as to HLF [#297], IAP/AMS [#304], and Mr. Salah [#263] are granted. HLF's Motion for Summary Judgment [#308] is denied, as are the Motions of IAP/AMS [#266], QLI [#271], and Mr. Salah [#293]. The Motions to Strike filed by Mr. Salah [#295], QLI [#330], and Plaintiffs [#305] are granted in part and denied in part as explained in the attached Order. The case will proceed to trial on **12/1/04 at 10:00 a.m. in COURTROOM 1903** on both liability and damages as to QLI, and on damages alone as to HLF, IAP/AMS, and Mr. Salah. *AK*

11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 11/10/04 | 638 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 11/10/2004 | |
| | | | date mailed notice | |
| FT/ *sery* | courtroom deputy's initials | | FT | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

NOV 1 0 2004

STANLEY BOIM, Individually and as )
Administrator of the Estate of )
DAVID BOIM, deceased, and JOYCE )
BOIM, )
     )
              Plaintiffs, )
     )
          v. )    No. 00 C 2905
     )
QURANIC LITERACY INSTITUTE, HOLY )
LAND FOUNDATION FOR RELIEF AND )
DEVELOPMENT, ISLAMIC ASSOCIATION )
FOR PALESTINE, AMERICAN MUSLIM )
SOCIETY, AMERICAN MIDDLE EASTERN )
LEAGUE FOR PALESTINE, UNITED )
ASSOCIATION FOR STUDIES AND )    Magistrate Judge
RESEARCH, MOHAMMED ABDUL HAMID )    Arlander Keys
KHALIL SALAH, MOUSA MOHAMMED ABU )
MARZOOK, AMJAD HINAWI, and THE )
ESTATE OF KHALIL TAWFIQ AL-SHARIF, )
     )
              Defendants. )

## MEMORANDUM OPINION AND ORDER

This case arises out of the murder of David Boim, a seventeen-year-old American citizen who was killed in a Hamas terrorist attack in the West Bank. David's parents sued two men who were directly involved in the murder, as well as several U.S.-based individuals and organizations they claim helped to support Hamas, for violation of 18 U.S.C. §2333. The case is before the Court on motions for summary judgment.

638

A.   Factual Background

  1.   Procedural History of *Boim v. QLI, et al.*

  On May 13, 1996, David Boim, a citizen of both the United
States and Israel who was living in Israel with his parents, both
United States nationals, was shot in the head while waiting for a
bus in the West Bank.   David's father, Stanley Boim, testified at
his deposition that, shortly after the attack, "it became public
knowledge as reported in the media that Hamas was behind it."
Transcript of Deposition of Stanley Boim, p. 14.   The official
document reporting David's death indicated that David had died
from a "Gunshot Wound; a victim of a terrorist attack as stated
in Israeli death certificate issued by the Ministry of Interior
at Jerusalem on June 3, 1996."   *See* Report of the Death of an
American Citizen Abroad (attached as Exhibit 2 to Plaintiffs'
(HLF) Rule 56.1 Statement).   And a 1997 article from the
Jerusalem Post indicates that one of the men wanted for his
involvement in the attack, "Khalil Ibrahim Tawfik Sharif," who
went on to kill himself in a 1997 suicide bomb attack on a
Jerusalem pedestrian mall, was a Hamas activist.   *See* "3rd Ben-
Yehuda Bomber Identified," Jerusalem Post, October 30, 1997
(attached as Exhibit 11 to Plaintiffs' Rule 56.1 Statement in

support of its motion against HLF).[1] Another of the attackers, Amjad Hinawi, confessed to participating in the attack; he was charged by the Palestinian Authority with participating in a terrorist act and as an accomplice in the killing of David Boim. Despite his confession, Mr. Hinawi pled not guilty, but was tried and convicted on both counts, and sentenced to ten years of hard labor. *See* Notes of United States Foreign Service Officer Abdelnour Zaibeck, a representative from the Consulate General of the United States, who attended Mr. Hinawi's court proceedings (attached as Exhibit 6 to Plaintiffs' (HLF) Rule 56.1 Statement); Report of Sentence of Amjad Mu`hamad Rashid Al`hinawi (attached as Exhibit 10 to Plaintiffs' (HLF) Rule 56.1 Statement).

On May 12, 2000, David's parents, Stanley and Joyce Boim, sued Mr. Hinawi and the estate of Khalil Tawfiq Al-Sharif, who had by that time blown himself up in the suicide bombing. They also sued Mousa Mohammed Abu Marzook, who allegedly served for many years as the admitted leader of Hamas' political wing in the United States, and Mohammed Abdul Hamid Khalil Salah, who allegedly served as the United States-based leader of Hamas' military branch. *See* Complaint, ¶¶11-12. The Boims also named as defendants the Quranic Literacy Institute ("QLI"), the Holy

---

[1]Because the Boims filed separate motions against each defendant, with separate Rule 56.1 Statements, the Court has added the defendants' identifiers to avoid confusion for anyone hoping to find the particular exhibits in the vast record.

3

Land Foundation for Relief and Development ("HLF"), the Islamic Association for Palestine ("IAP"), the American Muslim Society (d/b/a the Islamic Association for Palestine in Chicago) ("AMS"), and the American Middle Eastern League for Palestine ("AMELP") — all entities that, according to the complaint, directly or indirectly raise and launder money for Hamas and finance Hamas' terrorist activities. *See* Complaint, ¶¶5, 6,7, 8, 9. Finally, the Boims sued the United Association for Studies and Research ("UASR"), which allegedly serves as Hamas' political command center in the United States. *Id.*, ¶10.

In each case, the Boims sought to hold the defendants civilly liable under the Antiterrorism Act of 1990 (the "Antiterrorism Act"), 18 U.S.C.§ 2300 *et seq.* (West 2004). The Antiterrorism Act provides, in pertinent part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors or heirs, may sue therefor in any appropriate district court of the United States and . . . recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. §2333. The Boims alleged that defendants Hinawi and Al-Sharif were directly involved in David's murder, and that the remaining defendants provided material support to Hamas. *See* Complaint, ¶54. They requested compensatory damages in the amount of $100,000,000 and punitive damages in the amount of $100,000,000, plus fees and costs. The Boims further requested

4

that, in accordance with the Antiterrorism Act, their damages be trebled, and they sought an injunction preventing defendants from raising any additional money for Hamas. *Id.*, ¶¶56, 58.

Defendants QLI, HLF, Salah, IAP, AMS, and AMELP all moved to dismiss the Boims' complaint, arguing that the Boims' claim really sought to impose "aiding and abetting" liability, and that such liability was precluded under §2333. In an opinion issued January 10, 2001, the district judge disagreed, and denied the motions, holding that §2333 permitted a cause of action based on the theory that the "defendants aided and abetted international terrorism." *See Boim v. Quranic Literacy Institute*, 127 F. Supp. 2d 1002, 1018 (N.D. Ill. 2001). The next month, following a request by QLI, the district court certified three questions for appeal:

> (1) does funding, *simpliciter*, of an international terrorist organization constitute an act of terrorism under 18 U.S.C. §2331?;
>
> (2) does 18 U.S.C. §2333 incorporate the definitions of international terrorism found in 18 U.S.C. §§2339A and 2339B?; and
>
> (3) does a civil cause of action lie under 18 U.S.C. §2331 and §2333 for aiding and abetting international terrorism?

*See Boim v. Quranic Literacy Institute, et al.*, No. 00 C 2905 (N.D. Ill. Minute Order entered February 22, 2001).

Before the appeal was heard, the parties consented to proceed before a United States Magistrate Judge, and the case was

reassigned to this Court on April 13, 2001. The Seventh Circuit set the appeal for argument on September 25, 2001, and issued its decision on June 5, 2002. The court first held that the Boims may succeed in their claims against the organizational defendants by proving that they "provided material support to terrorist organizations." *Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000, 1016 (7th Cir. 2002). On the question of whether 18 U.S.C. §2333 is broad enough to cover the conduct of persons who, like the organizational defendants, did not themselves commit the violent acts complained of, the court held, after noting that the interpretation of §2333 was a matter of first impression, that "aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of section 2333," because "[t]he only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Id.* at 1021.

The court held that this did not, as the defendants argued, amount to imposing "guilt by association" in violation of the First Amendment: "[t]hat Hamas may also engage in legitimate advocacy or humanitarian efforts is irrelevant for First Amendment purposes if HLF and QLI knew about Hamas' illegal operations, and intended to help Hamas accomplish those illegal goals when they contributed money to the organization." *Id.* at

1024 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982); *Scales v. United States*, 367 U.S. 203, 229 (1961); *Noto v. United States*, 367 U.S. 290, 298 (1961); *Healy v. James*, 408 U.S. 169, 186 (1972); *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687, 703 (7th Cir. 2001)). The court also rejected defendants' argument that liability could not be imposed under §2333 if, as contended, the defendants provided support to Hamas with the sole intent of contributing to the organization's humanitarian and charitable programs, rather than its military or terrorist factions: "[t]errorist organizations use funds for illegal activities regardless of the intent of the donor, and Congress thus was compelled to attach liability to all donations to foreign terrorist organizations." *Id.* at 1027.

In short, the Seventh Circuit answered the certified questions as follows:

> funding, *simpliciter*, of a foreign terrorist organization is not sufficient to constitute an act of terrorism under 18 U.S.C. §2331. However, funding that meets the definition of aiding and abetting an act of terrorism does create liability under sections 2331 and 2333. Conduct that would give rise to criminal liability under section 2339B is conduct that "involves" violent acts or acts dangerous to human life, and therefore may meet the definition of international terrorism as that term is used in section 2333. Finally, . . . civil liability for funding a foreign terrorist organization does not offend the First Amendment so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping.

*Id.* at 1028.

7

Following the Seventh Circuit's ruling, the Boims moved for
default judgment against Mr. Hinawi and against UASR. This Court
granted both motions; the former for failing to answer the
Complaint despite proper service, and the latter for failing to
comply with discovery. The Boims also moved to sever the case
against Mr. Hinawi and to dismiss the case as to Mr. Marzook and
the estate of Al-Sharif because of an inability to effectuate
service on them. Again, the Court granted both motions.
Additionally, the Court granted the Boims' motion for the entry
of a default judgment against AMELP.

Thereafter, the Boims filed a First Amended Complaint,
naming principally the same defendants, but adding allegations
about each. With respect to HLF, the Boims added that, in
December 2001, HLF was named as a "Specially Designated
Terrorist" by the President of the United States, that HLF's
assets had been seized by the Federal Bureau of Investigation,
and that the Court of Appeals for the District of Columbia
Circuit had ruled, in *Holy Land Foundation v. Ashcroft*, 333 F.3d
156 (D.C. Cir. 2003), that HLF funded Hamas' terrorist
activities. *See* First Amended Complaint, ¶6.

With respect to IAP, the Boims added an allegation about the
structure and organization of the various entities using the
"IAP" name; specifically, that "[t]here has been continuously
since the early 1980's an entity or group of persons and entities

operating under the name 'Islamic Association for Palestine' (collectively, 'IAP National'). IAP National is an umbrella organization that encompasses the various organizations throughout the country which call themselves 'IAP,' including defendants AMELP, AMS, and IAP Texas." *Id.*, ¶7. The Boims had simply referred to "IAP Texas" as "IAP" in their original Complaint.

The Amended Complaint also references meetings that took place in 1993 and 1994 between named defendants and Hamas members and activists, and it alleges that the defendants worked together and with Mr. Marzook as part of an ongoing conspiracy to promote Hamas and to raise money in the United States for Hamas' terrorist operations. *Id.*, ¶¶32-33, 36. The Amended Complaint did not add any new causes of action, however; the Boims still seek redress for a single cause of action – violation of 18 U.S.C. §2333.

The remaining, non-defaulted defendants – Mr. Salah, QLI, HLF, IAP and AMS – all answered the First Amended Complaint (IAP and AMS filed a joint Answer), and the case proceeded through discovery. It is now before the Court on motions and cross-motions for summary judgment.

> 2. <u>Parallel and Related Proceedings</u>

>> a. <u>Proceedings relating to Terrorist Designations</u>

On January 23, 1995, President Clinton signed Executive

Order 12947, prohibiting transactions with terrorists who threaten to disrupt the Middle East peace process. *See* Executive Order No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995). Annexed to the Order was a relatively short list (with just twelve entries) of such terrorist organizations (thereafter referred to as "Specially Designated Terrorists" or "SDTs"). *Id.*, 60 Fed. Reg. at 5081.[2] Hamas (also known as the Islamic Resistance Movement) was one of the organizations on the list. *Id.* Executive Order 12947, *inter alia*, prohibited donations to designated organizations, directed all agencies of the United States Government to take all appropriate measures within their authority to carry out the Order's provisions, directed the Federal Bureau of Investigation to handle the investigation of possible violations of the Order, and directed the FBI to timely notify the Department of the Treasury of any action taken on such investigations.

To that end, on November 5, 2001, Dale L. Watson, the

---

[2]In the wake of the September 11th attacks, President Bush signed a similar order, Executive Order 13224, and created a new list of individuals and organizations he dubbed "Specially Designated Global Terrorists" or "SDGTs." *See* Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001). Neither Hamas, nor any of the defendants named in this case was included on the list of SDGTs that was originally annexed to Executive Order 13224. At one point or another, however, Hamas, the Holy Land Foundation and Mohammed Salah have been added to the list of SDGTs, as have other individuals and organizations whose names appear in this opinion. *See* Alphabetical List of Blocked Persons, Specially Designated Nationals, SDTs, SDGTs, Foreign Terrorist Organizations & Specially Designated Narcotics Traffickers, 31 C.F.R. Ch. V, App. A (October 25, 2004).

Assistant Director of the Federal Bureau of Investigation's

Counterterrorism Division, wrote an "action memorandum" to R.

Richard Newcomb, Director of the United States Treasury

Department's Office of Foreign Assets Control ("OFAC"),

concerning HLF. Mr. Watson's memo described some of the history

of Hamas, one of the frontrunner SDTs; it also described the

history of HLF, HLF's organizational structure, and the results

of various surveillance projects capturing and documenting the

relationship between HLF and Hamas. Mr. Watson summed up his

memo by recommending that OFAC add HLF (which he referred to as

HLFRD) to the list of SDTs:

> FBI investigations of HAMAS activities in the United
> States have revealed that the HLFRD is the primary
> fund-raising entity for HAMAS and that a significant
> portion of the funds raised by the HLFRD are clearly
> being used by the HAMAS organization. The information
> provided in this document confirms that the HLFRD is
> acting for or on behalf of HAMAS. Further, senior
> members of HLFRD support HAMAS ideology and activities.
> These HAMAS activities interfere with the Middle East
> peace process and pose a threat to the national
> security, foreign policy, or economy of the United
> States. As such, HLFRD should be considered by OFAC
> for SDT designation as a HAMAS entity, subject to the
> prohibitions of the [International Emergency Economic
> Powers Act].

Watson Memorandum, p. 49 (Bates No. 0108) (attached to the

Declaration of Samuel A. Simon, Jr., at Exhibit 13 of Plaintiffs'

(HLF) Rule 56.1 Statement).

On December 4, 2001, Director Newcomb issued a "Blocking

Notice" to HLF, advising that OFAC had blocked all of HLF's real

11

and personal property, including offices, furnishings, equipment, and vehicles, as well as all funds and accounts in which HLF has any interest. *See* Exhibit 14 to Plaintiffs' (HLF) Rule 56.1 Statement. On March 8, 2002, HLF sued John Ashcroft, the United States Department of Justice, Paul O'Neill, the United States Department of the Treasury, Colin Powell and the United States Department of State in the United States District Court in Washington D.C., seeking a declaration that the defendants' designation of HLF as an SDT and the defendants' seizure of HLF's assets were unlawful; HLF alleged violations of the United States Constitution, the Religious Freedom Restoration Act ("RFRA"), the International Emergency Economic Powers Act ("IEEPA"), and the Administrative Procedures Act ("APA").

HLF lost its challenge of the SDT designation and blocking order, both in the district court, *see Holy Land Foundation v. Ashcroft*, 219 F. Supp. 2d 57 (D. D.C. 2002), and on appeal to the United States Court of Appeals for the D.C. Circuit, *see Holy Land Foundation v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (hereinafter "Ashcroft"). Of particular import here, the D.C. Circuit determined that "[t]he ample record evidence (particularly taking into account the classified information presented to the court *in camera*) establishing HLF's role in the funding of Hamas and of its terrorist activities is incontrovertible." 333 F.3d at 165. The court noted that HLF

12

"had every opportunity to come forward with some showing that
that evidence is false or even that its ties to Hamas had been
severed," and it failed to do so, even when given additional time
to respond to the evidence weighing in favor of the SDT
designation. *Id.* at 165-66. Along the same lines, the court
noted that "HLF had every opportunity and incentive to produce
the evidence sufficient to rebut the ample evidence supporting
the necessary conclusion that it was a funder of Hamas but could
not do so." *Id.* at 166. And, in addressing HLF's RFRA claim,
the court held that "[t]here is no free exercise right to fund
terrorists. The record clearly supports a conclusion that HLF
did." *Id.* at 167. HLF filed a petition for *certiorari* to the
United States Supreme Court; that petition was denied. *See Holy
Land Foundation for Relief & Development v. Ashcroft*, — U.S. —,
124 S.Ct. 1506 (Mar. 1, 2004).

  b.   Criminal Proceedings

On July 26, 2004, the United States indicted HLF and seven
of its principals (Shukri Abu-Baker, Mohammad El-Mezain, Ghassan
Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader, and
Abdulraham Odeh) for, among other things, conspiring to provide
and providing material support to a foreign terrorist
organization - namely, Hamas - in violation of 18 U.S.C.
§2339B(a)(1). The case is pending in the United States District
Court in Dallas, Texas. On August 19, 2004, the United States

indicted Mr. Salah, as well as Mousa Mohammed Abu Marzook and Abdelhaleem Hasan Abdelraziq Ashqar, for, among other things, knowingly providing and attempting to provide material support and resources to a foreign terrorist organization - namely Hamas - in violation of 18 U.S.C. §2339B. That case is pending in this district.

Almost immediately after the indictments were handed down, HLF and Mr. Salah filed separate motions to stay this action pending resolution of the criminal matters. On September 9, 2004, after hearing from the parties both in briefs and in extensive oral arguments, the Court denied those motions. Mr. Salah moved for reconsideration, and, after hearing additional oral argument from the parties, the Court denied the motion for reconsideration as well.

B.    Discussion & Analysis

The Boims have filed separate motions for partial summary judgment on the issue of liability against Mr. Salah and HLF, both of whom filed their own cross-motions for summary judgment. Additionally, IAP and AMS filed a joint motion for summary judgment against the Boims, who filed a cross-motion for summary judgment against those entities. And QLI moved for summary judgment in its favor, without prompting a cross-motion from the Boims. Thus, in all, there are seven summary judgment motions before the Court; there are also three motions to strike, which

14

the Court will consider in connection with the relevant motions for summary judgment.

Summary judgment is properly entered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has instructed district courts to act "with caution" in granting summary judgment; "where there is reason to believe that the better course would be to proceed to a full trial," the motion should be denied. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). At this stage of the proceedings, the Court makes no credibility determinations and weighs no evidence; instead, the Court accepts the non-movant's evidence and draws all justifiable inferences in its favor. *Id.*

The Boims have sued the defendants for violation of 18 U.S.C. §2333, which provides, in relevant part, that "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor . . . and shall recover threefold the damages he or she sustains . . . ." 18 U.S.C. §2333(a). The statute "clearly is meant to reach beyond those persons who themselves commit the violate act that directly causes the injury"; indeed, the statute is specifically drafted

"to extend liability to all points along the causal chain of terrorism." *Boim*, 291 F.3d at 1011, 1020. Conduct that would give rise to criminal liability under §2339B(a), would give rise to civil liability under §2333. *Id.* at 1028. And 2339B provides that "[w]hoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. §2339B(a)(1).

The Boims have alleged that the defendants conspired to provide, and provided, material support to Hamas. "Material support" would include, among other things, money and financial services, lodging, training, safehouses, and false documentation or identification. 18 U.S.C. §§2339A(b), 2339B(g). To prove that the defendants provided material support to Hamas in violation of §2333, the Boims would have to show that they knew about Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping. *Boim*, 291 F.3d at 1023. To prove that the defendants conspired to provide material support to Hamas in violation of §2333, which imports general tort law principles, *see Boim*, 291 F.3d at 1010, 1020, the Boims would have to show that the defendants "acted in concert to commit an unlawful act . . . the principal element of

16

which [was] an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981)(quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)). The Boims need not show that the defendants knew about the attack that killed David Boim, or that they committed any specific acts in furtherance of that attack; rather, the Boims need only show that the defendants were involved in an agreement to accomplish an unlawful act and that the attack that killed David Boim was a reasonably foreseeable consequence of the conspiracy. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 643 (1946). Nor would the Boims be required to provide direct evidence of an agreement between the parties; "[c]ircumstantial evidence may provide adequate proof of conspiracy." *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971).

     1. <u>Motions Filed By and Against The Holy Land Foundation</u>

     The Boims seek summary judgment against HLF on the issue of liability only. In their motion, the Boims argue that the undisputed evidence demonstrates all of the necessary elements of their claim against this defendant - namely, that David Boim was a United States citizen, that he was killed in a Hamas attack, and that Holy Land Foundation supported Hamas' terrorist activities. To support the last point, the Boims rely

substantially on the rulings in *Holy Land Foundation for Relief &amp; Development v. Ashcroft, supra.* The Boims argue that, based upon those rulings, HLF is collaterally estopped from denying that it knowingly provided material support to Hamas. HLF countered that the evidence is, at best, inconclusive as to all of these points; in particular, on the last point, HLF argues that collateral estoppel does not apply under the circumstances presented.

HLF also filed a cross-motion for summary judgment, arguing that, given the lack of evidence to support the Boims' claim, HLF is entitled to judgment as a matter of law. Specifically, HLF argues that the Boims' claim fails because they have offered no admissible evidence to establish that HLF has ever knowingly provided material support to Hamas, or that Hamas is responsible for David Boim's murder.

By way of background, HLF, originally known as the Occupied Land Fund, was incorporated as a tax-exempt organization in California on January 11, 1989. *See* Articles of Incorporation of the Occupied Land Fund (attached as Exhibit J to Plaintiffs' (HLF) Rule 56.1 Statement). On September 16, 1991, it changed its corporate name to The Holy Land Foundation for Relief and Development and moved to Texas. *See* Certificate of Amendment of Articles of Incorporation of the Occupied Land Fund (attached as Exhibit J to Plaintiffs' (HLF) Rule 56.1 Statement). An HLF brochure submitted with the Boims' motion for summary judgment

indicates that HLF was "established in 1987 and had since grown
to become prominent among relief organizations that serve the
humanitarian needs and promote the well-being of the Palestinian
people in the West Bank, Gaza Strip, and beyond." *See* Exhibit V
to Plaintiffs' (HLF) Rule 56.1 Statement. The D.C. Circuit noted
that HLF "describes itself as 'the largest Muslim charity in the
United States.'" *Ashcroft*, 333 F.3d at 160.

With respect to HLF's ties to Hamas, the record evidence
(deposition testimony as well as documentary evidence from the
administrative record in the *Ashcroft* case) shows that, in the
years after the United States designated Hamas as an SDT, HLF
provided significant funding (hundreds of thousands of dollars)
to the following organizations: the Islamic Charity Association
(a.k.a. Islamic Charitable Society in Hebron), Ramallah Zakat
Committee, Jenin Zakat Committee, Nablus Zakat Committee,
Tolkarem Zakat Committee, Orphan Care Association in Bethlehem,
Qalqiliyah Zakat Committee, Hebron Zakat Committee (a.k.a. Hebron
Tithing and Alms Committee), Dar El Salam Hospital, Islamic Aid
Committee (a.k.a. Islamic Relief Agency), Sanabil Association for
Relief and Development, and the Human Appeal International-
Jordan. *See* Transcript of Deposition of Shukri Abu-Baker, pp.
170-76; *see also* AR 1209-15 (attached as Exhibit 4 to Plaintiffs'
(IAP/AMS) Rule 56.1 Statement). The evidence further shows that
all of these organizations are either known fronts for Hamas,

known supporters of Hamas, or entities whose funding is known to benefit the Hamas agenda. *See* Watson Memorandum, pp. 0087-88, 0091-0105; *see also, e.g.,* AR 0856-63, 1252-61, 1271-78.

The record also contains a report of a statement from Mohamed Anati, the Executive Director of the Holy Land Foundation, Jerusalem, the sole agency of HLF in the West Bank and Israel (at least as of 1994). *See* Accord between HLF and HLF-Jerusalem (attached as Exhibit 4 to Plaintiffs' (IAP/AMS) Rule 56.1 Statement, pp. 0759, 0764, 0810). In the statement, Mr. Anati admits being a Hamas activist, and admits that some of HLF's money was channeled to Hamas. *See* AR 1263-1278. The record also contains documents that appear to show (there are no official documents) that, in 1997, the Government of Israel's Minister of Defense declared HLF to be "disallowed" for channeling money to Hamas. *See* AR 1335-40.

The Boims also rely upon a videotape from a 1989 IAP conference that shows, among other things, a veiled speaker who is identified as a Hamas terrorist and who specifically thanks the Occupied Land Fund (the entity now known as HLF) for its support. *See* Exhibit T to Plaintiffs' (HLF) Rule 56.1 Statement; Declaration of Reuven Paz, Exhibit A (attached as Exhibit M/A to Plaintiffs' (HLF) Rule 56.1 Statement). Mr. Abu-Baker admitted that he attended that conference. *See* Responses to Requests for Admission, ¶4 (attached as Exhibit U to Plaintiffs' (HLF) Rule

56.1 Statement).

The record also includes brochures and other literature designed, in whole or in part, to promote Hamas' agenda. These items routinely included a solicitation to send funds for the cause to HLF (or the Occupied Land Fund, depending on the publication date). HLF's representative, however, denies that HLF took any affirmative steps to have its name and address included in these documents. *See* Group Exhibit P to Plaintiffs' (HLF) Rule 56.1 Statement; Transcript of Deposition of Shukri Abu-Baker, pp. 105-115.

The record also contains deposition testimony from Mr. Abu-Baker, who has served as HLF's President and Chief Executive Officer since 1989. *See* Answers to Interrogatories, Nos. 2, 5 (attached as Exhibit 21 to Plaintiffs' (HLF) Rule 56.1 Statement); Deposition of Shukri Abu-Baker, p. 10. Mr. Abu-Baker initially testified as HLF's Rule 30(b)(6) designee; in that capacity, he testified that HLF frequently received donations from people who wanted their money to go to the family or children of a "shaheed" or "martyr," and that HLF made it a practice to try to accommodate the requests of those donors. *See* Abu-Baker Deposition, p. 168. According to the Boims, a "shaheed" or "martyr" is someone who dies while serving Hamas' agenda, whether in a suicide bombing or some other terrorist attack, or at the hands of an Israeli soldier. *See, e.g.,*

21

Exhibit E to Plaintiffs' (HLF) Rule 56.1 Statement (translation
of The Khaled Mishaal Interview, describing terrorist acts as
"martyrdom operations"); Exhibit E to Plaintiffs' Reply
Memorandum, ¶¶5d, 5e (and attached exhibits E and F)(Reuven Paz'
translations of Palestinian Authority and Hamas website
publications characterizing Mr. Al-Sharif, one of David Boim's
murderers, who subsequently died in a suicide bombing, as a
"martyr"); Mr. Abu-Baker testified that a broader meaning may be
ascribed to these terms, such that they can refer to anyone who
dies as a result of the Israeli occupation and the Palestinian
uprising.  Deposition of Shukri Abu-Baker, pp. 162-63, 167-68.
In either case, it is clear that HLF targeted the families of
martyrs to receive its money.

In his capacity as a 30(b)(6) witness, Mr. Abu-Baker also
testified that, in 1992, HLF received a $210,000 contribution
from Mr. Marzook.  *See* Deposition of Shukri Abu-Baker, pp. 75-76,
79.  Mr. Abu-Baker testified that he knows Mr. Marzook, and that
Mr. Marzook is married to the first cousin of Ghassan Elashi, who
served first as HLF's Treasurer and Secretary, and later as the
Chairman of HLF's Board of Directors, *see* Answers to
Interrogatories, No. 2 (attached as Exhibit 21 to Plaintiffs'
(HLF) Rule 56.1 Statement); HLF's Responses to Requests for
Admission, ¶6 (attached as Exhibit C to Plaintiffs' Reply
Memorandum).  Mr. Abu-Baker testified that, other than the

$210,000 contribution, Mr. Marzook had no relationship or involvement with HLF. *See* Transcript of Deposition of Shukri Abu-Baker, p. 75.

According to the Boims – and Mr. Watson – Mr. Marzook served for many years as the head of Hamas' political bureau; he was designated as an SDT on August 25, 1995. *See* Complaint, ¶¶12, 34; Watson Memorandum, pp. 0073-74 (attached as Exhibit B to Plaintiffs' (HLF) Rule 56.1 Statement). The Watson Memorandum details Mr. Marzook's $210,000 contribution, and relies upon it to link HLF to Hamas. Watson Memorandum, pp. 0074. And the administrative record upon which Mr. Watson relied contains copies of checks written by Mr. Marzook and made payable to HLF. *Id.*, pp. 0684-87.

Some time after Mr. Abu-Baker's 30(b)(6) deposition, the Boims indicated that they wanted to depose Mr. Abu-Baker in his individual capacity as a fact witness. Counsel for HLF indicated that Mr. Abu-Baker would, if deposed, invoke his Fifth Amendment right and refuse to answer substantive questions. *See* August 10, 2004 Letter from John Boyd to Richard Hoffman (attached as Exhibit H to Plaintiffs' Reply). And, in fact, the Boims' counsel deposed Mr. Abu-Baker on September 28, 2004, and he did, as expected, refuse to testify pursuant to the Fifth Amendment. *See* Transcript of Oral and Videotaped Deposition of Shukri Abu-Baker, pp. 6-127 (attached as Exhibit A to Plaintiffs' Supplement

to the HLF Summary Judgment Record Based on the Testimony of Shukri Abu-Baker). Similarly, at his deposition, Mr. Elashi invoked his Fifth Amendment right, refusing to answer any substantive question posed on the ground that it might tend to incriminate him. *See* Transcript of Deposition of Ghassan Elashi, pp. 6-91. Because Mr. Abu-Baker and Mr. Elashi chose to remain silent at their depositions, the Court is entitled to draw a negative inference that the answers they would have given, had they answered the questions posed and answered them truthfully, would have tended to subject them to criminal liability. *See, e.g., In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663 (7th Cir. 2002); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). This is just one more bit of admissible evidence against HLF on the question of whether it knew about Hamas' illegal activities and desired to help those activities succeed.

In contrast to this evidence, the record also contains a July 27, 2004 declaration from HLF's attorney, John Boyd. *See* Exhibit A to HLF's Rule 56.1 Statement). Attached to that declaration is another declaration from Mr. Boyd, this one signed on June 15, 2002 and prepared in response to the motion for summary judgment filed by the government in the *Ashcroft* case. *See* Exhibit A/1 to HLF's Rule 56.1 Statement. And attached, in turn, to Mr. Boyd's 2002 declaration are declarations from Shukri

Abu-Baker, then HLF's CEO, Dalell D. Mohmed, an HLF donor and an Emergency Relief Coordinator for HLF, and Mohammed Abumoharram, the manager of HLF's Gaza office. *See* Exhibits A/2, A/3, and A/4 to HLF's Rule 56.1 Statement. All three declarations testify to a vast amount of admirable, charitable work done by HLF – all totally unrelated to Hamas – and all three declarants adamantly disavow any ties to Hamas, and any condonation of Hamas' activities. *See* Exhibit A/2, §§3, 7, 30, 31; Exhibit A/3, §§2, 5-30, 32, 35-51; Exhibit A/4, §§5-7, 12. Ordinarily, these declarations might be enough to create a genuine issue of fact as to the connection between Hamas and HLF. *See Anderson*, 477 U.S. at 255. *But see Logan v. Caterpillar, Inc.*, 246 F.3d 912, 923 (7th Cir. 2001)(self-serving affidavits, if not supported in the record, will not preclude summary judgment). Thus, resolution of the Boims' summary judgment motion turns, in no small part, on whether the Court is bound, under the doctrine of collateral estoppel or issue preclusion, by the *Ashcroft* court's ruling that HLF provided material support to Hamas. *See Holy Land Foundation for Relief & Development v. Ashcroft, supra.*

Before turning to the collateral estoppel question, the Court considers HLF's argument that the Boims have failed to provide evidence that David Boim was actually killed by Hamas. As HLF correctly points out, if the Boims have failed to meet this burden, the Boims' case would fail, without the Court even

having to reach the question of whether HLF funded Hamas.

HLF's assertions notwithstanding, the record contains ample evidence showing that Hamas did, in fact, take responsibility for the attack that killed David Boim. The evidence in the record shows that David was murdered in a terrorist attack, not in some random drive-by shooting. Mr. Hinawi, one of the attackers, was charged with and convicted of committing a terrorist act, as well as for his participation in the murder. *See* Abdelnour Zaibeck's Notes of Proceedings for Amjad Hinawi (February 10, 12 and 14, 1998)(attached as Exhibit 6 to Plaintiffs' (HLF) Rule 56.1 Statement); Report of Sentence of Amjad Hinawi (February 14, 1998) (attached as Exhibit 10 to Plaintiffs' (HLF) Rule 56.1 Statement). A September 22, 1997 press bulletin issued by the Government of Israel's Press Office states that Mr. Hinawi is a member of Hamas, and that the Government of Israel sought Mr. Hinawi's extradition because of his involvement with the Hamas attack that killed David. *See* Press Bulletin of September 22, 1997, p. 2 (attached as Exhibit 9 to Plaintiffs' (HLF) Rule 56.1 Statement). Al-Sharif, who, with Mr. Hinawi, carried out the attack on David Boim and his friends, is also reported in the record as being a Hamas activist. *See* "3rd Ben-Yehuda Bomber Identified," the Jerusalem Post (October 30, 1997) (attached as Exhibit 11 to Plaintiffs' (HLF) Rule 56.1 Statement). Mr. Boim testified that, shortly after David's murder, the media reported

26

that Hamas was taking credit for the attack, and it became public knowledge that Hamas was behind the attack. Transcript of Deposition of Stanley Boim, p. 14 (attached as Exhibit 3 to Plaintiffs' (HLF) Rule 56.1 Statement).

Added to this evidence is the fact that a default judgment has been entered against Mr. Hinawi, which means, as a practical matter, that the Court accepts as true the well-pled allegations in the Complaint about him – that is, that he is a Hamas terrorist and one of two Hamas agents who carried out the attack on David Boim. *See* Complaint, ¶¶13, 25-28; *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)("As a general rule, a 'default judgment establishe[s], as a matter of law, that defendants [are] liable to plaintiff as to each cause of action alleged in the complaint.' . . . Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true.")(quoting *Breuer Electric Mfg. Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir. 1982).

In short, all of the evidence in the record on this issue points to Hamas as the entity responsible for David's murder. Even now, HLF has offered no evidence that anyone other than Hamas was responsible for the attack. Accordingly, the Court finds that David Boim was murdered by Hamas activists, in a Hamas-sponsored attack, and that no reasonable jury could find

27

otherwise.

The Court turns now to the collateral estoppel issue and considers what effect, if any, the D.C. Circuit's rulings in the *Ashcroft* case should have on this case. The Boims argue that HLF is collaterally estopped from relitigating the issue of whether it knowingly funded Hamas and its terrorist activities. The Boims assert that HLF has already raised this issue – and lost – in the *Ashcroft* case.

"Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). "Collateral estoppel, like the related doctrine of *res judicata*, serves to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" *Id.* (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). At various turns, the Supreme Court has broadened the scope of the collateral estoppel doctrine, first by abandoning the mutuality of parties requirement, and then by approving the "offensive" use of collateral estoppel – that is, the use of the doctrine by a plaintiff seeking to foreclose a defendant from

relitigating an issue the defendant previously lost against another plaintiff. *Id.* at 158-59 (citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)). *See also Wolverine Mutual Insurance v. Vance*, 325 F.3d 939, 943 n.3 (7th Cir. 2003).

Collateral estoppel "may compel a grant of summary judgment as to the factual issues resolved by [an] earlier judgment." *Cook County v. Lynch*, 560 F. Supp. 136, 140 (D.C. Ill. 1982). The doctrine applies when (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action. *Chicago Truck Drivers, Helpers & Warehouse union (Independent) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526 (7th Cir. 1997). It "does not apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue . . . ." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480-81 (1982)(citing *Allen v. McCurry*, 449 U.S., at 95; *Montana v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328-329 (1971)). And "'[r]edetermination of issues is warranted if there is reason

to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation.'" *Id.* at 481 (quoting *Montana*, 440 U.S. at 164 n.11).

Notably, the Court is not being asked to consider the adequacy of the process provided HLF in the designation proceedings, to the extent there were any designation proceedings. The prior action in question is not the SDT designation, but the proceedings in the *Ashcroft* case challenging that designation. Thus, the question before this Court is whether the decision of the D.C. Circuit – not the underlying decision by OFAC – satisfied the elements set forth above. With regard to those elements, the parties agree that HLF was fully represented in the *Ashcroft* case; they disagree as to whether the remaining elements have been satisfied. HLF argues that collateral estoppel cannot apply, because the issues before this Court are different from those decided in the *Ashcroft* case, and because the D.C. courts did not provide HLF with a "full and fair opportunity" to litigate the question of whether it ever provided support to Hamas.

In the *Ashcroft* case, HLF sued the individuals and agencies responsible for HLF's SDT and SDGT designation, and for the seizure of HLF's assets. In its complaint, HLF alleged that the defendants violated HLF's procedural due process rights by depriving HLF of its property without prior notice and a hearing,

and without a prompt post-deprivation hearing, all in violation
of the Fifth Amendment to the United States Constitution (Count
One); that the defendants violated HLF's Fifth Amendment right to
substantive due process (Count Two); that the defendants' seizure
of HLF's assets constituted a taking without just compensation,
in violation of the Fifth Amendment's Takings Clause (Count
Three); that the defendants searched HLF's premises and seized
HLF's assets without a warrant and without probable cause, in
violation of the Fourth Amendment to the United States
Constitution (Count Four); that the defendants' designation of
HLF as an SDT and an SDGT and their seizure of HLF's assets
substantially interfered with HLF's rights to freedom of speech
and freedom of association, as guaranteed by the First Amendment
(Count Five); that the defendants' designation of HLF as an SDT
and an SDGT and their seizure of HLF's assets substantially
burdened HLF's exercise of religion, as well as that of HLF's
employees and donors, in violation of both the First Amendment
and the Religious Freedom Restoration Act (Counts Six and Seven,
respectively); and that the designation and seizure of assets
were done in violation of various sections of the Administrative
Procedures Act (Count Eight). *See Holy Land Foundation v.
Ashcroft, et al.*, No. 02cv00442 (GK) (D. D.C. Complaint filed
March 8, 2002) (attached as Exhibit 15 to Plaintiffs' (HLF) Rule
56.1 Statement). HLF sought a declaratory judgment that the

defendants' actions violated HLF's rights as outlined in the complaint, and an injunction restraining the defendants from continuing to block HLF's assets, as well as fees and expenses. *Id.*

On May 31, 2002, the *Ashcroft* defendants filed a motion seeking dismissal of Counts One through Seven, and summary judgment on Count Eight, the Administrative Procedures Act claim. *See HLF v. Ashcroft, et al.*, No. 02cv00442 (GK) (D.D.C. Motion filed May 31, 2002)(attached as Exhibit 18 to Plaintiffs' (HLF) Rule 56.1 Statement). The district court conducted a "lengthy motions hearing" on HLF's motion for a preliminary injunction and the defendants' dismissal and summary judgment motions. Based on the presentations at that hearing, as well as the parties' briefs and the entire administrative record before it, the court issued its opinion. *See Holy Land Foundation for Relief & Development v. Ashcroft, et al.*, 219 F. Supp. 2d 57 (D. D.C. 2002).

As a preliminary matter, the district court determined that the scope of its review was limited to the administrative record, primarily because HLF had failed to establish that the record was, in any way, incomplete and had failed to demonstrate any bias or bad faith on the part of OFAC in the designation process. *Id.* at 65-66. In ruling on the defendants' motion for summary judgment on HLF's APA claim, the district court determined that OFAC's decision to designate HLF as an SDT and an SDGT was

neither arbitrary nor capricious; rather, the court held, "[t]he seven volume, 3130 page administrative record in this case provides substantial support for OFAC's determination that HLF acts for or on behalf of Hamas." *Id.* at 69. Specifically, the court noted, "the administrative record contains ample evidence that . . . HLF has had financial connections to Hamas since its creation in 1989; . . . HLF funds Hamas-controlled charitable organizations; . . . HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; [and] FBI informants reliably reported that HLF funds Hamas." *Id.* at 69. The court then detailed the evidence in the administrative record supporting each of these points, concluding that, because OFAC's determination that HLF acts for or on behalf of Hamas was neither arbitrary nor capricious, but was supported by substantial evidence in the administrative record, the defendants had not violated the APA and were, therefore, entitled to summary judgment on that claim. *Id.* at 74-75.

With respect to the defendants' motion to dismiss the RFRA and constitutional claims, the district court held that HLF had failed to state a claim under the RFRA, the First Amendment or the Fifth Amendment. Specifically, the court held that the defendants' actions had not run afoul of procedural or due process concerns or the Takings Clause, *id.* at 76-78, and that HLF failed to state a claim for violation of any right to free

association, free speech, or the free exercise of religion. *Id.* at 80-83. The court held, however, that HLF had stated a claim for violation of its Fourth Amendment rights, most notably by alleging that the government had entered HLF's offices, searched HLF's property, and seized HLF's documents and office equipment, all without a warrant, and without otherwise establishing the necessary probable cause. *Id.* at 79-80.

On HLF's preliminary injunction motion, the court held that HLF had not demonstrated a likelihood of success on any of its claims, and that the balance of harms and public interest would, in any case, weigh in favor of denying HLF's motion. *Id.* at 84-85. Thus, in the end, the district court denied HLF's preliminary injunction motion, and granted the defendants' motion to dismiss and for summary judgment as to all but the Fourth Amendment claim. *Id.* at 85.

HLF appealed, arguing, among other things, that the district court erred in refusing to order the administrative record completed and supplemented, and that the defendants' designation of HLF as an SDT and an SDGT and the attendant seizure of HLF's assets were arbitrary and capricious. *See Holy Land Foundation for Relief & Development v. Ashcroft, et al.*, No. 02-5307 (D.C. Cir. Brief of Appellant filed January 23, 2003)(attached as Exhibit 17 to Plaintiffs' (HLF) Rule 56.1 Statement). In connection with the first argument, HLF claimed that the district

court had refused to allow HLF to conduct discovery and refused to supplement and complete the record with exhibits HLF proffered that demonstrated the inaccuracy of the record. *See* Brief of Appellant, p. 53. In its opinion, issued after oral argument, the D.C. Circuit first agreed with the district court that the decision to designate HLF as an SDGT was "based on ample evidence in a massive administrative record." 333 F.3d at 162. In reaching this conclusion the court: rejected HLF's attempt to attack the hearsay evidence in the record, noting that "the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations"; and rejected HLF's attempt to characterize as irrelevant evidence in the record that pre-dated the 1995 designation of Hamas as a terrorist organization, noting that HLF presented no plausible evidence showing that HLF's ties to Hamas had been severed. *Id.* The court held that OFAC had reasonably determined that Hamas had an interest in HLF's property, as the record "provided substantial evidence to support that conclusion." *Id.* at 163.

Further, the court held, in the course of the redesignation proceedings, if not the initial designation proceedings, "HLF was accorded all the administrative process it was due . . . ." *Id.* at 163. Specifically, the court noted, in April 2002, the Department of the Treasury notified HLF that it was re-opening

the administrative record and considering whether to re-designate HLF as an SDGT on the basis of additional evidence linking HLF and Hamas; HLF was given thirty-one days to respond; HLF responded, and Treasury considered its response as well as the other evidence in deciding whether redesignation was appropriate. *Id.* at 164. This was enough, the court held, to satisfy due process concerns under the circumstances. *Id.*

The *Ashcroft* court recognized in its appellate opinion, for the district court "to reach the outcome that it did [on defendants' motion to dismiss HLF's First Amendment claims], that there is no constitutional right to fund terrorism, the district court first had to find that HLF funds terrorism." *Id.* at 165. The D.C. Circuit acknowledged that this was improper in the context of a motion to dismiss under Rule 12(b)(6), which does not permit the court to look beyond the complaint and would not have permitted the court here to consider the administrative record, as it unquestionably did. *Id.* at 165. But, the court held, any error on the part of the district court in this regard was harmless, because under no circumstances could HLF have come forward with evidence upon which a reasonable trier of fact could have found that the SDT and SDGT designation and the blocking order violated HLF's First or Fifth Amendment rights. *Id.* at 165. On this point, the D. C. Circuit determined that:

> [t]he ample record evidence (particularly taking into account the classified information presented to the

court *in camera*) establishing HLF's role in the funding
of Hamas and its terrorist activities is
incontrovertible.  While not in accordance with proper
procedures, HLF has had every opportunity to come
forward with some showing that that evidence is false
or even that its ties to Hamas had been severed.  HLF's
presentations at the administrative stage did not reach
this goal, even when HLF was given an additional
thirty-one days to respond to its redesignation and to
the new evidence in April of 2002.

333 F.3d at 165-66.

Based upon the quoted language, this Court is persuaded that

the question of whether HLF provided material support to Hamas

was not only actually litigated in the *Ashcroft* case, but it was

necessary to the D.C. Circuit's decision to affirm the district

court's dismissal of the bulk of HLF's complaint.  In short, the

Court finds that the basic prerequisites for the application of

issue preclusion are satisfied – the issue on which the Boims

seek to preclude HLF is the same as that involved in the prior

litigation, the issue was actually litigated, and it was

essential to the final judgment. *See Chicago Truck Drivers,*

*Helpers and Warehouse Union (Independent) Pension Fund v. Century*

*Motor Freight, Inc.* 125 F.3d 526, 530 (7th Cir. 1997).

Turning to the question of whether HLF had a "full and fair

opportunity" to litigate this issue, the Court begins with the

proposition that "judicial affirmance of an administrative

determination is entitled to preclusive effect." *Kremer,* 456

U.S. at 480 n.21 (citing *CIBA Corp. v. Weinberger,* 412 U.S. 640,

644 (1973)).  It is of no consequence that the *Ashcroft*

37

litigation involved the judicial review of an administrative determination, as opposed to being a case initiated in the federal courts. *Grubb v. Public Utilities Comm'n*, 281 U.S. 470, 475-477 (1930). Additionally, the "full and fair opportunity to litigate requirement is satisfied so long as minimum due process standards are satisfied." *Charles Koen & Associates v. City of Cairo*, 909 F.2d 992, 1000 (7th Cir. 1990). HLF argues that this was not the case in the D.C. Circuit proceedings, because: HLF never had a hearing before the agency whose action HLF challenged; HLF was denied the opportunity to put exculpatory evidence in the record; HLF was denied the opportunity to call witnesses to establish its innocence; the court sustained the agency's decision even though it was based entirely on hearsay; the court relied on secret evidence; the court granted summary judgment against HLF *sua sponte*, without first providing notice of its intent to do so; and the court struck from the record all of the evidence HLF tendered.

None of HLF's arguments on this score is new; each was raised – and rejected – in the *Ashcroft* case. The Court similarly rejects them here. First, based upon the exhibits submitted, it appears that the administrative record challenged in the *Ashcroft* case actually did contain the documents HLF sought to include. At a hearing on HLF's attempt to obtain evidence outside the parameters of the administrative record,

38

Judge Kessler, the district judge to whom the *Ashcroft* case was assigned, specifically asked the government's attorney whether the administrative record included HLF's materials, and she represented that it did:

> THE COURT: All right. Then I want to know whether that record includes any of the materials which I believe plaintiff says that it submitted to Treasury in that period between the designation and the redesignation?

> MS. SHAPIRO: Yes, absolutely. In fact one of the things that was accomplished by doing the redesignation was the incorporation of all of the materials that plaintiff submitted with its motion for a preliminary injunction, and an additional letter that Mr. Cline wrote to the Treasury Department making some additional points in addition to incorporating those documents.
> Those are all contained in the administrative record. I think there may be close to an entire volume dedicated to their submissions.

*See Holy Land Foundation v. Ashcroft*, No. 02-442, Transcript of Motions Hearing Before Judge Kessler, p. 25 (D.D.C. July 18, 2002) (attached as Exhibit 6 to HLF's Rule 56.1 Statement).

Moreover, HLF has never (in the *Ashcroft* case or in this Court) offered any insight as to what was lacking in the record before the federal courts in the *Ashcroft* case. In its appellate brief to the D.C. Circuit, HLF attempted to support its argument that the government's SDT designation was incorrect and biased with evidence HLF had unearthed showing that (1) the United States Agency for International Development ("USAID") issued a 2002 press release boasting that it (USAID) had contributed food, water and medical supplies to Al Razi Hospital; and (2) another

non-Muslim charity that was in partnership with USAID publicly acknowledged donating to Al Razi Hospital, as well as at least three of the same zakat committees that HLF contributed to - the same committees that evidenced, according to the government, HLF's support of Hamas. *See Holy Land Foundation v. Ashcroft*, No. 02-5307, Brief of Appellant at 56, filed January 23, 2003 (D.C. Cir.) (attached as Exhibit 17 to Plaintiffs' (HLF) Rule 56.1 Statement). As the Court sees it, there are two problems with this evidence: first, contributing to one entity - or even a few entities - connected to Hamas is not the same thing as deliberately targeting Hamas-controlled entities to receive the vast majority of one's money, which is what the government showed HLF did. Second, and more importantly, this evidence does nothing to disprove the evidence showing that HLF provided material support to Hamas.

Finally, "[d]ue process is not a fixed menu of procedural rights. How much process is due depends on the circumstances." *Society of Lloyd's v. Ashenden*, 233 F.3d 473, 479 (7th Cir. 2000). *See also Moyer v. Peabody*, 212 U.S. 78, 84-85 (1909)("what is due process of law depends on circumstances. It varies with the subject-matter and the necessities of the situation."), *cited in Hamdi v. Rumsfeld*, — U.S. —, 124 S.Ct. 2633, 2681 (June 28, 2004)(Thomas, J., dissenting). The Court is persuaded that, under the circumstances, HLF had a "full and fair

opportunity" to litigate its claim that it did not provide material support to Hamas. In proceedings before the D.C. Circuit, HLF was represented by counsel, and HLF had the opportunity to argue and explain its position fully. It is true that Judge Kessler denied HLF's motion to expand the scope of her review, and denied HLF the opportunity to depose witnesses involved in the designation and re-designation proceedings. But it is equally true that that decision was not made until after the judge had heard a detailed proffer from HLF's counsel concerning what information and discovery they sought, and why. This Court is in no position to second guess the judge's rulings on the issue. Moreover, the D.C. Circuit did consider the judge's rulings on the issue, and, in those proceedings, HLF was again ably represented by counsel, who had a full and fair hearing before the Court of Appeals.

To the extent the proceedings surrounding HLF's SDT designation and redesignation failed to measure up (in terms of discovery and the strict adherence to the rules of evidence) to the standards one might expect to find in a *de novo* proceeding in federal court, that is perhaps excusable; after all, the designation proceedings were not a *de novo* proceeding in a federal court. Rather, HLF's complaints arise - and must therefore be viewed - in the context of executive orders, agency action and judicial review of that action, all involving a

volatile and emotional issue (terrorism). This Court does not know - and will likely never know - the exact nature of the "classified information" that was "presented to the [D.C. Circuit] *in camera.*" *See Holy Land Foundation v. Ashcroft*, 333 F.3d at 165. But that does not vitiate the potential preclusive effect of the court's judgment. Indeed, collateral estoppel or issue preclusion may appropriately be applied based on default proceedings, where the later court has no evidence before it, and based on proceedings that are so abbreviated that they are the functional equivalent of default proceedings. *E.g., In re Catt*, 368 F.3d 789, 791-92 (7th Cir. 2004).

The Court is not insensitive to HLF's contention that some Muslims and affiliated organizations have experienced certain hardships in the post-September 11th climate in America. But the Court's role requires it to focus not on generalities, but on specifics. And here, HLF has given the Court no reason to question the D.C. Circuit's judicial independence or integrity. There is nothing to suggest that the court acted inappropriately or as a rubber stamp for the Justice Department. On the contrary, based upon the record, the Court can only conclude that the D.C. Circuit provided HLF with a full and fair opportunity to present its side of the case; the court simply chose to reject HLF's side in favor of the defendants'.

In short, HLF had a full and fair opportunity to be heard on

42

the question of whether it provided material support to Hamas, the question was actually litigated and decided in the *Ashcroft* case, and this Court is bound by the D.C. Circuit's ruling on the issue. Collateral estoppel applies here, and, as a result, the Boims are entitled to summary judgment against HLF on liability. With the D.C. Circuit's ruling, as well as the other evidence in the record linking Hamas to David Boim's murder and linking HLF to Hamas, no reasonable jury could find for HLF on the liability issue. Accordingly, the Court grants the Boims' motion for summary judgment, and denies HLF's motion for summary judgment.

2. Motions Filed By and Against IAP and AMS

The Islamic Association for Palestine ("IAP") and the American Muslim Society ("AMS") joined forces, as they did with their Answer to the Complaint, in their joint motion for summary judgment. In their motion, they argued that, although the record might contain some evidence that some of the other defendants knew about Hamas' terrorist activities and engaged in acts to help those activities succeed, the record contains no evidence that this was true of IAP or AMS. The Boims filed a cross-motion for summary judgment on the issue of liability only, arguing that IAP and AMS provided material support to Hamas by paying for Hamas leaders and members to come to the United States to attend and speak at conferences, by helping to distribute pro-Hamas literature and propaganda, and by using that literature and

propaganda to solicit donations to Hamas' cause.

For IAP and AMS to be liable to the Boims under 18 U.S.C. §2333, they must have known about Hamas' illegal activities, they must have desired to help those activities succeed, and they must have engaged in some act of helping. *See Boim v. Quranic Literacy Institute, et al.,* 291 F.3d at 1023. Summary judgment in the defendants' favor is appropriate only if no reasonable jury could find for the Boims on these points; conversely, summary judgment in the Boims' favor is appropriate only if no reasonable jury could find for the defendants on these points. *See Anderson,* 477 U.S. at 248.

The first element of the Boims' claim requires a showing that IAP and AMS knew about Hamas' illegal activity, and, on this point, the record is clear: IAP and AMS concede that Hamas "has used political and violent means, including terrorism, to pursue its goal of establishing an Islamic Palestinian state in Israel, the West Bank, and Gaza," and they concede that Hamas was responsible for David Boim's murder. *See* IAP/AMS' Rule 56.1 Statement, ¶¶10-11; IAP/AMS' Response to Plaintiffs' Rule 56.1 Statement, ¶5. The remaining two elements – that IAP and AMS desired to help Hamas' illegal activities succeed, and that they engaged in some act of helping to further that goal – require a bit more discussion.

At the outset, the Court notes that IAP and AMS' arguments

44

on summary judgment, both in their own motion, and in response to the Boims' motion, effectively boil down to: "that's a different organization; that's not us." The Court rejects the notion that the IAP involved in this case is somehow different from the IAP whose name appears throughout the record. Although the evidence shows that there were a number of organizations using the IAP name, the evidence also shows that those organizations were related – whether officially or unofficially.

According to the parties' statements of fact, the IAP named in the Boims' complaint is a not-for-profit Texas corporation; the Court will refer to this entity as "IAP Texas" in an attempt to avoid confusion. AMS, another named defendant, is a not-for-profit Illinois corporation that serves as the Chicago Chapter of IAP. According to IAP and AMS, the purpose of both corporations is "to promote the cause of Palestine in America"; according to the Boims, their purpose is "to promote Hamas and the Muslim Brotherhood." *See* IAP/AMS' Rule 56.1 Statement, ¶¶4-5; Plaintiffs' Response to IAP/AMS' Rule 56.1 Statement, ¶¶4-5.

In their complaint, the Boims allege that "[t]here has been continuously since the early 1980's an entity or group of persons and entities operating under the name "Islamic Association for Palestine" (collectively, "IAP National")" and that "IAP National is an umbrella organization that encompasses the various organizations throughout the country which call themselves "IAP,"

including Defendants AMELP, AMS and IAP Texas." *See* First Amended Complaint, ¶7. Although the defendants dispute this, the evidence bears this out.

Rafeeq Jaber testified that he has served as President of AMS from its inception in 1993 to the present; he also served as President of an entity referred to as "IAP National" from 1996 to 1998, and then again from 1999 to the present. Transcript of Deposition of Rafeeq Jaber taken April 9, 2003[3], pp. 10-12 (attached as Exhibit 10 to the Appendix of Exhibits to Plaintiffs' Answer to IAP and AMS' Rule 56.1 Statement). He testified that he also served as the President of IAP Texas beginning in 2002. *Id.*, p. 15. Although he testified that IAP Texas and AMS are two distinct entities, he also testified that IAP National is sort of an umbrella organization that floats between IAP Texas and AMS, without any separate corporate structure; when IAP National is headquartered in Dallas, IAP Texas serves as the National organization; when IAP National is headquartered in Chicago, AMS serves as the National Organization. *Id.*, pp. 13-15. Thus, there is no question that, during the years when IAP Texas served as the headquarters for

---

[3] Mr. Jaber's deposition was initially taken on April 9, 2003. After hours of questioning, the parties agreed to continue the deposition. Mr. Jaber's second deposition was held on July 28, 2003. The Court will refer to the transcripts from Mr. Jaber's April 9, 2003 deposition as "Jaber Deposition I", and to the transcripts from the July 28, 2003 deposition as "Jaber Deposition II."

IAP National, IAP Texas and IAP National were one and the same; similarly, when AMS served as the headquarters for IAP National, AMS and IAP National were one and the same.

Similarly, Omar Ahmad, who served as the President of IAP National before Mr. Jaber, testified that AMELP, another of the companies alleged by the Boims to be within IAP's umbrella, did business for a time as IAP, though apparently without any kind of corporate formality. *See* Deposition of Omar Ahmad, pp. 38, 46, 76-77.

Mr. Jaber testified that, even when IAP National was based in AMS' Chicago office, IAP Texas continued to be responsible for certain IAP National projects; IAP Texas published Al-Zaytuna, it held fundraising events, sold promotional merchandise and it helped to organize and plan IAP's annual conference. Jaber Deposition I, pp. 131-32. Mr. Jaber also testified that IAP Texas created promotional items – videotapes, audiotapes, t-shirts, cups and such - and then IAP National and AMS sold them for profit. *Id.*, pp. 95-96. Mr. Jaber testified that IAP National and AMS "exchange[d] money" with IAP Texas. *Id.* at 261. He also testified that, at times, AMS and IAP National gave money to AMELP. Jaber Deposition II, pp. 51-52 (attached as Exhibit 5 to IAP and AMS' Rule 56.1 Statement).

The Boims' characterization of IAP as an umbrella organization is further supported by Mr. Jaber's testimony that

IAP National, the organization that floated between AMS and IAP Texas, had "chapters" in various other parts of the country, including Detroit, Wisconsin, New Jersey and California. Jaber Deposition I, pp. 184-85. According to Mr. Jaber, the chapters, which were really more like committees, helped to publicize conferences and other events put on by IAP National, and they helped to raise money for IAP. *Id.* at 185-88, 192. In fact, he testified that, in the years before AMS was officially incorporated, he was known as the head of IAP's Chicago chapter; he testified that he formed AMS, in large part, to make more official or legitimate the activities that he was already doing for IAP National. Jaber Deposition II, pp. 89-90.

Further solidifying the fact that these organizations are all related, loosely if not officially, is the fact that they have acted as one in this lawsuit. As noted, IAP and AMS filed a joint answer, as well as a joint motion for summary judgment and a joint response to the Boims' motion. And, according to Mr. Ahmad, AMS hired Mr. Fennerty to represent it in this lawsuit, and AMELP just tagged along. Ahmad Deposition, p. 44.

In short, the record shows that at all times relevant to this action, there was a national organization serving as the Islamic Association for Palestine, and that IAP Texas and AMS either formally served as that organization, or were so intertwined and involved with that organization as to make any

formal distinction meaningless. The defendants cannot now hide behind their ambiguous and amorphous corporate design. The Court finds that the defendants' "it wasn't us" arguments ring hollow.

Turning to the question of whether IAP and AMS desired to help Hamas' activities succeed, and, in fact, engaged in some act of helping those activities succeed, the record contains an abundance of evidence that both of these propositions is, in fact, true. First, the Watson Memorandum includes a report of surveillance tapes that clearly demonstrate a desire on the part of all in attendance to help Hamas survive and prosper. *See* AR 1399-1475 (attached as Exhibit 5 to Plaintiffs' (IAP/AMS) Rule 56.1 Statement). The reports detail conversations that were recorded in October of 1993, during a meeting that took place in Philadelphia, Pennsylvania.

The overarching theme of the discussions taped by the FBI concerned how the entities affiliated with and working for Hamas should operate in the United States in light of the Oslo Accord, more formally known as "the Oslo Declaration of Principles," in which Yasser Arafat and Yitzhak Rabin recognized, ostensibly on behalf of Palestinians and Israelis, each other's right to exist as a people within the borders of Palestine/Israel, and committed themselves to negotiating a permanent settlement and to improving relations between the two peoples. The participants in the Philadelphia meeting, all believed by the FBI to be members or

supporters of Hamas, universally condemned the Accord and vowed
to do what they could to ensure its failure.  For example,
according to the FBI, Mr. Ashqar asked rhetorically "What shall
we do next?" and answered that "[t]he answer is to adhere to a
strategy that can make the accord fail"; said "we can achieve
that," but "how to achieve our goals is not the subject of this
meeting.  The objective is how can we act in the American
theater."  Exhibit 5, AR 1419.  *See also* AR 1458 (recap of
meeting's objectives listing, as number one, "[t]he need to make
the peace accord fail.")

The men discussed the best way to support the Movement,
which clearly refers to Hamas, though they tried to be careful
about using the name Hamas, and concluded that the institutions
operating in the United States "should be at the service of the
Movement over there [and that] [t]his should include finance,
information, political and everything."  *Id.*, 1431.  According to
the FBI report, the men discussed trying to increase awareness
and fundraising efforts by bringing in guests from the occupied
territories to speak at mosques and Islamic centers (AR 1432),
having HLF and IAP join forces (AR 1439), placing appeals for
humanitarian donations in Al-Zeitouna, the Monitor and other
Islamic magazines (AR 1443), among other means.  According to the
FBI, a speaker identified as Abdul Rahman LNU (last name unknown)
urged that the group should "concentrate our efforts on

50

supporting Jihad . . . . This can be done, he said, through concentrating our financial resources on those directly connected with Jihad, such as [the] injured, the martyrs, their families and the prisoners." Exhibit 5, AR 1445.

At a closing meeting, the men discussed that "their institutions, such as the Fund [HLF] and the Union [IAP] were established in the first place to provide assistance to the Movement [Hamas] inside the Occupied Territories and they should not deviate from this objective." *Id.*, AR 1459. Ultimately, the group concluded that IAP should not change its objectives or methods dramatically. *See id.*, AR 1461.

According to the FBI, Omar Ahmad attended that meeting. At his deposition in this case, Mr. Ahmad testified that he could not recall whether he attended the 1993 meeting in Philadelphia. Deposition of Omar Ahmad, pp. 221- 25. But he testified that it was not uncommon for him to meet with the men identified in the surveillance report – Abdelhaleem Hassan Ashqar, Akram Karubi, Mohammed Al-Hanooti, Ismail Elbarasse, Moin Kamal, Mohammed Shabib, Shukri Abu-Baker, Ghassan Elashi, and Haitham Maghawri. *Id.*, pp. 241-42. Mr. Ahmad testified that he knew some of these men back in 1993 – namely, Messrs. Ashqar, Karubi, Al-Hanooti, Elashi, Abu-Baker and Maghawri; he further testified that he did not know whether Ashqar, Karubi, Al-Hanooti, and Elashi were or were not members or supporters of Hamas, but that he knew for

sure that Abu-Baker and Maghawri were not. *Id.*, pp. 227-235, 237. He testified that both Messrs. Abu-Baker and Maghawri told him many times that they had nothing to do with Hamas. *Id.*, p. 235.

Mr. Ahmad testified that he served as President of AMELP, but he could not remember the exact time frame. Ahmad Deposition, p. 8, 30. He also testified, however, that, during the time when he was President of AMELP, AMELP was doing business as IAP and sometimes as the IAP Information Office, and he testified that AMELP did business as IAP, and sometimes as the IAP Information Office, during the early 1990s. *See* Ahmad Deposition, p. 38, 46, 76-77. Thus, it is extremely likely that Omar Ahmad was serving as President of AMELP and IAP in October 1993, when the Philadelphia meeting took place. This is consistent with the testimony of Rafeeq Jaber, who testified that he became President of IAP in 1996, and that Mr. Ahmad preceded him in that position; he also testified that, when he was working with IAP in the late 1980s and early 1990s, he dealt with the President of IAP, who was Jasser Bushnaq first and then Omar Ahmad. *See* Jaber Deposition I, p. 55-56.

In addition to the documents contained in the Watson Memorandum, the record contains evidence that IAP and AMS (as well as the various organizations within the national IAP umbrella) contributed money, on a number of occasions, to HLF,

and that they routinely and consistently encouraged people to donate money to HLF, and otherwise assisted in HLF's fundraising endeavors. *See, e.g.,* Jaber Deposition I, pp. 69-76. Mr. Jaber testified that some of the money IAP and AMS gave to HLF actually represented donations from individuals who had given the money to IAP or AMS to give to HLF; Mr. Jaber testified that people sometimes came to him and asked if he would accept a donation to AMELP or HLF, he accepted the donation, and then turned around and wrote a check to AMELP or HLF. *Id.,* pp. 73-74, 76. When asked why people would give IAP or AMS money on behalf of HLF, Mr. Jaber testified that he recommended HLF to people wishing to make donations to the Palestinian cause. Jaber Deposition I, pp. 76-77.

Mr. Jaber testified that IAP and AMS "encourage[d] people to donate for [HLF] of course," and "we mention that in our IAP web page." *Id.,* pp. 201-02. He testified that neither IAP National nor AMS has ever donated its own money to HLF, but that they worked to "promote [HLF] in every way we can." *Id.,* pp. 203, 206. Mr. Jaber testified that one way IAP promoted HLF was by including solicitations for donations to HLF in the press releases and "action alerts"[4] IAP National published. *Id.,* pp.

---

[4]"Action alerts" were communiques published and distributed from time to time, typically in response to some event in the Middle East or the United States, or to mark an anniversary or auspicious occasion. Jaber Deposition I, pp. 263-64.

206-08. Mr. Jaber testified that IAP National routinely solicited donations to the Occupied Land Fund and HLF "to support the needy people in Palestine." Jaber Deposition II, pp. 166-67. Omar Ahmad similarly testified that IAP advertised for HLF, and encouraged people to donate to HLF. Ahmad Deposition, pp. 98-100.

Additionally, Mr. Jaber testified that IAP allowed HLF to set up a booth at its annual conventions to do its own fundraising; he also testified that the money IAP raised at its 1996 convention all went to HLF. Jaber Deposition I, pp. 253-55.

Mr. Jaber also testified that, long before he officially formed AMS in 1996, he was actively involved in the business of IAP through an organization called the Mosque Foundation. *See* Jaber Deposition II, pp. 69-70. Mr. Jaber testified that, in connection with his involvement with the Mosque Foundation, he became known as the head of IAP's Chicago Chapter in 1991. In that capacity, in the late 1980s and early 1990s, he worked with IAP to sponsor annual events celebrating the anniversary of the *Intifada*. *Id.*, pp. 70-76, 80-81. Mr. Jaber testified that the money raised during these *Intifada* celebrations all went to HLF (or the Occupied Land Fund, as it was then known). *Id.*, pp. 77-78.

Although these fundraising and financing activities relate to HLF, and not Hamas, taken in the context of the findings made

above and elsewhere about HLF's established link to Hamas, this is strong evidence that IAP was supporting Hamas, consistent with the FBI's surveillance reports.

Beyond fundraising, the record shows that IAP and AMS published and distributed an abundance of pro-Hamas documents. Mr. Ahmad testified that IAP published statements and information from Hamas. Ahmad Deposition, pp. 254-55. Mr. Jaber initially testified that, at least while he was in charge, neither IAP nor AMS had ever published Hamas press releases or communiques (he could not say whether the same was true before he assumed control). Jaber Deposition I, p. 165. On further questioning, however, he admitted that the December 1988/January 1989 edition of *Ilafilastine* featured IAP's logo and published a Hamas statement, along with a solicitation for donations to be made to the Occupied Land Fund (HLF); Mr. Jaber also admitted that IAP's logo appeared on the publication of Hamas' charter, as did several IAP addresses. Jaber Deposition II, pp. 175-76. Mr. Jaber also admitted that IAP had more recently published and distributed a number of pro-Hamas documents, including an August 30, 2001 editorial written by Khalid Amyreh that advocated martyrdom operations, meeting death with death, and killing jews. Jaber Deposition II, pp. 189-90. He testified that IAP paid Mr. Amyreh for the material he provided, but that IAP did not necessarily publish the editorial because it shared Mr. Amyreh's

views. *Id.*, pp. 190-92.

Additionally, Mr. Jaber testified that, when Mohammed Salah was arrested in Israel, IAP National and AMS had a number of events to try and garner public support for his release. Jaber Deposition I, pp. 212-13. Though, in fairness, he also testified that he believed the Israeli government was holding Mr. Salah without justification. *Id.*, p. 214. On the other hand, Mr. Jaber testified that, in 1997, under his leadership, IAP National published documents designed to garner public support for Abu Marzook, who Mr. Jaber knew at the time to be the head of the political bureau of Hamas. *Id.* at 227-29. Despite this, Mr. Jaber testified, AMS and IAP National "got involved in the case" by printing and distributing information about Mr. Marzook and his arrest in New York, and by asking people "to write to the president, to the judge . . . ." Jaber Deposition I, pp. 78-79. Mr. Jaber testified that IAP National and AMS generated and distributed documents aimed at rallying support for HLF after HLF's assets were seized by OFAC. Jaber Deposition II, pp. 98-99. Of course, publishing documents in support of members of Hamas or in support of organizations or people known to support Hamas is not against the law. But all of this does tend to evidence a desire on the part of IAP to help Hamas succeed.

The record also shows that IAP held annual conferences or conventions, invited pro-Hamas speakers to present at those

56

conferences or conventions, and paid for their travel expenses. Omar Ahmad testified that, when he was President of AMELP, doing business as IAP, IAP's practice with respect to the annual conferences was to bring in speakers from a variety of groups, including Hamas. Ahmad Deposition, pp. 122-23. He further testified that, when IAP brought a speaker from overseas to speak at a conference, IAP paid that person's travel expenses. *Id.*, pp. 101-02. Rafeeq Jaber also testified that IAP National paid the travel expenses of the speakers it brought in for its conventions. Jaber Deposition I, p. 269.

The record shows that IAP's 1989 conference featured a veiled Hamas terrorist. *See* Plaintiffs' Rule 56.1 Statement, Exhibit 43 (the videotape of the conference); Ahmad Deposition, pp. 196-99 (admitting that the speaker appears to represent Hamas); Jaber Deposition II, pp. 132-35(confirming that the tape shows IAP's 1989 conference and bears IAP's logo). The record shows that IAP's 1996 conference featured Sheikh Ali al-Bayanouni, who was the leader of the Muslim Brotherhood[5] of Syria, and "Sister Nadia al-Ashi, the wife of Musa Abu Marzouk,[6]

---

[5]The Muslim Brotherhood, which started as an Islamist revivalist movement in 1928, is the parent organization from which Hamas sprung. *See* Plaintiffs' (IAP/AMS) Rule 56.1 Statement, ¶¶1-4.

[6]This is a reference to Mousa Mohammed Abu Marzook, who was originally named as a defendant in this case; Mr. Marzook was awaiting extradition proceedings in New York at the time this article came out. *See In re Extradition of Marzook*, 924 F.Supp. 565, 579 (S.D. N.Y. 1996).

the political leader of Hamas who has been in an American prison for more than a year and a half." *See* Muslim World Monitor, p. 4 (January 1997)(attached as Exhibit A to Plaintiffs' Reply Brief).

At his deposition, Mr. Jaber was shown an excerpt from a book by Steven Emerson entitled "American Jihad, The Terrorists Living Among Us"; the excerpt dealt with Hamas and identified various instances where Hamas leaders or Hamas supporters had appeared and spoken at IAP conferences. For example, according to Mr. Emerson, IAP's 1989 Kansas City conference featured a Hamas commander, as well as Yusef al-Qaradawi, an Egyptian-born religious scholar based in Qatar; IAP's 1996 Chicago conference featured Mohammad abu Faris, a Jordanian Islamic leader who, according to Mr. Emerson, called for jihad in his speech; IAP's 1997 Chicago conference featured Ahmed al-Kufahi, who, according to Mr. Emerson, urged the audience to take up arms against the Israeli occupation; IAP's 1999 conference featured Salah Sultan, who spoke in support of the martyrdom operations; IAP's 2000 conference featured Jamal Said, who, according to Emerson, advocated providing support for the families of the martyrs and specifically requested that the attendees donate to that cause. Jaber Deposition II, pp. 147-159. Mr. Jaber admitted that each of the people identified had, in fact, given speeches at the various IAP conferences, but he testified that he could not remember whether they, in fact, made the statements Mr. Emerson

attributed to them. Mr. Jaber made it clear, however, that he is familiar with Mr. Emerson, and that he considers him to be an "Arab-basher" and a "liar." *Id.*

The record makes clear that, if IAP has never outrightly cheered on Hamas' terrorist activities, it has come awfully close. Certainly, IAP has never condemned Hamas' tactics. Indeed, Mr. Jaber testified that IAP takes no position on whether suicide bombings, also called "martyrdom operations," are right or wrong, "because we do not judge. I don't believe we are in a position to judge the people what they do and what they do not do. Because the one in the field is different than the one sitting in the chair like me here." Jaber Deposition II, pp. 194-95. The record shows that IAP actually praises Hamas' terrorist activities, though it does so somewhat subtly: Mr. Jaber admitted that IAP National, under his leadership, published articles and editorials characterizing suicide bombers and those who carried out bombing operations against Israeli targets as "martyrs" and as "freedom fighters," though he claimed that IAP took no official position on the validity of those characterizations. Jaber Deposition II, pp. 194-98.

The record also contains a declaration from Rashid Khalidi, a professor of Middle Eastern History and the Director of the Center for International Studies at the University of Chicago; Professor Khalidi served as an advisor to the Palestinian

delegation to the Palestinian-Israeli peace negotiations of 1991-1993 in Madrid and Washington, D.C. *See* Declaration of Rashid Khalidi (attached as Exhibit 6 to IAP and AMS' Rule 56.1 Statement). Professor Khalidi's aim is to make clear that opposition to the Israeli occupation is not the same as support for Hamas; the Court did not for one moment equate the two. But expressing that opposition via suicide bombings and terrorist attacks such as the one that killed David Boim would seem, to this Court, to be precisely what Hamas is about. And the Seventh Circuit has instructed that those who provide material support to terrorists, who help to fund - directly or indirectly - Hamas' terrorist activities are liable, under 18 U.S.C. ¶2333 to the same extent as those who actually commit the terrorist acts.

The Court recognizes that the record contains some statements that counter the evidence detailed above. For example, in a declaration submitted in support of IAP and AMS' motion for summary judgment, Mr. Jaber states that, at least while he was a member or the President of IAP and AMS, neither organization supported terrorists or terrorist activities, engaged in helping terrorist activities succeed, engaged in helping terrorist acts, or intentionally, knowingly or deliberately gave money to support terrorist activities. *See* Declaration of Rafeeq Jaber, ¶¶5-8 (attached as Exhibit 4 to IAP and AMS' Rule 56.1 Statement). But the Seventh Circuit has said

that conclusory, self-serving testimony, lacking factual support in the record, cannot defeat a summary judgment motion. *See, e.g., Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001); *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 709 (7th Cir. 1995); *Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir. 1994). More importantly, Mr. Jaber's declaration does nothing to refute the evidence that IAP provided material support to Hamas in the years when he was not a member and was not the President.

Based upon the evidence in the record, the Court is persuaded that no genuine issues of fact exist, and that no reasonable jury could, on the record before the Court, find in favor of IAP and AMS on the question of liability. Accordingly, the Court denies IAP/AMS' motion for summary judgment, and grants the Boims' motion for partial summary judgment against these defendants.

3.    Motions Filed By and Against Mohammed Salah

The Boims have alleged that Mohammed Salah, a naturalized U.S. citizen who lives in Illinois, is "the admitted U.S.-based leader of the military branch of Hamas," and is named on the list of Specially Designated Terrorists. First Amended Complaint, ¶12. They allege that Mr. Salah was incarcerated in Israel from January 1993 to November 1997, after pleading guilty to a variety

61

of offenses, including financing a number of Hamas' operatives;
they further allege that, during that period of incarceration,
Mr. Salah admitted that he channeled money for Hamas' operations
and that he recruited, organized and trained terrorist operatives
in Israel. *Id.* Finally, they allege that Mr. Salah worked with
Abu Marzook to coordinate Hamas' fundraising and money laundering
operations in the United States. *Id.*, ¶34.

To hold Mr. Salah liable under 18 U.S.C. §2333, the Boims
must show that he knew about Hamas' illegal activities, he
desired to help those activities succeed, and he engaged in some
act of helping. *See Boim v. Quranic Literacy Institute, et al.*,
291 F.3d at 1023. The Boims have moved for summary judgment on
liability against Mr. Salah, arguing first that, because of the
Israeli conviction, Mr. Salah is estopped from denying that he
knew about Hamas' terrorist activities, desired to help them
succeed, and committed acts to help them succeed; alternatively,
the Boims argue that, even without the Israeli conviction, the
evidence in the record shows that Mr. Salah provided material
support to Hamas in violation of 18 U.S.C. §2333. Mr. Salah
opposed the Boims' motion, arguing that the Israeli conviction
carries no weight in this court, and that, without that
conviction, the Boims have no evidence that he provided any
support to Hamas or that Hamas was even involved in David Boim's
murder. In fact, Mr. Salah filed a cross-motion for summary

judgment, arguing that, as a matter of law, the Boims cannot prevail on their claim against him because the record contains no admissible evidence linking him to Hamas, and no admissible evidence linking Hamas to David's murder.

Before turning to the merits of the parties' summary judgment motions, the Court must address a motion to strike filed by Mr. Salah. Mr. Salah has moved to strike a number of the exhibits that Boims have filed in support of their motion for summary judgment. Mr. Salah argues that Exhibits 7 through 15, 17 through 21, 23 through 26, and 28 are irrelevant, unreliable, or otherwise inadmissible, and that the Court should not consider them in ruling upon the Boims' motion for summary judgment. For purposes of this motion only, the Boims have chosen not to defend the admissibility of Exhibits 10, 17, 18, 23, 24, 26, and part of Exhibit 12. Because of this, the Court will not consider these exhibits in ruling on the Boims' motion for summary judgment against Mr. Salah. The Court will address in turn below the contested exhibits.

At the outset, on summary judgment, the Court may consider any evidence that would be admissible at trial. *See Stinnett v. Iron Works Gym/Executive Health Spa*, 301 F.3d 610, 613 (7th Cir. 2002). At this stage, the evidence need not be admissible in form, but it must be admissible in content. *Id.* The question of admissibility, as well as the decision to grant or deny a motion

to strike exhibits as inadmissible, are vested in the district court judge's sound discretion. *See, e.g., Credit General Insurance Company v. Midwest Indemnity Corp.*, 916 F.Supp. 766, 771 (N.D. Ill. 1996).

Mr. Salah first asks the Court to strike Exhibit 7, which the parties have referred to as the "Hinawi conviction," though it is really just the English translation of the notes U.S. Foreign Service Officer Abdelnour Zaibeck made while observing Hinawi's trial. Mr. Salah argues that the document is inadmissable because (1) it is inauthentic, (2) it violates Federal Rule of Evidence 1002, (3) it constitutes hearsay and double-hearsay, (4) the Boims have not complied with Federal Rule of Evidence 604 regarding interpretation and translation of this document, and (5) it would not otherwise be admissible at trial. The Court has not relied on this exhibit in connection with the motions involving Mr. Salah, and will therefore grant Mr. Salah's motion to strike it.

Mr. Salah next moves to strike Exhibits 8 and 9, which are described, respectively, as a copy of a Palestinian Authority website regarding Al-Sharif, one of the perpetrators of the attack that killed David Boim, and printed material from Hamas websites. Mr. Salah contends that exhibits 8 and 9 are inadmissible for many of the same reasons raised in connection with Exhibit 7 – hearsay, proper authentication, and compliance

with Rule 604; they also argue that the websites are irrelevant, and that admitting them would confuse the jury. Like Exhibit 7, these exhibits have played no role in the Court's consideration of the motions involving Mr. Salah, and the Court will therefore grant Mr. Salah's motion to strike them.

Mr. Salah next seeks to strike Exhibit 11, which is a transcript, in English, of an interview of Khaled Mishaal, who was actively involved in the creation and growth of Hamas and served as the head of Hamas' political bureau; the interview was conducted by Ghassan Charbel for Al-Hayat and published in seven parts in December 2003. Mr. Salah contends that Exhibit 11 is inadmissible because it (1) has not been authenticated pursuant to Federal Rule of Evidence 902, (2) constitutes hearsay, and (3) presents expert testimony without having qualified the witness as an expert. Mr. Salah also claims that the source of Exhibit 11 is unknown. Mr. Salah's authenticity challenge would clearly fail; the interview was published by Al-Hayat, a well known Arabic language newspaper, *see* Declaration of Reuven Paz, ¶19, and under the Federal Rules of Evidence, "extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to . . . [p]rinted materials purporting to be newspapers or periodicals." Federal Rule of Evidence 902(6). Having said this, however, because the Court has not considered this exhibit in connection with the motions filed by and against

65

Mr. Salah, the Court will grant Mr. Salah's motion to strike it.

Next, Mr. Salah asks the Court to strike Exhibit 12, which consists of the declaration from Samuel A. Simon, Jr., the FBI agent charged with responding to the Boims' subpoena for documents relating to the Watson Memorandum, as well as the corresponding documents that were part of the administrative record in the *Ashcroft* case. For purpose of this motion only, the Boims have stated that they do not contest the admissibility of any of the documents, except for Agent Watson's memorandum, and so the Court will limit its discussion to that specific document and will not consider the remaining documents.

Mr. Salah contends that the Watson Memorandum is inadmissible hearsay. To the extent this is true, the Watson Memorandum clearly falls under the public record exception to hearsay, and is therefore admissible. *See, e.g., U.S. v. Sutton*, 337 F.3d 792, 797 (7th Cir. 2003) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 158, 170 (1988)(opinions contained in an investigative report of an airplane crash covered by public record exception to hearsay)). Federal Rule of Evidence 803(8) provides a hearsay exception for public reports setting forth "matters observed pursuant to duty imposed by law as to which matters there was a duty report . . . ." In his affidavit accompanying the Watson Memorandum, Agent Simon authenticated the report as having been part of the administrative record in the

*Ashcroft* case. Mr. Salah does not challenge that the report was prepared by FBI representatives in the course of the FBI's regularly conducted activities. Nor does he challenge the fact that the report summarizes an investigation performed by the FBI in accordance with its legal duty regarding the affiliation of Mr. Salah, among others, with Hamas.

Mr. Salah next seeks to strike Exhibits 14 and 15, which are described, respectively, as an August 21, 1995 handwritten statement of Mr. Salah, and an English translation thereof. Mr. Salah argues that these exhibits should be stricken because the Boims failed to authenticate the documents in accordance with Rule 604, and because the Boims failed to comply with Rule 604's translation requirements. The Court disagrees on both counts. Federal Rule of Evidence 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Here, because Mr. Salah produced the documents during discovery, the Boims asked Mr. Salah questions to authenticate both exhibits at his deposition. *See* Deposition of Mohammad Salah, pp. 73-76. Mr. Salah invoked his Fifth Amendment rights and refused to answer any questions regarding the documents. Because he refused to answer questions that would either authenticate the documents or deny their authenticity, this Court

refuses to allow him to now claim that the Boims have failed to meet their burden to authenticate.

Moreover, the Seventh Circuit has held that the opponent of the evidence bears the burden of showing that a genuine issue of authenticity exists. *Cf. Tyson v. Jones & Laughlin Steel Co.,* 958 F.2d 756, 761 (7th Cir. 1992). Mr. Salah has failed to make such a showing here. His brief merely claims that the Boims failed to meet their burden because they offered "no evidence that Salah actually made the statement in question." Salah's Motion to Strike, p. 11. As previously stated, the Boims made efforts to authenticate the documents. They specifically asked Mr. Salah if he personally hand-wrote the document in question, when he wrote the document, and why he wrote the document. Mr. Salah's refusal to answer the question or deny that he wrote the documents gives rise to the inference that the documents are authentic.

Perhaps more significant is the fact that Mr. Salah himself produced the translation during discovery. Indeed, the Boims specifically asked Mr. Salah at his deposition if Exhibit 15 was an accurate translation and if it was a document that he produced during discovery. *See* Salah Deposition, pp. 73-77. Again, Mr. Salah's refusal to answer any questions regarding the translation's accuracy gives rise to the inference that it is accurate.

Additionally, Dr. Paz, the Boims' expert, authenticated the translation. Rule 604 of the Federal Rules of Evidence states "[a]n interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." In his declaration, Dr. Paz affirmed that the translation of Mr. Salah's statement was "true and correct." Paz Declaration, ¶26. For all of these reasons, the Court denies the motion to strike Exhibits 14 and 15.

Mr. Salah next asks the Court to strike Exhibits 13, 19, 20, 21, 25, and 28 – all purported bank documents – on the grounds that they have not been properly authenticated and constitute inadmissible hearsay, pursuant to Rules 901 and 802, and 801, respectively. Initially, the Court notes that authentication "does not erect a particularly high hurdle" to admissibility. *United States v. Dhinsa,* 243 F.3d 635, 658-59 (2d Cir.2001) (citing Fed. R. Evid. 901). Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The party offering the evidence is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*

176 F.3d 43, 49 (2d Cir. 1999) (internal citation and quotation marks omitted). The proponent satisfies Rule 901 "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id.*

The checks that the Boims rely upon easily clear the Rule 901 hurdle. "Commercial paper, signatures thereon, and documents relating thereto to the extent provided by general commercial law" are self-authenticating and do not require extrinsic evidence of authenticity. *Ament v. Townsend,* No. 98 C 1918, 1998 WL 299806, at *4 (N.D. Ill. May 29, 1998) (citing Fed. R. Evid. 902(9)). Nor do the checks fall victim to Mr. Salah's hearsay challenge. *See Kepner-Tregoe, Inc. v. Leadership Software, Inc.,* 12 F.3d 527, 540 (5th Cir. 1994)("'signed instruments such as wills, contracts and promissory notes are writings that have independent legal significance and are nonhearsay.'") (quotations omitted.)

The Boims have also sufficiently established the authenticity of Mr. Salah's checking account statements and wire transfer receipts from LaSalle Talman Bank. LaSalle Bank Corporation authenticated many of the checking account statements. *See* Szewczyk Dec. ¶¶ 7-8, 11-12 (attached as Exhibit 2 to Plaintiffs' Response to Mr. Salah's Motion to Strike); Fed. R. Evid. 803(6). With regard to the remaining checking account statements and wire transfer receipts, the Court notes that all

of these documents were produced by Mr. Salah in response to the Boims' discovery request seeking "all bank statements, all cancelled checks, all statements from instruments" etc. While Rule 902 does not identify evidence produced in discovery as self-authenticating – at least when the evidence has not been produced pursuant to a subpoena – Mr. Salah refused to either acknowledge or disavow these exhibits at his deposition. Instead, Mr. Salah remained silent, invoking his Fifth Amendment right not to incriminate himself. The Court is free to draw from Mr. Salah's silence inferences adverse to Mr. Salah's interests, especially in light of the other evidence authenticating the records. Under the circumstances presented here, the Court concludes that Mr. Salah's production and subsequent silence are sufficient to authenticate the documents in question.

Finally, Mr. Salah's checking account statements and wire transfer receipts do not constitute hearsay. The Boims have introduced evidence tending to establish that these records were prepared in the regular course of a regularly conducted business activity. *See* Fed. R. Evid. 803(6); *see also* Szewczyk Dec. ¶¶ 4, 7-8, 11-17). As the Tenth Circuit explained, "[b]ank records are particularly suitable for admission under Rule 803(6) in light of the fastidious nature of record keeping in financial institutions, which is often required by governmental regulation." *United States v. Johnson,* 971 F.2d 562, 572 (10th

Cir. 1992). Accordingly, Mr. Salah's motion to strike the bank records included in Exhibits 13, 19, 20, 21, 25 and 28 is denied.

Turning to the merits of the parties' summary judgment motions, the Court quickly denies Mr. Salah's motion. His assertions to the contrary notwithstanding, the default judgment against Hinawi, together with the Report of Hinawi's Sentence, would be enough to establish, at a minimum, an issue of fact as to whether Hamas was responsible for David Boim's murder. Moreover, as the Court will explain below, the evidence establishes that Mr. Salah provided material support to Hamas.

Initially, although Mr. Salah has declined to admit that Hamas uses violence and acts of terrorism to further its goals, he does not dispute that Hamas has been designated as an SDT, an SDGT, and an FTO; nor does he dispute that Mousa Abu Marzook, who served at various times as the leader of Hamas' political wing, has been designated as an SDT, or that he himself has been designated as an SDT. *See* Plaintiffs' (Salah) Rule 56.1 Statement, ¶¶17-19, 22, 27, and Mr. Salah's responses thereto.

It is undisputed that, on January 25, 1993, Mr. Salah was arrested by the Israeli military authorities; he was prosecuted in an Israeli military court in 1995 for "membership and activity in an illegal organization [Hamas]," "holding office in an illegal organization [Hamas]," "performance of services for an illegal organization [Hamas]," "activity against public order,"

and "giving shelter." *See* Report of Court Proceedings in Court
File #4221/93 (attached as Exhibit 31 to Plaintiffs' (Salah) Rule
56.1 Statement); Plaintiffs' (Salah) Rule 56.1 Statement, ¶69,
and Mr. Salah's response thereto. Mr. Salah pled guilty to these
charges, he was convicted based upon his plea, and he was
sentenced to eight years imprisonment, with five years to be
served from the date of his arrest, and the remaining three years
to be suspended and served only if Mr. Salah committed additional
offenses within five yeas of his release from prison. *See* Report
of Court Proceedings in Court File #4221/93 (attached as Exhibit
31 to Plaintiffs' (Salah) Rule 56.1 Statement).

The record shows that, while Mr. Salah was in custody in
Israel, he was interviewed a number of times by the Israeli
Secret Service, and, during the course of those interviews, he
made statements that are, to put it mildly, vastly against his
interest. The transcripts of those interviews, along with their
English-language translations were submitted by the Boims in
support of their motion for summary judgment against Mr. Salah,
*see* Plaintiffs' (Salah) Rule 56.1 Statement, Exhibit 17; in light
of the parties' arguments (or lack thereof) on Mr. Salah's motion
to strike, the Court has not considered these statements.

But the record also includes another statement from Mr.
Salah while he was in Israeli custody, a statement written in his
own hand and addressed, not to the Secret Service, but to other

73

individuals who were being held in the same detention center as Mr. Salah; the record also includes the English-language translation of this statement. See Plaintiffs' (Salah) Rule 56.1 Statement, Exhibits 14 and 15. In this statement, Mr. Salah details his involvement with Hamas, his relationship with Mr. Marzook, and the specifics of his activities in Israel and the Occupied Territories during his January 1993 trip and during prior trips. *See id.* In particular, in this statement, Mr. Salah writes that he made the 1993 trip at the request of Mr. Marzook, and that the purpose of the trip was to revive and organize Hamas' military operations in the wake of the December 1992 deportation of 400 Hamas members. *See* Exhibit 15, pp. 5-6. In fact, the statement reveals that Mr. Salah attempted to accomplish and accomplished this goal. As the Court will explain in more detail below, the statement shows that Mr. Salah distributed money to Hamas' operatives for the express purpose of carrying out terrorist activities. By way of example, the statement shows that Mr. Salah met with Salah Arouri, a Hamas activist, and that he provided Mr. Arouri with money to buy weapons to be used in terrorist operations. *See id.*, p. 8-9. The statement describes various meetings with Hamas' operatives, all geared, specifically or generally, to Hamas' military operations. *See id.*, pp. 6-23. It also includes an assessment of how his detention might, and might not, impact Hamas'

operations. *Id.*, pp. 49-52.

The Boims first argue that, because of the Israeli conviction, Mr. Salah is estopped from denying that he provided material support to Hamas. And, at first blush, the conviction would seem to establish that Mr. Salah, in fact, provided money to men whom he knew to be Hamas operatives, with the intent that the money would be used to finance and otherwise further Hamas' terrorist activities – conduct that would clearly subject him to liability under §2333. *See* Boim, 291 F.3d at 1023. But, Mr. Salah argues, the confession he gave while in custody in Israel, and the resulting conviction, were procured by torture, the product of coercion and duress. As such, he argues, they are entitled to no weight in this Court.

The question of what impact, if any, the Israeli confession and conviction should have in this Court has turned into a mini trial within a trial: the Boims have offered a declaration from Emanuel Gross, a law professor and licensed Israeli attorney who has served as a military attorney, a military judge and the President of an Israeli military tribunal, who opines that Mr. Salah's conviction "met generally accepted standards of fairness." *See* Declaration of Emanuel Gross, ¶12. For his part, Mr. Salah submitted a declaration from Avigdor Feldman, the Israeli attorney who represented him throughout the Israeli military proceedings and who both parties agree is "one of the

75

most distinguished and prominent civil rights attorneys in Israel." *See* Plaintiffs' (Salah) Rule 56.1 Statement, ¶77, and Mr. Salah's response thereto. According to Mr. Feldman, Israeli military courts do not comport with accepted principles of fairness generally, and Mr. Salah's case was no exception; Mr. Feldman opined that Mr. Salah's conviction is not worthy of full faith and credit under the laws of the United States. *See* Declaration of Avigdor Feldman, ¶¶4-32.

Despite his declaration, at his deposition, Mr. Feldman acknowledged that, even in the Israeli military court proceedings, defendants get full discovery, except for matters that are "put under a privilege of secrecy"; they have access to pre-trial discovery, an opportunity to confront and cross-examine witnesses who testify against them; they are notified of the charges against them, they receive notice of hearings and have the opportunity to present evidence in their favor, they have access to counsel, and they have the right to appeal. *See* Deposition of Avigdor Feldman, pp. 13-14, 22-24. Mr. Feldman also testified, consistent with Mr. Gross, that, even in the military courts, a conviction may not be based exclusively on a defendant's confession; rather, there must be some corroborating evidence to support the conviction. *See id.*, p. 23; Declaration of Emanuel Gross, ¶17(c); Plaintiffs' (Salah) Rule 56.1 Statement, ¶84, and Mr. Salah's response thereto. Mr. Feldman

testified that he recalled Mr. Salah telling him that he had been subjected to certain conduct that might be interpreted as torture. Feldman Deposition, p. 29. He, not surprisingly, testified that he did not witness any misconduct or torture, *id.*, pp. 30, 33, 36; and he testified that, each time he saw Mr. Salah, Mr. Salah appeared to be fine physically, he had no bruises or other physical signs of abuse. *Id.*, pp. 45-46.

To be sure, the record contains evidence that arguably counsels against affording full faith and credit to Mr. Salah's conviction in the Israeli military court. For example, the record includes an unclassified State Department cable, dated March 4, 1993 and written to the Israeli Minister of Foreign Affairs in connection with the United States Embassy's attempts to monitor Mr. Salah's treatment; the cable states that the Embassy "remains troubled by allegations of mistreatment of these three Americans and we have asked for an investigation into these allegations." Exhibit 2 to Mr. Salah's Appendix of Exhibits in Response to Plaintiffs' Motion for Summary Judgment. More specifically, the cable states that Mr. Salah reported being confined in a cell known as "the refrigerator," that he reported being threatened with beatings for failure to sign a Hebrew language statement, he reported being forced to stand naked and threatened with beatings if he failed to sign a statement. *Id.*

On the flip side, the record also includes State Department

cables in which Mr. Salah is reported to be "relaxed and in good physical condition" and that he "reports no mistreatment." *Id.* But, at the end of the day, none of the evidence that gives the Court pause on the full faith and credit question goes to the statement Mr. Salah wrote on August 21, 1995; rather, the issue comes up in the context of statements Mr. Salah allegedly made to the Secret Service. Mr. Salah has never claimed that the August 21, 1995 statement was the product of torture, coercion or duress. Rather, the record shows that that statement was written by Mr. Salah for people he believed were other Palestinian prisoners; people who were, for all intents and purposes, on his side.[7]

Perhaps more importantly, the record contains an abundance of evidence to corroborate much of what Mr. Salah wrote in his statement. For example, in his statement, Mr. Salah details his relationship with Mousa Abu Marzook, the admitted leader of Hamas' political wing, who has himself admitted to raising money for Hamas. *See In re Extradition of Marzook*, 924 F.Supp. 565, 579 (S.D. N.Y. 1996). Mr. Salah describes various meetings he had with Mr. Marzook, and he states that, in connection with his

---

[7]At his deposition, Mr. Feldman suggested that this statement too could have been the product of coercion, because Mr. Salah may have felt pressure from these people to prove that he was not a collaborator. *See* Feldman Deposition, pp. 60-62. But Mr. Salah has never said that this was the case; and, in fact, the coercion he has claimed – being kept in "the refrigerator," being forced to stand naked, and being threatened with beatings, all relate to treatment by the Secret Service, not his fellow prisoners.

1993 trip to the Occupied Territories, Mr. Marzook told him to allocate funds as follows: "Ramallah: 100,000; Nablus: 130,000; Hebron: 100,000; Gaza: Military (Activity): 300,000; The Rest: According to the Military and General Requirements." *See* Translation of August 21, 1995 Statement, p. 13 (attached as Exhibit 15 to Plaintiffs' (Salah) Rule 56.1 Statement). Thus, Mr. Salah's total expected allocation would have been in excess of $630,000 (depending on the "Military and General Requirements" in the non-delineated regions). In fact, the bank records show that, shortly before Mr. Salah left on his trip, he received wire transfers and other deposits from Mr. Marzook or from people associated with Mr. Marzook that totaled almost a million dollars.

Specifically, the record includes wire transfer reports showing that large amounts of money flowed from Ismail Elbarasse, a Hamas activist, to Mr. Salah: two reports show incoming transfers of $300,000 each, and another shows an incoming transfer of $135,000. *See* Plaintiffs' (Salah) Rule 56.1 Statement, Exhibit 13. According to the reports, the money was wired to an account controlled by Mr. Salah, account number 022034532. *Id.* Bank statements from that account, held jointly by Mr. Salah and his wife, in fact reflect a $300,000 deposit on December 29, 1992, a $135,000 deposit on January 20, 1993, and a $300,000 deposit on January 25, 1993. *Id.*

The record also includes an incoming wire transfer showing that Nasser Alkhatib transferred money to Mr. Salah in January 1993. Specifically, the record shows that Mr. Alkhatib transferred $50,000 to Mr. Salah on January 21, 1993. *See* Exhibit 28. Mr. Salah's bank statement confirms that his account did, in fact, receive a $50,000 credit on that date. *See* Exhibit 13. The bank records also show that Mr. Alkhatib wired money to Mr. Salah's wife, Azita Salah; on January 21, 1993, he transferred $30,000 to her, and, on January 22, 1993 he transferred $170,000 to her; according to the bank's transfer reports, both transfers were deposited into a joint account that Mrs. Salah shared with her husband, account number 239328806. *See* Exhibit 28. A summary of that account confirms that, on January 22, 1993, the account had two "credit memos," one for $30,000, and one for $170,000. *Id.* The Boims have alleged that Mr. Alkhatib is a Hamas activist who served as Mr. Marzook's personal secretary and made financial transactions on his behalf, before leaving the country in 1993; this is supported by information contained in the Watson Memorandum. *See* Watson Memorandum, p. 15[8] (in which Agent Watson reports that, "[d]uring an FBI interview . . . on March 15, 1994," Nasser Alkhatib advised that "he worked for Marzook and conducted various bank

---

[8]The Watson Memorandum is included as an attachment to the Declaration of FBI Agent Samuel A. Simon, Jr., Exhibit 12 to Plaintiffs' (Salah) Rule 56.1 Statement.

transactions for Marzook").

The bank records further corroborate Mr. Salah's statement as to how he allocated the money he brought with him when he traveled on Mr. Marzook's instructions. For example, Mr. Salah's bank records show that, on September 3, 1992, while he was in Israel, Mr. Salah wrote ten $5,000 checks that were made out to cash and drawn on his LaSalle Talman account; the checks were cleared through the central branch of an Israeli bank in Tel Aviv five days later. *See* Plaintiffs' (Salah) Rule 56.1 Statement, Exhibits 19-20. Mr. Salah's bank records also show that, on January 28, 1993, shortly after Mr. Salah was arrested, the bank posted three $10,000 checks he had written, presumably shortly before that date. *See* Exhibits 13, 20.

Additionally, in his August 21, 1995 statement, Mr. Salah claims that he helped to train two new Hamas recruits, Sharif Alwan and Rizzak Salah. *See* Statement, p. 4. This statement is corroborated by a bank record showing that, on September 29, 1992, Mr. Salah wrote a $3,000 check to Ghada Sherif for, according to the memo line on the check, "tickets syria." *See* Plaintiffs' Rule (Salah) 56.1 Statement, Exhibit 21.

Even on seemingly inconsequential matters, the statement is corroborated in the record. For example, Mr. Salah's statement notes that, some time in late 1991 or early 1992, certain activities for Palestine, though expected to continue, did not

proceed because, among other reasons, "I was busy building my
house." *See* Translation of August 21, 1995 Statement, p. 5
(attached as Exhibit 15 to Plaintiffs' (Salah) Rule 56.1
Statement). The record shows that, in fact, Mr. Salah was
building a new house at the end of 1991. *See* Declaration of
Ahmad Zaki Hammad, ¶9 (in which Mr. Hammad states that he lent
Mr. Salah money to pay contractors who were building his new
house)(attached as Exhibit B to QLI's Supplemental Appendix in
Support of its Motion for Summary Judgment); Exhibit 41 to
Plaintiffs' (QLI) Rule 56.1 Statement (showing that Mr. Hammad
wrote the check in October 1991). *See also* Deposition of
Mohammed Salah, p. 6-7 (where Mr. Salah testifies that he has
lived in the home for eleven years, since "'92 almost").

In addition to Mr. Salah's statement, the record includes
the Watson Memorandum, which details Mr. Salah's role with Hamas
and his involvement with many men known by the governments of
both the United States and Israel to be Hamas terrorists. *See*
Watson Memorandum (Exhibit 12 to Plaintiffs' (Salah) Rule 56.1
Statement). With respect to the flow of money to Mr. Salah, the
Watson Memorandum states that, in 1992 and January 1993, Messrs.
Marzook and Elbarasse were providing funds to Mr. Salah, who was
arrested in Israel on January 25, 1993 for supporting Hamas
terrorist activities. *See* Watson Memorandum, p. 15.
Specifically, Agent Watson states that "[r]ecords verified that

Marzook deposited a total of $23,410.00 into Salah's U.S. bank account during the time period of May 20, 1990 to November 29, 1992"; that "Elbarasse deposited a total of $740,000.00 in Salah's account during the time period of August 8, 1992 to January 25, 1993; and Nasser Alkhatib deposited a total of $251,000.00 into Salah's account during the time period of August 21, 1992 to January 22, 1993." *Id.*, pp. 15-16. With respect to Mr. Salah's Israeli arrest, Agent Watson notes that, at the time of his arrest, Mr. Salah had $97,000 in cash in his possession, after having admitted to already disbursing approximately $140,000 to individuals identified by the GOI [Government of Israel] as members of Hamas. *Id.*, p. 15.

It is important to note that, although Mr. Salah has challenged the admissibility of some of the evidence against him, he has not rebutted any of this evidence. In fact, he has chosen to remain silent in the face of the evidence demonstrating his ties to Hamas and his efforts on behalf of Hamas' terrorist activities, which brings the Court to the next point.

Added to the evidence detailed above is the fact that Mr. Salah has invoked the rights afforded him by the Fifth Amendment to the United States Constitution, both in response to deposition questions and in response to many of the Boims' statements of undisputed fact; his wife similarly invoked her Fifth Amendment rights at her deposition. By way of example, Mr. Salah declined

to answer the following questions based upon his rights as protected by the Fifth Amendment: (1) "are you now or have you ever been a member of Hamas," *see* Deposition of Mohammed Salah, p. 78; (2) "[i]n fact it's true, sir, that you are now and have been a member of Hamas," *id.*; (3) "[i]t's correct, sir, that you played a role in the activities of Hamas," *id.*; (4) "[i]t's correct, sir, isn't it, that Abu Marzook instructed you to travel to Israel in January 1993 to see what could be done to reorganize Hamas after the [1992] deportations; isn't that correct, sir," *id.*, p. 90; (5) "[a]nd it's correct, sir, that when you went to Israel, the West Bank and Gaza in 1992 and 1993, you knew at the time Hamas was involved in perpetrating violent acts in that part of the world; isn't that correct, sir," *id.*, p. 95; (6) "[y]ou learned, sir, that Hamas took credit for murdering David Boim; isn't that correct, sir," *id.*, p. 98; (7) "[i]t's correct, sir, that you, yourself, provided organizational and financial assistance to persons you knew or suspected were members of Hamas; isn't that correct, sir," *id.*, p. 100; and (8) "you are the U.S. based military leader of Hamas; isn't that correct, sir," *id.*, p. 172. He also invoked his Fifth Amendment rights in response to many of the Boims' Rule 56.1 statements of fact. Specifically, Mr. Salah "relie[d] upon his privilege against self-incrimination as to the contention that $735,000 was transferred by someone identified as Ismail Elbarasse to LaSalle

Talman account number 02-203453-2 which was held in the name of Muhammad Salah and Azita Salah," Mr. Salah's Response to Plaintiffs' (Salah) Rule 56.1 Statement, ¶24; he "relie[d] upon his privilege against self-incrimination as to the statement that the funds were to be used by Salah to fund Hamas military operations," id., ¶25; he relied upon his privilege against self-incrimination as to the statements about the ten $5,000 checks he wrote to cash from Israel in September 1992, see id., ¶42; he relied upon his privilege against self-incrimination as to the statements about his dealings with Rihbe Abdel Rahman, the unlicensed Israeli money changer, see id., ¶59-61; he relied upon his privilege against self-incrimination as to the statements about the wire transfers coming into his account from Marzook and Alkhatib, see id., ¶62; and he relied upon his privilege against self-incrimination as to the statement that, at the time of his arrest in Israel, he had $97,400 in his possession, see id., ¶64.

Although silence alone would not support the entry of summary judgment, it does give rise to a negative inference that Mr. Salah and his wife would have incriminated themselves, had they answered the questions posed. See, e.g., In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 663 (7th Cir. 2002); Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). And that inference, when taken together with the evidence of Mr. Salah's involvement with Hamas, is enough to establish liability on Mr.

Salah's part under 18 U.S.C. §2333. Based on the evidence in the record, including the negative inference that is permissibly drawn from Mr. Salah's decision to invoke his Fifth Amendment rights, a reasonable jury could reach but one conclusion: Mr. Salah knew about Hamas' illegal activities, he wanted those activities to succeed, and he engaged in numerous acts to help ensure that they did.

Mr. Salah makes a couple of arguments relating to the conspiracy allegations in the Boims' complaint, which bear consideration. First, Mr. Salah argues that the Boims' claim must fail because they cannot establish that he was, in any way, connected to Hamas after January 1993, when he was arrested in Israel; indeed, he argues, he was in an Israeli prison when David Boim was killed. But this is of no moment. The Seventh Circuit did not say that, to impose liability under §2333, the Boims have to link Mr. Salah or any of the other defendants specifically to the attack that killed David Boim; rather, the court held that, to impose liability for aiding and abetting – that is, providing material support to – a terrorist organization, the Boims need only show that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and that they engaged in some act of helping. *Boim*, 291 F.3d at 1028. The evidence shows that all three are true with respect to Mr. Salah, and no reasonable jury could find otherwise. Moreover, under

principles of civil conspiracy law, which is subsumed in §2333, Mr. Salah would be liable for acts committed in furtherance of the conspiracy to fund Hamas, even if those acts were committed after he ceased being an active participant. *See United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989)("the law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation"; "for withdrawal to limit a conspirator's liability 'mere cessation of activity is not enough ...; there must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators. And the burden of withdrawal lies on the defendant.'") (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964)). Had Mr. Salah disavowed his involvement with Hamas, or somehow repudiated his involvement with Hamas' military operations, he might be able to escape liability for acts committed in furtherance of Hamas' agenda after that repudiation. But the record contains no evidence that Mr. Salah ever did so.

Second, and relatedly, Mr. Salah argues that the Boims' claim against him must fail because the record contains no evidence linking him to the men who shot David Boim. And, to support that proposition, Mr. Salah cites *Ungar v. The Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D. D.C. 2002), which, as

87

Mr. Salah admits, did not involve §2333. For purposes of this case, the Court is bound by the Seventh Circuit's decision, which holds that liability under §2333 extends broadly to encompass traditional tort and criminal liability concepts. *See Boim*, 291 F.3d at 1020. Thus, even if the Boims could not establish that Mr. Salah provided material support to Hamas – a hypothetical, given the conclusion above that they could, and did – the Boims could still impose liability on Mr. Salah if they could show that David's death was a reasonably foreseeable consequence of the conspiracy that was Hamas, *see Pinkerton*, 328 U.S. at 643, which would seem almost a given on the record before the Court.

4.   <u>Motions Filed By and Against Quranic Literacy Institute</u>

The Boims have alleged that the Quranic Literacy Institute, an Illinois not-for-profit corporation that translates and publishes sacred Islamic texts, is really engaged in the business of raising and laundering money for Hamas. *See* First Amended Complaint, ¶5. Tangentially, the Boims allege that QLI provided an aura of legitimacy to Mr. Salah by purporting to employ him as a computer analyst, effectively permitting him to continue to act on behalf of Hamas without raising suspicion; the Boims allege that QLI helped to conceal Mr. Salah's role as Hamas' military commander and served as the vehicle through which he channeled hundreds of thousands of dollars to Hamas operatives. *See* First Amended Complaint, ¶¶5, 44.

As with the other defendants, to prevail on their claim against QLI, the Boims would have to show that QLI provided material support to Hamas, or that it attempted or conspired to provide material support to Hamas. 18 U.S.C. §2333. QLI has moved for summary judgment, arguing that the Boims cannot possibly prevail because (1) no money attributable to QLI ever went to Hamas; (2) QLI employed Mr. Salah legitimately, though on a volunteer basis; and (3) QLI had no knowledge that Mr. Salah may have been engaged in unlawful activities elsewhere. The Boims did not file a summary judgment motion with respect to QLI; in fact, they argue that summary judgment is inappropriate because genuine issues of fact exist as to whether QLI helped to conceal Mr. Salah's illegal activities, whether QLI gave cash to Mr. Salah to distribute to Hamas agents, and whether QLI raised and laundered money for Hamas through a real estate transaction involving property in Woodridge, Illinois.

Before turning to the merits of QLI's motion for summary judgment, the Court must consider the parties' motions to strike certain exhibits submitted with the parties' motion papers. In support of its motion for summary judgment, QLI submitted declarations from its three founders, Amer Haleem, who serves as QLI's Secretary, Ahmad Zaki Hammad, who serves as QLI's President, and Ibrahim Abusharif, who served as QLI's Treasurer from 1990 to 1998. The Boims have asked the Court to strike

these declarations because, in the Boims' view, they are not based on personal knowledge. The Boims also ask the Court to strike Mr. Hammad's declaration because they never had a chance to depose him. On this latter argument, the Court will deny the motion; the Boims never issued a notice for Mr. Hammad's deposition, and, at least based on the documentary evidence submitted, defendants' counsel never told the Boims that Mr. Hammad would not be produced for deposition (rather, counsel reported only that Mr. Hammad was out of the country and had been for quite some time, which was apparently true).

Turning to the question of personal knowledge, as the Boims correctly point out, affidavits submitted in support of summary judgment must be made based on personal knowledge. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003); Fed. R. Civ. P. 56(e); Fed. R. Evid. 602. Although "personal knowledge" may include reasonable inferences, those inferences must be "substantiated by specific facts," and they must be "grounded in observation or other first-hand personal experience." *Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir. 1998)(citing *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988)); *Payne*, 337 F.3d at 772 (citing *Visser v. Packer Engineering Associates*, 924 F.2d 655, 659 (7th Cir. 1991)(*en banc*)). The Court finds that the declarations of Mr. Haleem, Mr. Abusharif and Mr. Hammad generally pass muster under these standards,

90

despite the fact that they do not explicitly state that the representations made therein are based upon personal knowledge.

For example, although the Boims argue that paragraphs 2, 3, 5, and 7 of Mr. Haleem's declaration are not based on personal knowledge, the statements made therein do appear to be based on Mr. Haleem's first-hand knowledge; according to his declaration, Mr. Haleem was one of the founders of QLI and the Quran Project, and he served and serves as QLI's Secretary; as such, he would seem to have been in a position to know why the founders formed the organization (¶¶2-3, 5) and what the focus of the project was (¶7). The same would be true with respect to Mr. Abusharif: as the Treasurer of QLI, and as an active volunteer with both QLI and the Quran Project, Mr. Abusharif would seem to have first-hand knowledge of why QLI and the Quran Project were started, and what went on at the business. Similarly, the Court may infer that Mr. Haleem, as a founding member of QLI, as the Secretary of QLI, and as one of the three people who were most active in QLI and the Quran Project, would have had personal knowledge about what he and the other volunteers were doing for QLI, as well as about how QLI's activities were financed; the same is true of Mr. Abusharif. Mr. Haleem would also appear to have personal knowledge of Mr. Salah's employment status with QLI and the employment verification letter, as well as about the transactions and investments QLI decided to pursue. Indeed, Mr. Haleem states

in his declaration that he was directly involved in both the employment verification letter and the Woodridge transaction. And it is certainly no great leap to infer that Mr. Abusharif, who served as Treasurer of QLI, has first-hand knowledge of how and why QLI was funded.

There is, however, nothing in any of the declarations that would allow the Court to infer that any of these men would have had personal knowledge about what Mr. Salah did when he was not doing work for QLI or the Quran Project. Accordingly, from Mr. Haleem's declaration, the Court will strike paragraph 21 and those portions of paragraph 22 dealing with activities other than those done for QLI and the Quran Project; from Mr. Abusharif's declaration, the Court will strike paragraphs 18, 22, 23, 24, and those portions of paragraph 19 dealing with Mr. Salah's non-QLI activities; and, from Mr. Hammad's declaration, the Court will strike paragraph 10 and the first sentence of paragraph 9.

The Boims also ask the Court to strike portions of the three declarations based on relevance. Even if the Court were to agree that the statements about the formation and background of QLI are irrelevant to the question of liability, the Court will not strike them on this basis; just as the statements in the Boims' submissions about Hamas' history give context to the allegations in the Boims' claims, the statements about QLI's history give context to QLI's defenses to those claims.

Next, the Court turns to QLI's motion to strike, which
covers certain paragraphs in FBI Agent Robert Wright's affidavit,
as well as the statement made by Mohammed Salah while he was in
Israeli custody; QLI also asks the Court to disregard, for
purposes of its motion, the fact that Mohammed Salah and his wife
invoked their Fifth Amendment rights in response to questions
asked of them at their depositions. The Court has addressed Mr.
Salah's statement, as well as the consequences of his decision to
invoke the Fifth Amendment, in the context of the motions for
summary judgment filed by and against Mr. Salah. Neither of
these pieces of evidence is direct evidence of QLI's liability,
though of course Mr. Salah's involvement with Hamas is a
necessary predicate to holding QLI liable for trying to cover up
those activities. But instructions about how the evidence
against Mr. Salah should weigh against QLI can be addressed at
the final pre-trial conference and at trial, as can instructions
about adverse inferences to be drawn from Mr. Salah's and Mrs.
Salah's invocation of the Fifth Amendment. For purpose of
resolving QLI's motion for summary judgment, the Court has not
relied upon Mr. Salah's statement or his and his wife's decision
to refuse to answer deposition questions.

As for the June 8, 1998 affidavit of FBI Agent Wright, QLI
seeks to strike paragraphs 8, 22, 24, 27, 31 and 50, and the
Boims have indicated that they do not oppose the motion with

respect to paragraphs 8, 24, 27 and 31, leaving only paragraphs 22 and 50 in dispute. Paragraph 22 of Agent Wright's affidavit states:

> bank records show that on each of October 29, 30 and 31, 1991, Salah received a $6,000 check, ($18,000 in total), executed by Ahmad Zaki Hameed, the President of QLI. The checks were not drawn on QLI bank accounts, but rather from Zaki's personal bank account.

Wright Affidavit, ¶22 (attached as Exhibit 26 to Plaintiff's (QLI) Rule 56.1 Statement). Paragraph 50 states:

> Salah has related to Israeli authorities that he arrived in Jerusalem on January 14, 1993 for the purpose of meeting other Hamas operatives to coordinate, among other things, a terrorist attack against Israeli [sic]. Salah further related that on January 19, 1993, subsequent to his initial round of meetings with various Hamas operatives, some of whom Salah met with pursuant to Abu Marzook's instructions, he placed an international call from Israel to his wife Azita in Chicago and instructed her to wire $200,000.00 from their joint LaSalle Bank account to First Chicago Bank of Ravenswood account number 678006002654-4 held in the name of Rihbe Abdel Rahman. According to Salah, Rahman was an unlicensed money changer. Bank records reviewed by the FBI indicate that Azita Salah carried out her husband's instructions on the same day. According to Salah the $200,000.00 was then transferred from Abdel Rahman account to the Middle East.

Id., ¶50. QLI argues that these statements should be stricken because they refer to bank documents that were not attached and therefore violate both the best evidence and the hearsay rules. In response, the Boims argue that the testimony about the $200,000 transfer and about the October 29 $6,000 check is proper because the bank documents evidencing those transactions are, in fact, a part of the record; they further argue that the testimony

94

about the remaining two $6,000 checks is appropriate because records documenting those transactions have all been lost or destroyed or are otherwise unavailable. For purposes of this motion, the Court need not decide whether Agent Wright's testimony is proper; as the Court will explain, even without this evidence, the Boims have offered enough evidence to get to a jury.

The Court turns now to the merits of QLI's summary judgment motion. As indicated above, the record contains declarations from QLI's founders, Amer Haleem, who serves as QLI's Secretary, Ahmad Zaki Hammad, who serves as QLI's President, and Ibrahim Abusharif, who served as QLI's Treasurer from 1990 to 1998. According to Mr. Haleem and Mr. Abusharif, QLI was formed out of a desire "to provide their fellow English-speaking Muslims with a better and deeper understanding of their faith" and "to give Americans, in general, and readers of English worldwide a first hand knowledge of Islam from its principal sources." Declaration of Amer Haleem, ¶2 (attached as Exhibit 2 to QLI's Rule 56.1 Statement); Declaration of Ibrahim Abusharif, ¶2 (attached as Exhibit 4 to QLI's Rule 56.1 Statement). Mr. Haleem and Mr. Abusharif have represented that QLI's major undertaking and central purpose is "the Quran Project," "an entirely new translation of the Quran, based on a careful and scholarly review and analysis of every single word of the more than 6200 verses in

that book and the spiritual, legal, and historical contexts of their revelation, followed by a painstaking process of communicating this analysis in proper and befitting English that is both relevant to the modern reader and literary in merit, idiom, and impact." Abusharif Declaration, ¶6. *See also* Haleem Declaration, ¶7; QLI's Rule 56.1 Statement, ¶10. The Boims allege that, regardless of the truth of these statements, QLI also knowingly provided, conspired to provide and aided and abetted others in providing material support to Hamas. *See* Plaintiffs' Response to QLI's Rule 56.1 Statement, ¶10.

The Boims have alleged that QLI gave Mr. Salah a job and a monthly stipend, both of which allowed him to pursue his Hamas activities without arousing suspicion. QLI has attempted to show that this is fantasy; according to QLI, the reality was that QLI sought and received help from Mohammed Salah, on a volunteer basis, with respect to various administrative and computer-related tasks. To compensate Mr. Salah for that help, and to allow him to pursue this noble work, as well as the considerable volunteer work he was doing in the local Muslim community, QLI helped to arrange monthly stipend payments from a benefactor. Although QLI has attempted to provide an innocuous explanation for each of the Boims' allegations, the record evidence is such that a jury should be permitted to decide whether those explanations are true.

The record shows that Mr. Salah, in fact, worked for QLI beginning in the late 1980s or early 1990s, and continuing through 1993. *See* QLI's Rule 56.1 Statement, ¶¶19, 28; Hammad Declaration, ¶8; Muhammad Salah's Answers to Plaintiffs' First Set of Interrogatories, No. 2 (attached as Exhibit 22 to Plaintiffs' (QLI) Rule 56.1 Statement). QLI contends, however, that Mr. Salah worked for QLI on a volunteer basis, not as an employee. *See* QLI's Rule 56.1 Statement, ¶29, Haleem Declaration, ¶23; Hammad Declaration, ¶8, Abusharif Declaration, ¶20. Nevertheless, QLI admits that its President, Mr. Hammad, arranged for Mr. Salah (as well as Mr. Haleem and Mr. Abusharif) to receive a monthly payment of $3,000 from Yassin Kadi, who QLI characterizes as a "Saudi Arabian philanthropist."[9] Brief in Support of Summary Judgment, p. 9. *See also* Haleem Declaration, ¶¶16, 20, 23; Abusharif Declaration, ¶¶15, 17. In their declarations, Mr. Haleem and Mr. Abusharif both state that Mr. Hammad, who knew Yassin Kadi when he was at a Chicago architecture firm in the 1970s, asked Mr. Kadi to support Mr. Haleem, Mr. Abusharif and Mohammed Salah, the three individuals who were most active in volunteering their time and skills to the Quran Project and QLI. Haleem Declaration, ¶¶14, 16; Abusharif Declaration, ¶¶12, 15, 17. They further state that, with respect

---

[9]At least since October 12, 2001, the United States government has characterized Mr. Kadi quite differently: as of that date, he is a "Specially Designated Terrorist."

to Mr. Salah, the money was meant to compensate him, not only for his work with QLI and the Quran Project, but also for all of his work in the local Muslim community.[10]  Haleem Declaration, ¶23; Abusharif Declaration, ¶20.  According to Mr. Hammad – whose testimony about the whole Kadi arrangement is surprisingly sparse, given that Mr. Haleem and Mr. Abusharif say that he was the driving force behind the arrangement and the point person for Mr. Kadi – Mr. Kadi "provided support for Amer Haleem, Abraham Abusharif, and Muhammad Salah to enable them to pursue their good works in the Muslim community in the Chicago area, including, but not limited to, their otherwise uncompensated activities with the Quran Project and then with the Quranic Literacy Institute." Hammad Declaration, ¶6.  Interestingly, Mr. Hammad admits nothing about his role in setting up the "benefactor" arrangement.  And no one explains why Mr. Hammad received no money, despite everyone's apparent agreement that Mr. Hammad was the head of the project, the head of QLI and the person doing the bulk of the labor with respect to the translation and scholarly research. *See* Haleem Declaration, ¶19; Abusharif Declaration, ¶16.  By the declarants' own admissions, Mr. Haleem and Mr. Abusharif served

_____

[10]According to QLI, Mr. Salah was very active in the small, but growing Muslim community located in and around Bridgeview, Illinois; he donated his time, as well as his business and computer expertise and his expertise with all things Muslim, to serve the local community and to help it to grow and prosper.  To the extent the statements about Mr. Salah's activities are not based upon personal knowledge, they will not be considered.

as assistants to Mr. Hammad, and Mr. Salah served what was essentially an office manager role, yet each received $3,000 per month, while Mr. Hammad received nothing.

Adding to the troubling nature of the financial arrangements between Mr. Kadi and QLI, QLI seems to be deliberately vague about how Mr. Kadi's payments were made. Mr. Haleem and Mr. Abusharif both state that the funds never entered an account of QLI. *See* Haleem Declaration, ¶20; Abusharif Declaration, ¶17. But none of the declarants seems to want to specify where the money went. Mr. Haleem states that the money "was transmitted from an account controlled by Mr. Kadi in Europe to an account of one of the three recipients." Haleem Declaration, ¶20. In fact, according to Mr. Abusharif's deposition testimony, the money from Mr. Kadi was deposited into an account controlled by Mr. Salah – who was, by all accounts, less involved than Messrs. Haleem and Abusharif in QLI and who had, by all accounts, the lowest level of responsibility among the men involved in QLI. *See* Deposition of Abraham Abusharif, pp. 43-44 (attached as Exhibit 39 to Plaintiffs' (QLI) Rule 56.1 Statement). According to Mr. Abusharif, Mr. Salah then distributed the money to himself, Mr. Abusharif and Mr. Haleem. *Id.* This would seem to be particularly odd, given that Mr. Abusharif, not Mr. Salah, was the Treasurer of QLI.

Perhaps most damaging to QLI, the record contains evidence

demonstrating that, not only has Mr. Salah been designated as an SDGT, but Mr. Kadi, QLI's admitted "benefactor" was, effective October 12, 2001, officially named by the United States government as an SDGT. *See* Department of the Treasury, Office of Foreign Assets Control, Additional Designations of Terrorism-Related Blocked Persons, 66 Fed. Reg. 54404 (Oct. 26, 2001)(amending OFAC's list of individuals and organizations designated as SDGTs to include, among others, "Shaykh Yassin Abdullah Kadi"). QLI admits that Mr. Kadi was, in fact, designated as an SDGT, but they contend that that fact is largely irrelevant, given that the SDGT designation had not been made when Mr. Kadi provided support to QLI's principals, indeed, did not take place for another decade after Mr. Kadi provided that support. This is true. But even if Mr. Kadi had not been officially designated an SDGT at the time, a jury could reasonably find that the activities that ultimately led to that designation were, in fact, going on in 1991 and 1992 – indeed, that is the very basis for the Boims' allegations about the way in which QLI's "volunteers" were paid. It may very well be that QLI's principals simply have very bad luck in that the people they find to support (financially or otherwise) their endeavors just happen to turn up on the government's list of people who support (financially or otherwise) terrorist organizations. But, then again, it may be that QLI hooked up with Mr. Kadi and Mr.

Salah by design, because of a common desire to further terrorist activities, as the Boims allege. It is not for the Court to weigh the evidence or to decide whose side the evidence favors; that task belongs to the jury. *See Anderson*, 477 U.S. at 249 ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

Adding to the intrigue is a letter dated September 4, 1991 and written by Amer Haleem on letterhead bearing the Quran Project name; the letter states that "Mohammad Salah has been employed with THE QURAN PROJECT since January 1, 1991 as a Computer Analyst at a salary of $36,000 per year." *See* Exhibit 37 to Plaintiffs' (QLI) Rule 56.1 Statement. QLI and Mr. Haleem have explained that this letter was written when QLI was considering making Mr. Salah an employee and considering making that decision retroactive to allow QLI to pay Mr. Salah's social security taxes. *See* Haleem Declaration, ¶24. To prove his point, Mr. Haleem states that Mr. Salah requested the letter to support his application for an apartment in Justice, Illinois, that Mr. Salah in fact rented that apartment, and that he (Mr. Haleem) actually visited Mr. Salah at that apartment. *Id.*, ¶¶24-25. Mr. Haleem's explanation about the letter may, in fact, be true. But the letter could just as easily be viewed by a

reasonable jury as evidence that QLI was attempting to help Mr. Salah appear to be legitimate by making it appear that he was a regular employee, earning a regular salary, when, in fact, the set-up was altogether different. Indeed, the $36,000 figure suggests that, their assertions about the purpose of Mr. Kadi's support notwithstanding, the monthly payments were for Mr. Salah's QLI activities and not for anything else he did in the Muslim community. And the fact that Mr. Salah actually rented the apartment in Justice could be viewed, by a reasonable jury, not as evidence that the letter served an innocuous purpose, but as evidence that QLI's efforts to make Mr. Salah appear legitimate worked.

In addition to the evidence about QLI's alleged attempt to provide cover for Mr. Salah, the Boims have offered evidence from which a reasonable jury could find that QLI laundered money for Mr. Salah, and possibly for Hamas. For example, QLI admits that it asked Mr. Kadi for money to invest in a real estate transaction, and that, pursuant to that request, Mr. Kadi gave QLI $820,000. *See* Haleem Declaration, ¶¶27-28; Hammad Declaration, ¶7; Abusharif Declaration, ¶¶25-26. According to QLI, this amount was not a grant or a gift, but an interest-free loan. *See* Haleem Declaration, ¶27; Hammad Declaration, ¶7; Abusharif Declaration, ¶25.

According to QLI, on July 22, 1991, Dr. Tamar Al-Rifai, a

medical doctor with experience as a real estate developer,
purchased a piece of property in Woodridge, Illinois with Mr.
Kadi's $820,000, and the land was immediately transferred into a
land trust for the benefit of QLI. *See* Haleem Declaration, ¶¶29-
32; Abusharif Declaration, ¶¶26-28; Deposition of Tamer Al-Rifai,
pp. 30, 32-33, 39-40 (attached as Exhibit 20 to QLI's Rule 56.1
Statement). The record shows that, in June 1994, the Woodridge
property was sold for $970,000, and the money was deposited into
QLI's account. *See* Haleem Declaration, ¶¶36-37; Abusharif
Declaration, ¶¶31-32. Closing documents from the sale of the
Woodridge property show that QLI received a check in the amount
of $988,500 on June 30, 1994. *See* Exhibit 52 to Plaintiffs'
(QLI) Rule 56.1 Statement. There is no evidence in the record to
suggest that QLI ever repaid Mr. Kadi's "loan"; in fact, Mr.
Haleem testified that it did not. *See* Deposition of Amer Haleem,
pp. 121-22(attached as Exhibit 38 to Plaintiffs' (QLI) Rule 56.1
Statement).

Additionally, the record shows that, under the original
terms of the Woodridge deal, Mr. Al-Rifai was required to make
two rental payments to QLI; one in the amount of $150,000 on July
22, 1991 and one in the amount of $14,000 three months later.
*See* Lease & Sale Agreement dated July 22, 1991 and executed by
Mr. Hammad on behalf of QLI and Mr. Al-Rifai on behalf of Golden
Marble Inc. (attached as Exhibit 46 to Plaintiffs' (QLI) Rule

56.1 Statement); Al-Rifai Deposition, pp. 54-55; Affidavit of FBI Agent Robert Wright, ¶29. A subsequent Lease and Sale Agreement, executed after Mr. Al-Rifai's first round of checks bounced, provided for the rental payments to be made on January 15, 1992 and January 30, 1992; the amounts remained the same. *See* Lease and Sale Agreement dated January 23, 1992 and executed by Mr. Hammad on behalf of QLI and Mr. Al-Rifai on behalf of Golden Marble Inc. (attached as Exhibit 18 to QLI's Rule 56.1 Statement). Ultimately, on September 11, 1991, Mr. Al-Rifai and Golden Marble paid QLI $22,000; on September 12, 1991, they paid QLI $88,000. *See* Exhibit 48 to Plaintiffs' (QLI) Rule 56.1 Statement; QLI's Response to Plaintiffs' Rule 56.1 Statement, ¶¶137-138. QLI did not cash these checks until March 11, 1992. *See* QLI's Response to Plaintiffs' Rule 56.1 Statement, ¶140. QLI claims that the checks were deposited into a QLI account, and it cites the deposition testimony of Mr. Abusharif to support that claim. But, in fact, Mr. Abusharif, who testified that he deposited the checks immediately, appears to have been referring to the first set of checks from Mr. Al-Rifai, the set that bounced, when he said he deposited them into the QLI account; in fact he admitted that his testimony was based on general practice and some vague memory, rather than a specific recollection that he deposited the checks into QLI's account. *See* Abusharif Deposition, pp. 104-05. The record does, however, contain copies

of the checks, which appear to show an endorsement from the North American Muslim Trust, a "co-op fund" held for the Quran Project, as well as a bank statement from that fund showing a $110,000 deposit made on March 11, 1992. *See* Exhibit 2 to QLI's Response to Plaintiffs' Rule 56.1 Statement. But, in any event, the record shows that, within five days of Mr. Hammad endorsing the second round of Al-Rifai checks (which totaled $110,000), Mohammad Salah received the first of three wire transfers, totaling $107,000, from a Swiss bank. *See* QLI's Response to Plaintiffs' Rule 56.1 Statement, ¶¶143-144. It is possible that a jury may conclude that the closeness – in both amount and time – between the two groups of checks is pure coincidence. But it is also possible, in light of the other evidence in the record, that a jury might reasonably conclude that the transfers were connected, evidencing an intent on QLI's part to funnel money to Mr. Salah, and to do so secretly.

And there is more. According to QLI, it pushed Mr. Al-Rifai to sell the property in 1994 because Mr. Al-Rifai had missed rental payments due on the agreement, and because QLI had lost confidence in Mr. Al-Rifai's ability to make future payments. *See* Haleem Declaration, ¶¶34-36; Abusharif Declaration, ¶¶29-31. And, given that Mr. Al-Rifai's first checks bounced, that would seem to be a reasonable reaction on QLI's part. But the Boims have offered evidence that QLI pressured Mr. Al-Rifai to sell

105

when it did because it wanted to provide support, through Mr. Salah, to the Hamas activists and operatives who had been deported by the Israeli government to Lebanon. First, the record shows that QLI started to pressure Mr. Al-Rifai to sell the property in December 1992, which was right after the government of Israel deported 400 people suspected of being members of Hamas. *See*, e.g., Affidavit of Robert Wright, ¶39 (noting that on December 17, 1992, the GOI deported approximately 400 suspected Hamas members). Additionally, Mr. Al-Rifai told FBI Agent Wright, in 1998, that, when Mr. Hammad started pressuring him to liquidate the Woodridge investment, he told him that the money was needed immediately for "a mission above all else." *See* Wright Affidavit, ¶44; *see also* Al-Rifai Deposition, pp. 59, 65-67 (in which Mr. Al-Rifai testified that the people with whom he was dealing at QLI began to pressure him to sell the property in December 1992, and that, in pressuring him to sell, Mr. Hammad told him that what he was working on was "above all else."). It is possible, as QLI suggests, that Mr. Hammad simply meant that his work of translating the Quran was all important. But it is also possible, given the timing, that a jury could reasonably find that Mr. Hammad wanted to sell the property to liquidate money for the purpose of providing support to Hamas' deported members and their families.

Based on the record before it, the Court finds that the

106

Boims have offered enough evidence to get to a jury on their claim that QLI provided cover for Mohammed Salah's involvement with Hamas and that QLI helped to funnel money to Hamas. Accordingly, QLI's motion for summary judgment is denied.

C.  Conclusion

For the reasons explained above, the Court grants the Boims' motion for partial summary judgment against HLF [#297], grants the Boims' motion for partial summary judgment against IAP and AMS [#304], and grants the Boims motion for partial summary judgment against Mr. Salah [#263].  The Court denies the motions for summary judgment filed by HLF [#308], Mr. Salah [#293], QLI [#271], and IAP and AMS [#266].  Further, the motions to strike filed by Mr. Salah [#295], QLI [#330], and the Boims [#305] are granted in part and denied in part, as explained in this Opinion.

The case will proceed to trial on the matters remaining at issue on December 1, 2004 in Courtroom 1903.  The trial will involve both liability and damages as to defendant QLI, and damages alone as to defendants HLF, IAP and AMS, and Mr. Salah.

Dated: November 10, 2004

ENTER:

_Arlander Keys_
_____
ARLANDER KEYS
United States Magistrate Judge