

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, Individually and as Administrator of the Estate of DAVID BOIM, deceased, and JOYCE BOIM,<br><br>        Plaintiffs,<br><br>v.<br><br>QURANIC LITERACY INSTITUTE, HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, ISLAMIC ASSOCIATION FOR PALESTINE, AMERICAN MUSLIM SOCIETY, AMERICAN MIDDLE EASTERN LEAGUE FOR PALESTINE, UNITED ASSOCIATION FOR STUDIES AND RESEARCH, MOHAMMED ABDUL HAMID KHALIL SALAH, MOUSA MOHAMMED ABU MARZOOK, AMJAD HINAWI, and THE ESTATE OF KHALIL TAWFIQ AL-SHARIF,<br><br>        Defendants. | No. 00 C 2905<br><br>Magistrate Judge<br>Arlander Keys |

## MEMORANDUM OPINION AND ORDER

On May 13, 1996, David Boim, a seventeen-year-old American citizen living in Israel, was killed in a Hamas terrorist attack in the West Bank. David's parents, Joyce and Stanley Boim, sued under the Antiterrorism Act of 1990, 18 U.S.C.§ 2300 *et seq.* (West 2004), which creates a cause of action for United States nationals who are injured in their person, property, or business by reason of an act of international terrorism; the Act allows injured persons (or their estates, survivors or heirs) to recover threefold the damages sustained, as well as costs of suit, including attorney's fees. *See* 18 U.S.C. §2333.

The Act does not specify who may or should be sued. But the Boims named as defendants two men who were directly involved in the murder, Amjad Hinawi and Khalil Tawfiq Al-Sharif. They also named several U.S.-based individuals and organizations they claim helped to support Hamas – namely, Mousa Abu Marzook, who the Boims alleged served for many years as the admitted leader of Hamas' political wing in the United States, Mohammed Salah, who they alleged served as the United States-based leader of Hamas' military branch, the United Association for Studies and Research, which they alleged serves as Hamas' political command center in the United States, and the Quranic Literacy Institute, the Holy Land Foundation for Relief and Development, the Islamic Association for Palestine, the American Muslim Society, and the American Middle Eastern League for Palestine, which they alleged raise and launder money for Hamas and finance Hamas' terrorist activities.

The Court entered default judgments against Amjad Hinawi, UASR, and AMELP, and dismissed the case as to Mousa Abu Marzook and the estate of Khalil Tawfiq Al-Sharif. On November 10, 2004, the Court entered summary judgment against HLF, IAP/AMS and Mohammad Salah on the issue of liability. On December 1, 2004, the case went to trial on the two issues left unresolved by the proceedings up to that point: the question of whether the Quranic Literacy Institute was liable to the Boims under the statute, and

the question of the amount of damages, if any, to be awarded to the Boims from the liable defendants.

In light of the Court's rulings on summary judgment, and because the United States Treasury Department's Office of Foreign Assets Control had seized and frozen the assets of HLF, counsel for that entity elected not to participate in - or even attend - the liability phase of the trial; counsel for IAP/AMS and Mr. Salah followed suit. Counsel for all three defendants informed the Court that they might attend and possibly participate in the damages portion of the trial, and the Court advised them that that was acceptable, yet none of them showed up.

Prior to the trial, John Beal, counsel for QLI, whose liability was still very much an open question, requested a continuance of the trial date. Mr. Beal advised the Court that, because his client was a relatively minor player, he had been planning to ride the coattails of the other defendants' defenses; with the other defendants going out on summary judgment and electing not to participate in the trial, he argued, he could not reasonably be expected to carry the ball on his own without being given several more months to prepare. The Court denied Mr. Beal's motion for a continuance; given that the trial date had been set for at least six months, and given that the Boims had moved for summary judgment against all of the defendants except QLI, Mr. Beal had ample notice that he might be the sole

defendant to survive to trial. Following that ruling, Mr. Beal moved to withdraw from the case; the Court denied that motion as well, as it was quite clearly a backdoor attempt to push back the trial date and would have resulted in substantial prejudice to the Boims.

On the morning the trial was set to begin, Mr. Beal filed a "Notice of Non-Participation," advising the Court that he would attend the trial, but would not "actively participate in jury selection, will not give an opening statement, will not cross examine plaintiffs' witnesses, will not present defense witnesses or introduce defense exhibits, and will not give a closing argument." The Court advised Mr. Beal, and also advised his client, QLI's principal, Amer Haleem, that it believed counsel's planned course of action was both risky and foolish; the Court cautioned counsel and Mr. Haleem that it was counsel's job – not the Court's – to defend QLI, and that, however counsel chose to proceed, the Court would not assume that responsibility. Both Mr. Beal and Mr. Haleem indicated that they understood what was at stake, but were nonetheless determined not to participate in the trial.

At trial, Mr. Beal remained true to his word; he declined to participate in jury selection, and throughout the trial, he remained largely mum. After the Boims' attorney finished his opening statement, the Court asked Mr. Beal if he wished to make

an opening statement, and he declined. Each time counsel for the Boims finished examining a witness, the Court asked Mr. Beal whether he had any questions of the witness, and, each time, he said no. When counsel for the Boims asked the Court to admit the plaintiffs' trial exhibits, the Court asked Mr. Beal whether he wanted to make any objections, and he said no. After the Boims' attorney finished his closing argument, the Court asked Mr. Beal if he wanted to address the jury, and he declined. Mr. Beal attended the jury instruction conference, but did not participate. During deliberations, the jury requested to see the demonstrative exhibits. When the Court asked Mr. Beal whether he had any position with respect to whether the demonstrative exhibits should be permitted to go back to the jury room, he did not object.

At the close of the evidence, the Boims moved for judgment as a matter of law, and Mr. Beal made his own motion, on behalf of QLI, for judgment as a matter of law. The Court denied both motions, and sent the case to the jury. On December 8, 2004, the jury returned its verdict: it found QLI liable and awarded damages in the amount of $52 million against all Defendants; the Court then tripled the jury's award, as required by §2333, for a total award of $156 million.

On December 17, 2004, QLI filed a motion seeking judgment as a matter of law pursuant to Federal Rule of Civil Procedure

50(b), or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. In its motion, QLI argues that judgment as a matter of law is appropriate because the Boims failed to prove all of the essential elements of their claim, and because the jury's verdict was not supported by the evidence. Alternatively, QLI argues that it is entitled to a new trial for the same reasons, because it was adversely affected by the way in which the trial was handled, and because the jury's award is excessive. Defendants HLF, IAP/AMS and Mr. Salah also filed post-trial motions, adopting QLI's arguments about the excessiveness of the award.

Federal Rule of Civil Procedure 50 provides that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party . . . ." Fed. R. Civ. P. 50(a)(1). A party seeking relief under Rule 50(b) faces a high hurdle; to afford relief after a verdict has been returned, the Court must basically find that the jury was irrational when it reached the verdict it did; the motion should be granted only when, considering the totality of the evidence, the Court finds that no rational jury could have reached the verdict that the jury reached. *See Harvey v. Office of Banks &*

*Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004); *Ciesielski v. Hooters Management Corp.*, No. 03 C 1175, 2004 WL 2997648, at *1 (N.D. Ill. Dec. 27, 2004). In ruling on a motion under Rule 50(b), the Court views the evidence and all reasonable inferences in a light most favorable to the party who prevailed under the verdict; the Court does not re-weigh the evidence presented at trial or make credibility determinations. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). *See also Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir. 1989) (judgment as a matter of law is proper only when the evidence and all reasonable inferences drawn from it are insufficient to support the verdict when viewed in the light most favorable to the prevailing party). "If the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict . . ., the motion must be denied." *Cygnar*, 865 F.2d at 834 (citing *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir. 1988)).

When made after the jury has returned its verdict, a Rule 50 motion may be joined with a motion for a new trial under Rule 59. Fed. R. Civ. P. 50(b). "Rule 59(a) allows the Court to grant a new trial if the 'verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party.'" *Egebergh v. Village of Mount Prospect*, No. 96 C 5863, 2004 WL 856437, at *1 (N.D. Ill. April

20, 2004)(quoting *Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir. 1996)).

To prevail on their claim against QLI, the Boims had to show that QLI provided material support to Hamas, or that it attempted or conspired to provide material support to Hamas. 18 U.S.C. §2333. The Boims' theory, as alleged in their complaint, was that QLI provided an aura of legitimacy to Mohammed Salah by purporting to employ him as a computer analyst, effectively permitting him to continue to act on behalf of Hamas without raising suspicion; the Boims alleged that QLI helped to conceal Mr. Salah's role as Hamas' military commander, and served as the vehicle through which he channeled hundreds of thousands of dollars to Hamas operatives. *See* First Amended Complaint, ¶¶5, 44.

In support of its motion for judgment as a matter of law, QLI first argues that the evidence presented at trial was insufficient to allow the jury to conclude that QLI knowingly provided Mohammed Salah with "cover" or funneled any funds to Hamas through Mr. Salah, a necessary predicate to its decision to hold QLI liable for David's death; at best, QLI argues, the evidence was "suspicious" or "consistent with" the notion that QLI supported Hamas. Thus, QLI argues, the jury's findings in this regard must have been based upon speculation and conjecture, which is impermissible.

The Court disagrees with QLI's characterization of the evidence adduced at trial. Amer Haleem, QLI's Secretary, testified that Mohammed Salah, who had already been found by the Court to have provided material support to Hamas, worked for QLI as a volunteer, doing some computer and administrative work. He further testified that, despite Mr. Salah's supposed volunteer status, QLI helped to arrange significant stipends - $3,000 per month per person - for Mr. Salah, as well as two of QLI's principals, from Yassin Kadi, who Mr. Haleem tried to portray as a Saudi Arabian philanthropist, while the Boims tried to portray him as a financier of terrorism. Mr. Haleem also testified that, despite Mr. Salah's volunteer status, Mr. Haleem executed a letter that claimed Mr. Salah was a paid employee of QLI, and that he had been one for some time. He further testified that he wrote this letter with the goal of trying to help Mr. Salah obtain an apartment.

This testimony - taken together with the testimony of Matthew Levitt, the Boims' terrorism expert, who explained to the jury how terrorist networks such as Hamas operate, and with the evidence of Mr. Salah's extensive role in Hamas - would be more than enough to provide a sufficient basis for the jury's verdict. It is true that Mr. Haleem offered the jury explanations for why he wrote the letter to help Mr. Salah obtain housing, and for why QLI arranged for Mr. Salah to receive $3,000 a month from someone

who was designated by the United States as a terrorist. But the jury was free to accept or reject those explanations; it obviously chose to reject them, and the Court may not second guess that decision. *See Reeves*, 530 U.S. at 150-51 (in ruling on a motion for judgment as a matter of law, the court may not make credibility determinations or weigh the evidence; those are jury functions).

Next, QLI argues that the Boims failed to prove that Hamas killed David Boim, a necessary element of their claim. On the contrary, the Boims did prove that Hamas killed David Boim, and the Court ruled as much in connection with the summary judgment motions; specifically, the Court held, based on the record, "that David Boim was murdered by Hamas activists, in a Hamas-sponsored attack, and that no reasonable jury could find otherwise." *Boim v. Quranic Literacy Institute*, 340 F. Supp. 2d 885, 899 (N.D. Ill. 2004). The evidence supporting that finding was overwhelming. Indeed, Defendants IAP/AMS conceded that Hamas was responsible for David's murder. The Court's ruling in that regard is binding at the trial stage.

As an alternative to granting judgment as a matter of law, QLI asks the Court to grant a new trial because: (1) the Boims failed to prove an element of their claim; (2) the verdict was against the clear weight of the evidence; (3) the Court denied QLI's motion for a continuance of the trial; (4) QLI's rights

10

were adversely affected by the Court's rulings; and (5) the damages were excessive. The Court quickly rejects QLI's first two arguments; as explained above, the Boims *did* prove each element of their claim and the verdict was supported by substantial probative evidence.

Turning next to QLI's claim that the damages award was excessive, the Court simply cannot agree. The Court acknowledges that the jury's award was substantial - even before the mandatory trebling. But a jury's award may not be vacated unless it is "monstrously excessive" - so high that it can only be the result of passion and prejudice - or when it has "no rational connection to the evidence." *See, e.g., Honda Motor Company v. Oberg*, 512 U.S. 415, 422-23 (1994); *Kossman v. Northeast Illinois Regional Commuter Railroad Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000). That is not the case here.

The evidence established that David Boim was murdered by Hamas terrorists, and that the defendants had knowingly provided material support to Hamas. The plaintiffs sought damages for: David's lost benefits and wages, lost household services, lost guidance, loss of society, and mental anguish. At trial, both Stanley Boim and Joyce Boim testified, speaking in surprisingly even-keeled tones about the heart-wrenching pain and loss they have suffered because of David's murder. Among other things, they testified about their relationship with their son and the

role David played in their family; they testified that David had intended to become a doctor. The Boims also presented Dr. Stan Smith, who testified about the pecuniary loss to the Boims from David's murder. While QLI did not cite to the record regarding Dr. Smith's testimony about the amount of the pecuniary loss, the Court's recollection is that he opined that it was in the $22 million range. Neither QLI, nor any of the other defendants, offered any evidence or argument to rebut or undercut this figure. Thus, the record evidence could have supported an award of $22 million just for the lost wages and benefits David would have provided to the Boims if he had lived.

And that does not even begin to account for the types of losses that would reasonably have made up the bulk of the award – the damages to cover the Boims' mental anguish. On this score, counsel for the Boims opted not to ask the jury for a particular dollar amount, choosing instead to ask the jury to award whatever it saw fit. Given the nature of the case (one seeking damages for the murder of a son in a brutal and senseless terrorist act), and given the nature of the relationship between the victim and the plaintiffs (child/parent), the Court cannot say that the jury's award was "monstrously excessive" or that it lacked a rational connection to the evidence. It is high, but that is not surprising, given the nature of the case, and given that the defendants offered no alternative to the plaintiffs' pleas and

figures.

Finally, the Court considers QLI's arguments that its rights were violated by the Court's refusal to continue the trial date and by the general way in which the Court handled the proceedings in this matter. QLI, like the other non-defaulting defendants, moved for summary judgment in its favor and against the Boims. The Court denied QLI's motion, finding that QLI had "attempted to provide an innocuous explanation for each of the Boims' allegations," but that "the record evidence is such that a jury should be permitted to decide whether those explanations are true." *Boim*, 340 F. Supp. 2d at 927. In his current motion, Mr. Beal states that "it is evident that QLI has a substantively triable case." Yet, he chose not to try that case; he chose not to put on any evidence in QLI's favor, and he chose not to challenge or rebut any of the Boims' evidence. The Boims made their case to the jury; QLI declined to do so. Indeed, had the Boims not called Mr. Haleem as part of their case, the jury would have heard nothing from QLI; to the extent QLI is frustrated that it was not able to put more of its case before the jury – whatever that case would have been – it has no one to blame but itself.

Mr. Beal has argued that it was unfair to expect him to go to trial so soon after the Court issued its summary judgment rulings. But the trial date was set months before the summary

13

judgment motions were even briefed, and the Court consistently indicated that the date was firm. At the very latest, Mr. Beal had notice by October 8, 2004, that the trial date was firm, and that Mr. Salah was not going to participate in the trial. *See* Transcript of Hearing on Motion to Reconsider, October 8, 2004 (attached as Exhibit K to the Boims' Response to QLI's Motion for Judgment as a Matter of Law). Moreover, given that the Boims moved for summary judgment against all of QLI's co-defendants, but did not move for summary judgment against QLI, Mr. Beal should have been prepared for the very real possibility that his client could be the only defendant left to go to trial.

In short, Mr. Beal's predicament was solely of his own making. He took a gamble that some of his co-defendants would be left standing in the wake of the summary judgment rulings, and he lost. He chose to sit on the sidelines in the months leading up to the trial – despite the Court's persistent warnings that the case would proceed to trial in December. Moreover, contrary to Mr. Beal's argument in his motion to postpone the trial and in the instant post-trial motions, Mr. Haleem made it clear to the Court that his main concern was that, in the wake of the September 11, 2001 incidents, he felt that his organization could not get a fair trial, regardless of when it was held. He characterized his decision not to participate as a "protest." The Court did its very best to ensure that Mr. Beal and his client

14

understood the risks they were taking by choosing to sit out the trial; Mr. Beal and Mr. Haleem both indicated that they knew what they were doing, and that they knew what they stood to lose. Having now lost, they can hardly be heard to complain about it.

Mr. Beal argues that QLI's rights were violated because the Boims were allowed to introduce evidence that should have been stricken from the record and because Mr. Haleem, who was called by the Boims to testify, was precluded by the Court from testifying fully and completely on certain matters. These are the exact types of pitfalls that counsel created by choosing to remain inactive throughout the trial. Our system of jurisprudence is adversarial – it is counsel's job to object to evidence he thinks might be prejudicial to his client, and it is counsel's job to elicit testimony in his client's favor. See, e.g., United States v. Castro, 540 U.S. 375, 386 (2003)("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). Thus, to the extent QLI's right to a fair trial was violated, QLI has no one to blame but itself and its lawyer; by choosing to proceed as it did, despite the Court's warnings, QLI waived any right it might have had to complain about any violation of that right.

The Court's analysis on QLI's motion for a new trial applies with equal force to the post-trial motions filed by HLF, IAP/AMS

15

and Mr. Salah. In fact, it is hard to believe that these defendants would actually expect the Court to conduct another trial when they did not even bother to show up for the first trial.

## Conclusion

For the reasons set forth above, the Court denies QLI's Motion for Judgment as a Matter of Law or a New Trial [#677], denies HLF's Motion for New Trial [#678], denies IAP/AMS' Motion for New Trial [#672], and denies Mr. Salah's Post-Trial Motion [#679].

Dated: February 18, 2005

ENTER:

_Arlander Keys_
ARLANDER KEYS
United States Magistrate Judge