## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

STANLEY BOIM, Individually and as Administrator of
the Estate of David Boim, Deceased, and JOYCE BOIM,

        Plaintiffs,

v.

QURANIC LITERACY INSTITUTE, *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil No. 00 C 2905

Magistrate Judge Arlander Keys

### PLAINTIFFS' RULE 56.1 STATEMENT IN SUPPORT OF THEIR
### RENEWED MOTION FOR SUMMARY JUDGMENT AGAINST
### DEFENDANT HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT

Pursuant to Local Rule 56.1, Plaintiffs Stanley Boim, individually and as administrator of

the Estate of David Boim, deceased, and Joyce Boim (collectively, the "Boims") respectfully

submit this Statement of Material Facts as to Which There is No Genuine Issue in support of

their Renewed Motion for Summary Judgment against Defendant Holy Land Foundation for

Relief and Development.

### History of Civil Litigation against HLF and Related Parties

1.      On May 12, 2000, the Boims brought suit under the Antiterrorism Act of 1990

(the "Act"), as amended in 1992, 18 U.S.C. § 2333, for the murder of their son David Boim

against numerous defendants, including Holy Land Foundation for Relief and Development

("HLF"), Islamic Association for Palestine ("IAP"), American Muslim Society ("AMS"),

Quranic Literacy Institute ("QLI"), and Mohammed Abdul Hamid Khalil Salah ("Salah").

(Complt., Docket # 1).

2.     After this court denied defendants' motions to dismiss the complaint, the Seventh Circuit on April 6, 2001, granted QLI and HLF's petitions for interlocutory appeal to decide issues concerning the proper standard of liability under the Act. (Docket ## 64, 89).

3.     As a matter of first impression, a panel of the Seventh Circuit (Judges Rovner, Wood, and Evans) held that defendants could be liable under the Act for aiding and abetting the murder of David Boim by Hamas if Plaintiffs proved that "the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities." (*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1023 (7th Cir. 2002) (*Boim I*)).

4.     The Boims moved for partial summary judgment on the issue of liability against HLF on June 2, 2004. (Docket ## 297-301). HLF responded and cross-moved for summary judgment on July 28, 2004, and filed a reply in support of its cross-motion for summary judgment on September 17, 2004. (Docket ## 307-310, 327). The Boims filed a reply memorandum in support of their motion for partial summary judgment and in response to HLF's cross-motion for summary judgment on August 30, 2004. (Docket # 313). On September 22, 2004, the Boims filed a motion to supplement the record on HLF's cross-motion for summary judgment in part to file an inadvertently omitted Local Rule 56.1 response to HLF's statement of undisputed material facts, to which HLF responded on October 4, 2004. (Docket ## 331, 337). Lastly, on October 5, 2004, the Boims filed a motion to supplement the HLF summary judgment record based on Shukri Abu-Baker's pleading the Fifth Amendment in response to deposition questioning. (Docket # 338). Given the volume of paper involved, we hereby incorporate by reference rather than refile and serve all Plaintiffs' materials filed in connection with the HLF summary judgment briefing.

5.     IAP and AMS jointly moved for summary judgment against the Boims on June 16, 2004. (Docket ## 266-269). The Boims responded and cross-moved for partial summary judgment on the issue of liability against IAP and AMS on July 26, 2004, filing a reply brief in support of their cross-motion for partial summary judgment on October 8, 2004. (Docket ## 284-286, 291, 304). IAP and AMS then replied in support of their motion for summary judgment and responded to our cross-motion for partial summary judgment on September 15, 2004. (Docket ## 325-326). Given the volume of paper involved, we hereby incorporate by reference rather than refile and serve all Plaintiffs' materials filed in connection with the IAP/AMS summary judgment briefing.

6.     The Boims and Salah cross-moved for summary judgment against each other, and QLI moved for summary judgment against the Boims. (*See* Docket ## 263, 293, 271).

7.     Applying the *Boim I* standard, this court on November 10, 2004, issued an opinion granting summary judgment against HLF, IAP/AMS, and Salah, sending the issue of damages as to those parties to trial, in addition to sending the issue of liability and damages as to QLI to trial after denying QLI's motion for summary judgment. (*Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885 (N.D. Ill. 2004) (Docket # 638)).

8.     This court based its judgment against HLF in part on application of collateral estoppel to the D.C. Circuit's finding in *Holy Land Foundation for Relief & Development v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003), that HLF funded Hamas terrorism made in the context of upholding HLF's designations as a Specially Designated Terrorist and Specially Designated Global Terrorist and the resulting blocking order. (*Id.* at 900-906). Thus, this court concluded "[w]ith the D.C. Circuit's ruling, as well as the other evidence in the record [including deposition testimony as well as documentary evidence from the administrative record in the *Ashcroft* case]

linking Hamas to David Boim's murder and linking HLF to Hamas, no reasonable jury could find for HLF on the liability issue." (*Id.* at 906).

9.     On ruling against IAP and AMS on summary judgment, the court rejected IAP/AMS's attempt to argue that the allegations involved entities different from them, finding that "there was a national organization serving as the Islamic Association for Palestine, and that IAP Texas and AMS either formally served as that organization, or were so intertwined and involved with that organization as to make any formal distinction meaningless." (*Id.* at 908). Relying on the documents contained in the Watson Memorandum and other record evidence, the court found that IAP/AMS "contributed money, on a number of occasions, to HLF, and they routinely and consistently encouraged people to donate money to HLF, and otherwise assisted in HLF's fundraising endeavors." (*Id.* at 910). Thus, "taken in the context of the findings made above and elsewhere about HLF's established link to Hamas," this court concluded that IAP/AMS was supporting Hamas, an organization whose goals were known, endorsed, and supported by IAP/AMS. (*Id.*).

10.     The trial on the issue of liability against QLI and damages as to all defendants resulted in a jury verdict in the Boims' favor in the amount of $52 million, which under the Act was trebled to $156 million against QLI, Salah, HLF, IAP, and AMS. The judgment was amended twice on February 18, 2005, and February 25, 2005, respectively, to specify that liability for the judgment was joint and several and to name defaulting defendants to the judgment. (Judgment and Amendments, Exhibit A).

11.     All non-defaulting defendants (namely, QLI, Salah, HLF, IAP/AMS) appealed the judgment in March 2005. (Docket ## 703, 705, 707, 709). The same Seventh Circuit panel that sat in *Boim I* issued an opinion, reversing the judgments entered against the appellants and

remanding for further proceedings. (*Boim v. Holy Land Found. for Relief & Dev.*, 511 F.3d 707 (7th Cir. 2007) (*Boim II*)). The opinion was vacated when the Seventh Circuit agreed to rehear the case en banc and issued a new ruling, establishing a revised basis for liability against donors to terrorism. (*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc) (*Boim III*)).

12.     The en banc majority held that the proper standard for liability under the Act is not one of secondary liability under an aiding and abetting theory, but instead one of primary liability (having the character of secondary liability) by virtue of "a chain of explicit statutory incorporations by reference" leading to 18 U.S.C. § 2339A, a criminal statute prohibiting material support to terrorism enacted on September 13, 1994, preceding the death of David Boim on May 13, 1996. (*Boim III*, 549 F.3d at 690-91).

13.     The Seventh Circuit held that liability attaches to any donor-defendant that provided material support in any quantity to Hamas between the September 13, 1994 effective date of section 2339A and David Boim's May 13, 1996 death, knowing or being deliberately indifferent to the aims and activities (the character) of Hamas. (*Id.* at 693-98). Earmarking support for Hamas's nonviolent wing was held not to be a defense to liability under the Act. (*Id.* at 698). Consequently, "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." (*Id.*).

14.     Because Salah was incarcerated in Israel from 1993 to 1997, which overlapped with the time period when acts of material support to Hamas were illegal, *Boim III* reversed the summary judgment ruling against him and entered judgment in his favor. (*Id.* at 691, 705). The

United States Supreme Court denied the Boims' petition for a writ of certiorari to the Seventh Circuit on its ruling in favor of Salah. (130 S. Ct. 458 (2009)).

15.     *Boim III* upheld the judgments against both QLI and IAP/AMS, expressly relying on this court's findings made as to IAP/AMS at 340 F. Supp. 2d at 906-13. (*Id.* at 701-05).

16.     *Boim III* reversed this court's judgment against HLF because it found collateral estoppel could not be applied to the key issues concerning whether HLF knew Hamas was a terrorist organization and made contributions after the effective date of section 2339A, where those issues were not "essential to the judgment upholding the blocking order-and essentiality is the heart of collateral estoppel." (*Id.* at 701). On remand, this court stayed the case against HLF during the pendency of criminal proceedings against HLF and its officers, directors, and agents. (Docket # 850).

## Criminal Case against HLF and its Principals

17.     On December 7, 2011, the Fifth Circuit upheld the criminal convictions obtained in the Northern District of Texas against HLF principals and agents Shukri Abu-Baker, Ghassan Elashi, Mohammed El-Mezain, Abdulrahman Odeh, and Mufid Abdulqader, dismissing HLF's appeal for lack of jurisdiction. (*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011)). (A true and correct copy of the Fifth Circuit opinion is attached as Exhibit B).

18.     Abu-Baker, Elashi, and El-Mezain were founders, directors, and officers of HLF, which was called the Occupied Land Fund when first incorporated in California on January 11, 1989, before its name changed to HLF on September 16, 1991. (*Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 896; *El-Mezain*, Ex. B, 664 F.3d at 485-86). (*See also* Plaintiffs' Rule 56.1(B) Statement in Opposition to Defendants AMS and IAP's Motion for Summary Judgment ("IAP/AMS Rule 56.1 Statement") (Docket ## 285, 291) ¶¶ 75-76, 78, 80-81). At all relevant

times to this case, Abu-Baker served as HLF's Chief Executive Officer and President; Elashi as HLF's Treasurer, Secretary and later Chairman of HLF's Board of Directors; and El-Mezain as HLF's Board Chairman. (*Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 897; IAP/AMS Rule 56.1 Statement ¶¶ 78, 81).

19.    Odeh managed HLF's New Jersey office, and Abdulqader was a speaker and performer who appeared at HLF fundraising events. (*El-Mezain*, Ex. B, 664 F.3d at 485).

20.    Hamas was designated a Specially Designated Terrorist ("SDT") on January 24, 1995, in Executive Order 12947, which declared a national emergency with respect to the "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process." (Exec. Order No. 12947, 60 Fed. Reg. 5079 (Jan. 24, 1995)). Hamas was designated by the U.S. Department of State as a Foreign Terrorist Organization ("FTO") on October 8, 1997, under the Antiterrorism and Effective Death Penalty Act of 1996. (28 U.S.C. § 2261 *et seq.*, 62 Fed. Reg. 52650 (Oct. 8, 1997)).

21.    After an earlier mistrial, HLF and the individual defendants were tried in a second trial that lasted approximately six weeks. On November 24, 2008, the jury found HLF, Abu-Baker, Elashi, and El-Mezain, as well as Odeh and Abdulqader, each guilty of all applicable charges of conspiracy to provide material support and resources to a FTO (Hamas), in violation of 18 U.S.C. § 2339B(a)(1); providing material support and resources to a FTO (Hamas), in violation of 18 USC § 2339B(a)(1); conspiracy to provide funds, goods, and services to a SDT (Hamas), in violation of the International Emergency Economic Powers Act (IEEPA), 50 USC § 1701-1706; providing funds, goods, and services to a SDT (Hamas), in violation of IEEPA, 50 USC § 1701-1706; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A); forfeiture of assets; and

certain tax offenses not relevant to this motion. (True and correct copies of the Jury Verdict form, the Special Verdict form, and the Jury Charge are attached as Exhibits C, D, and E, respectively).

22. HLF was convicted on grounds of vicarious liability for the acts or omissions of its agents performed within the scope of their employment. (Jury Charge, Ex. E, pp. 21-22). HLF's conviction resulted in a one year probation sentence, forfeiture order, and money judgment in the amount of $12,400,000. (A true and correct copy of the HLF Judgment and Forfeiture Order is attached as Exhibit F; *see also El-Mezain*, Ex. B, 664 F.3d at 574-75).

23. On June 5, 2009, Attorney Ranjana Natarajan, Director of the National Security Clinic at the University of Texas School of Law, filed a notice of appearance and a notice of appeal on behalf of HLF, despite having no prior connection to the case. (*Id.* at 575). The government asked the Fifth Circuit to remand the case so that the district court could make findings regarding Ms. Natarajan's authority to represent HLF on appeal. The Fifth Circuit granted the request, ordering the district court to address "Ms. Natarajan's authority to represent HLF, whether HLF was represented at trial, and the corporate status of HLF at relevant times." (*Id.*).

24. After an evidentiary hearing, the Northern District of Texas court found HLF "*de facto* represented by the counsel of its co-defendants because HLF's identity and interests are merged with the identities and interests of Co-Defendants El-Mezain, Baker and Elashi." (A true and correct copy of Judge Solis' May 24, 2010 Order is attached as Exhibit G, p. 19). Judge Solis rejected the argument that if HLF had its own counsel, it would and could have argued that its officers and directors acted outside the scope of their employment, thereby disqualifying their actions from imputation onto HLF. (*Id.* at 14-16). He found "[t]he evidence clearly established

that HLF could not and did not operate independently from Baker, Elashi and El-Mezain. Baker, Elashi and El-Mezain were the heart of HLF and they directed and controlled HLF throughout its lifetime. HLF was created and operated to carry out their agenda in accordance with their directives. Any independent existence was in form only." (*Id.* at 15). Accordingly, HLF's defense strategy would and could only have been identical to that of the individual defendants— that "HLF was established and operated as a legitimate charity to help the desperate Palestinian people." (*Id.* at 16). Consequently, the seven attorneys representing the individual co-defendants adequately represented HLF's interests. (*Id.* at 16).

25. For purposes of the appeal, the Texas district court allowed the appointment of Ms. Natarajan, on her own initiative, as counsel for HLF. The Fifth Circuit, however, ruled that Ms. Natarajan lacked standing to bring the appeal without the authorization of HLF, and thus the court lacked jurisdiction to hear HLF's appeal. (*El-Mezain*, Ex. B, 664 F.3d at 576-78). To date, HLF itself has not pursued any means to contest its conviction. (A true and correct copy of the most recent entries from the Northern District of Texas Docket in the criminal case is attached as Exhibit H).

26. Baker, Elashi, El-Mezain, Abdulqader, and Odeh are all currently in prison. The district court imposed a term of 65 years for Baker and Elashi, 20 years for Abdulqader, and 15 years for Odeh and El-Mezain. (*El-Mezain*, Ex. B, 664 F.3d at 490). On May 17, 2012, Abu-Baker, Elashi, Abdulqader, and Odeh jointly filed a petition for a writ of certiorari in the United States Supreme Court, and El-Mezain filed one separately. (U.S. Sup Ct. Docket ## 11-1390, 11-10437, respectively).

## Judicially Established Elements of § 2333 Claim

27.     Personal jurisdiction, subject matter jurisdiction, and venue have never been contested in this case, and *Boim III*'s issuance of an opinion on the merits in this matter demonstrates satisfaction of these requirements. (*Boim III*, 549 F.3d 685) (*See also* Plaintiffs' Rule 56.1 Statement in Support of their Motion for Partial Summary Judgment against HLF (Docket # 298) ¶¶ 1-6; Defendant HLF's Statement of Material Facts in response to Plaintiff's Statement of Material Facts ("HLF's Response to Plaintiffs' Rule 56.1 Statement") (Docket # 309) ¶¶ 1-6 ).

28.     In affirming the judgments in favor of the Boims and against IAM/AMS and QLI, *Boim III* already found David Boim was a national of the United States murdered by the acts of Hamas; evidence of commission of an act of material support to Hamas between September 13, 1994 and May 13, 1996 with the requisite mental state (knowing the character of Hamas) satisfies both proximate cause and cause in fact of David's death; and such an act of material support would "appear to be intended . . . to intimidate or coerce a civilian population" or "to affect the conduct of a government by . . . assassination," as required under the Act and the statutes it incorporates by reference. (*Boim III*, 549 F.3d at 694, 698, 701-05). The only remaining issues to be decided against HLF are whether HLF knew it was funding Hamas in the proper 1994-1996 time frame, knowing the aims and activities of Hamas.

29.     Damages have already been adjudged at $156 million and were unchallenged on appeal. (Judgment and Amendments, Ex. A).

## HLF Knew Hamas' Goal was to Destroy Israel.

30.     HLF has conceded knowing that "Hamas has used political and violent means, including terrorism, to pursue its goal of establishing an Islamic Palestinian state in Israel, the

West Bank, and Gaza." (HLF's Response to Plaintiffs' Rule 56.1 Statement ¶ 15). It acknowledges that Hamas activists, particularly those in Hamas's military wing, have conducted many attacks, including large-scale suicide bombings and shootings, against Israeli civilian and military targets. (*Id.* ¶ 16).

31.     HLF President Shukri Abu-Baker was a panel speaker at IAP's December 1989 national conference in Kansas City. The 1989 conference was billed as a tribute to the memory of Abdullah Azzam, a recently killed Islamic cleric and leading ideologue of the mujahidin warriors in Afghanistan who was the teacher and mentor of Osama bin Laden. ( IAP/AMS Rule 56.1 Statement ¶¶ 99-102, 106, 118). Azzam himself was the keynote speaker the year prior at IAP's 1988 national annual conference in Oklahoma City, where he praised Sheikh Ahmed Yassin, the senior leader of Hamas, and called upon the attendees to embrace a theology of death in support of Islamic ideas and jihad. (*Id.* ¶¶ 99, 103).

32.     The 1989 conference featured a Hamas militant as a speaker whose identity was disguised by a hood that covered his head and face. (*Id.* ¶¶ 106-107, 115, 118). This Hamas member addressed the conference from a stage which displayed two large banners. The first banner, as translated, read "Palestine is Islamic from the [Mediterranean] Sea to the [Jordan] River. Sponsored by Islamic Association for Palestine. Conference in memory of the Martyr Abdullah Azzam." (*Id.* ¶¶ 108-109). The second banner, as translated, read "Islamic Resistance Movement—The Pioneer of Jihad in Palestine." (*Id.* ¶ 110). Abu-Baker presented from this same stage. (*Id.* ¶ 118).

33.     The disguised Hamas representative described in detail the history of the Hamas military apparatus and specific terrorist acts committed by Hamas. (*Id.* ¶ 115).

11

34.    Muharram al-Aarifi, a Muslim cleric from Lebanon, spoke at the 1989 conference and led the crowd in a chant praising Hamas. (*Id.* ¶ 114). Sheikh Yusuf Qaradawi, an Egyptian cleric described as a "leading Islamic scholar from Qatar," told the attendees, including Abu-Baker, that "the hour of judgment will not come until you fight the Jews. And the Muslims will kill them." (*Id.* ¶ 113).

35.    The addresses of HLF and IAP were listed on the back cover of the Hamas Charter distributed by IAP in Arabic in 1988 and in English in 1989. (*Id.* ¶ 120). In the same time frame, HLF repeatedly was advertised in IAP publications as the entity collecting donations for the Hamas jihadist cause, including imploring readers "to perform jihad for the sake of God with your money and donate as much as you can to support the Intifada in Palestine." (*Id.* ¶¶ 121-131).

### HLF Directed Aid to Hamas Social Institutions, including between 1994 and 1996.

36.    This court has already concluded that HLF was sending money to zakat committees and other organizations that were "known fronts for Hamas, known supporters of Hamas, or entities whose funding is known to benefit the Hamas agenda." (*Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 896). The court found the following organizations to be Hamas controlled or affiliated: the Islamic Charity Association (a.k.a. Islamic Charitable Society in Hebron), Ramallah Zakat Committee, Jenin Zakat Committee, Nablus Zakat Committee, Tolkarem Zakat Committee, Orphan Care Association in Bethlehem, Qalqiliyah Zakat Committee, Hebron Zakat Committee (a.k.a. Hebron Tithing and Alms Committee), Dar El Salam Hospital, Islamic Aid Committee (a.k.a. Islamic Relief Agency), Sanabil Association for Relief and Development, and the Human Appeal International–Jordan. (*Id.*).

37.     The court found that HLF provided significant funding (hundreds of thousands of dollars) to these organizations in the years after the United States designated Hamas as a SDT, citing testimony of Abu-Baker admitting that HLF funded these institutions starting at least in 1997 and in some instances earlier. (*Id.* (citing Abu-Baker Dep. Transcript, pp. 170-76)).

38.     The Seventh Circuit affirmed this court's holding that money from HLF went to Hamas, in finding that the money IAM/AMS solicited on behalf of HLF was funneled from HLF to Hamas. (*Boim III*, 549 F.3d at 701). It held that IAM/AMS's contributions took place during the period between section 2339A's effective date and David Boim's death. (*Id.* at 691).

39.     HLF itself has conceded that "the conclusion in the Watson Memorandum is that HLF provided funds to Hamas." (HLF's Response to Plaintiffs' Rule 56.1 Statement ¶ 39).

40.     HLF from its inception raised money for Hamas. During the 1989 IAP national conference, the masked Hamas speaker specifically thanked the Occupied Land Fund for its continued support of Hamas:

> To begin with, allow me to convey to you the blessings from your brothers, both behind bars and outside, in the holy blessed land. I extend thanks to all those who stood on our side at times when our allies were few, and when all forces turned against us to conquer our fighting arms [a name used for the Hamas' hit squads in the territories]. By this I mean specifically the Islamic Association for Palestine [and] the Occupied Land Fund . . . .

(IAP/AMS Rule 56.1 Statement ¶ 115).

41.     The videotapes recording the 1989 IAP national conference, edited for distribution, concluded with a request for donations to the Occupied Land Fund. It reads, "Send Your Tax deductable [sic] DONATIONS and information to Occupied Land Fund P.O. Box 928 LA, CA 90232-0928." (*Id.* ¶¶ 107, 119).

42.     HLF leaders Abu-Baker, Elashi, and Haitham Maghawri were amongst the participants at the October 1-3, 1993, Philadelphia conference that this court found demonstrated

"a desire on the part of all in attendance to help Hamas survive and prosper." (*Id.* ¶¶ 133-135, 138; *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 908).

43.     The objective of the October 1993 meetings was to rally support for Hamas in the American theater in furtherance of Hamas's goal to defeat through acts of terrorism the recently signed Oslo Accord, which recognized the right of Palestinians and Israelis to coexist. (*Id.* ¶ 145, *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 908-09).

44.     During the October 1993 meetings, participants cautioned each other not to mention "Hamas," and to refer to Hamas as "Samah" (Hamas spelled backward) or the "Movement." (*Id.* ¶ 146; *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 909).

45.     Abdelhaleem al-Ashqar made a presentation during the conference in which he stressed the need for charitable activities: "We need to support the families of the martyrs. This efforts [sic] has to continue. . . . We need people to control the institutions, and who form a political force for our brothers on the inside." (IAP/AMS Rule 56.1 Statement ¶ 147).

46.     During the meetings, a recommendation was made that "[t]he institutions here should be at the service of the Movement over there, according to the circumstances in the country. This should include financial, information, political, everything." (*Id.* ¶ 148; *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 909).

47.     The men discussed that "the Fund [HLF] and the Union [IAP] were established in the first place to provide assistance to the Movement [Hamas] inside the Occupied Territories and they should not deviate from the objective." (*Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 909 (internal quotations omitted)).

48.     Specific methods endorsed for mobilizing support in America for the Movement included "bringing in guests from the occupied territories to speak at mosques and Islamic

centers, having HLF and IAP join forces, [and] placing appeals for humanitarian donations in Al-Zeitouna, the Monitor and other Islamic magazines." (*Id.* (internal citations omitted)).

49.     One speaker urged the group to "concentrate our efforts on supporting Jihad . . . . This can be done, he said, through concentrating our financial resources on those directly connected with Jihad, such as [the] injured, the martyrs, their families and the prisoners." (*Id.* (internal quotations omitted)).

50.     Hamas leader Muin Shabib addressed the conference on the subject of Islamic/Hamas institutions.   (IAP/AMS Rule 56.1 Statement ¶¶ 138, 151).   He listed "our institutions" in Gaza as including:   The Islamic Association; the Islamic University; Al-Salah Association; Al-Wafa Association for the Elderly and some of the zakat committees. (*Id.* ¶ 151). In the West Bank, Shabib listed the Al-Tadoman Association; the Jenin Zakat Committee, the Ramallah Zakat Committee and the Association of Islamic Studies and Cultures as Hamas institutions. (*Id.*).

51.     The establishment of these charitable organizations, known as "Da'wa," is critical to the continuing vitality of Hamas and the pursuit of its mission to eradicate the existence of Israel, as it creates a civilian infrastructure that gives Hamas the ability to reach and garner public support and provides a screen for its covert activities.   Da'wa mobilizes and incentivizes future terrorists (including suicide attackers), creates a funding resource for Hamas's terrorist activities, and allows for the organization of activities, distribution of Hamas materials, and indoctrination of Hamas ideology. (*Id.* ¶¶ 12-21).

52.     One of the Hamas founders, Dr. Ibrahim Al-Yazuri, told *London Filastin Al-Muslimah* that social work is part of the Hamas strategy to encourage and support terrorist activities. "The Hamas movement is concerned about its individuals and its elements, especially

those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom. The movement takes care of their families and their children and provides them with as much material and moral support as it can." (*Id.* ¶ 22).

53. On March 13, 1995, Hamas leader Sheykh Abd al-Khaleq al-Natshe, signing as head of the Islamic Charitable Society in Hebron, reported to HLF that the Muslim Youth Society in Hebron had distributed food packages funded by HLF to the families and orphaned children of Hamas prisoners and martyrs. (A true and correct copy of the Supplemental Declaration of Reuven Paz is attached as Exhibit I, ¶¶ 7-9).

54. The Muslim Youth Society in Hebron (aka Young Muslim Society or Young Muslim Youth Association) is a sub-group of the Islamic Charitable Society in Hebron. (Paz Suppl. Declaration, Ex. I, ¶ 8). It is an organization renowned for developing numerous suicide bombers for Hamas. (*Id.* ¶ 7; *see also* Appendix of Exhibits to Plaintiffs' IAP/AMS Rule 56.1 Statement, Vol. 4, Paz Declaration, Ex. 8, ¶ 12j).

55. Payments funded by HLF were also distributed by the Muslim Youth Society to relatives of Hamas martyrs on April 2, 1995, April 3, 1995, and April 11, 1995. (Paz Suppl. Decl., Ex. I, ¶¶ 9-11).

56. HLF's provision of funds to the Muslim Youth Society to aid families and relatives of Hamas martyrs and prisoners is consistent with HLF's knowledge and direct support for the Hamas terrorist mission. (*Id.* ¶¶ 10-12).

57. HLF's Grants List shows that on November 7, 1994, HLF provided $2,790.00 to the Sanabil Association for Relief and Development. HLF provided $3,610.00 to this same organization on December 21, 1994. (Appendix of Exhibits to Plaintiffs' IAP/AMS Rule 56.1 Statement (Docket # 291), Vol. 3, Group Exhibit 4, AR 1799, attached as Exhibit J).

58.     HLF's Grants List shows that separate transfers in the amount of $21,124.00 and $2,160.00 were made to the Islamic Relief Committee on December 21, 1994. (*Id.* at 1799-1800, Ex. J).

59.     This court has already found that the Islamic Charitable Society in Hebron, Sanabil Association for Relief and Development, and the Islamic Relief Committee are Hamas-controlled or affiliated organizations. (*Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 896; *see also* IAP/AMS Rule 56.1 Statement ¶ 195-200).

60.     Evidence previously submitted by the Boims establishing funding of Hamas social organizations, leaders, and families outside the September 1994 to May 1996 time frame (both earlier and later) serves to demonstrate that HLF's funding of Hamas was continuous. (Plaintiffs' Supplement to HLF MSJ (Docket # 338), p. 1 n.1).

## Factual Findings Essential to Criminal Convictions

61.     To convict on each of the conspiracy and substantive counts related to providing support to Hamas as a SDT and FTO (Counts 1-32), the jury was required to find that the charged defendant knew that it was providing support to Hamas. (Jury Charge, Ex. E, pp. 26, 28-30, 33-34, 37-38, 40, 44).

62.     On the substantive counts related to providing support to Hamas as a SDT and FTO, predicated on individual wire transfers to zakat committees (Counts 2-10, 12-21, 23-32), the jury was instructed that it could find a defendant provided support to Hamas if they found "(1) that the entity to which the defendant provided the support was operating under Hamas's direction or control or if it was organizing, managing, supervising, or otherwise directing the operation of Hamas's personnel or resources and (2) that the defendant under consideration knew [the same]." (Jury Charge, Ex. E, pp. 30, 38, 44).

63.     The Fifth Circuit upheld the jury's findings that HLF's officers and agents knowingly conspired to and provided support to Hamas through funding zakat committees controlled by Hamas. (*El-Mezain*, Ex. B, 664 F.3d at 527-35).

64.     Hamas control of the zakat committees funded by HLF was established through the expert testimony of Avi, an anonymous legal advisor for the Israeli Security Agency, and Dr. Matthew Levitt, the same expert the Boims have presented in this case. (*Id.* at 489, 531-34). Avi presented testimony establishing that most of the zakat committees at issue had come under Hamas control by 1991. (*Id.* at 489).

65.     The zakat committees that HLF and its principals were convicted of funding and that provided the basis for the jury's $12.4 million forfeiture order and money judgment included: Islamic Charitable Society of Hebron, Ramallah Zakat Committee, Jenin Zakat Committee, Nablus Zakat Committee, Tolkarem Zakat Committee, Qalqilia Zakat Committee, and Islamic Science and Culture Committee. (Jury Charge, Ex. E, pp. 29, 35-36, 42-43; *El-Mezain*, Ex. B, 664 F.3d at 487 n.1).

66.     The conspiracy to commit money laundering charge in Count 22 is derivative of the conspiracy to provide support to Hamas as a SDT in Count 11. Both conspiracies began on January 25, 1995, when Hamas was named a Specially Designated Terrorist, pursuant to Executive Order 12947 under IEEPA. (Jury Charge, Ex. E, pp. 32, 40).

67.     To convict on Counts 11 and 22, the jury had to find that, beginning on January 25, 1995, two or more persons agreed to violate Executive Order 12947 by willfully contributing funds, goods, and services to, or for the benefit of, a Specially Designated Terrorist, and that at one least one overt act was committed in furtherance of the crime. (Jury Charge, Ex. E, pp. 14, 32-34, 40-41). The overt acts listed in the Superseding Indictment for Counts 11 and 22 included

an April 3, 1995 wire transaction from HLF's bank account in the amount of $30,000 to the Islamic Charitable Society of Hebron, and an April 22, 1996 wire transaction from HLF's bank account in the amount of $9,758 to the Islamic Science and Culture Committee. (A true and correct copy of the Superseding Indictment is attached as Exhibit K, pp. 23, 28).

68.     The $12.4 million forfeiture order and money judgment imposed on HLF were based on Count 22, the money laundering conspiracy involving a SDT, and captured wire transactions that took place from 1995 to 2001. (HLF Judgment and Forfeiture Order, Ex. F, p. 6; Special Verdict Form, Ex. D; Jury Charge, Ex. E, pp. 40-41; *El-Mezain*, Ex. B, 664 F.3d at 486-87 & n.1) . While the forfeiture order is the subject of an appeal, the money judgment against HLF remains valid. (A true and correct copy of Judge Solis' October 27, 2011 First Amended Preliminary Order of Forfeiture is attached as Exhibit L).

69.     The jury was instructed that acts similar to those charged in the indictment could be used to determine whether the charged defendant "had the state of mind or intent necessary to commit the crime charged in the indictment." (Jury Charge, Ex. E, pp. 24).

70.     Evidence demonstrating that defendants funded the same zakat committees before and after Hamas's first official designation as a terrorist organization in 1995 allowed the jury to conclude that defendants' intent was to support Hamas. (*El-Mezain*, Ex. B, 664 F.3d at 489, 529).

71.     The Fifth Circuit's review of the evidence presented in the criminal trial, which allowed it to sustain the individual defendants' convictions despite any trial court errors, demonstrates a near complete overlap with the evidence presented in this case. For example, HLF's connection to Hamas was established by (1) Hamas political leader Mousa Abu Marzook's influence over the affairs of HLF (*Id.* at 486, 488, 504, 527-28); (2) the 1993

Philadelphia meeting, attended by Baker and Elashi, organized to rally support for the use of Hamas terrorism to defeat the Oslo Accord, wherein HLF's role in fulfilling that mission was emphasized and Hamas was code-named "Samah" (*Id.* at 487, 504, 529, 571); (3) Hamas leader Muin Shabib's identification of various zakat committees to which HLF donated funds as "ours" at the 1993 Philadelphia meeting (*Id.* at 489, 504, 506, 534); (4) HLF fundraisers attended by Hamas leaders, where speakers and performers praised Hamas, and donations were encouraged and solicited by HLF (*Id.* at 488, 528, 530); (5) HLF's solicitations for donations in pro-Hamas magazines published by IAP that contained articles praising Hamas and urging readers to donate money to HLF in support of Intifada (*Id.* at 529); and (6) HLF providing donations to zakat committees to support families and orphaned children of Hamas prisoners and martyrs (*Id.* at 510 n.11, 532-33, 549).

72.     Avi testified that the Young Muslim Society (or Young Muslim Youth Association) was a sub-group of Islamic Charitable Society of Hebron, which was headed by Hamas leader Abdel Khaleq al-Natsheh. (*Id.* at 530, 532). He testified that a 1999 letter from a group of prisoners seeking support from the Young Muslim Society was consistent with Hamas's support for prisoners. (*Id.*).

73.     HLF documents showed that al-Natsheh reported back to HLF about the committee's use of grants. (*Id.* at 532 n.23). The Fifth Circuit viewed this as further evidence of HLF's connection to Hamas. (*Id.*).

74.     Applying a harmless error standard, the Fifth Circuit upheld the individual defendants' convictions notwithstanding the trial court's errors admitting hearsay evidence where a "plethora of evidence" demonstrated that HLF functioned as the fundraising arm for Hamas both before and after Hamas was designated as a terrorist organization. (*Id.* at 526-31,

535). It spelled out particular pieces of evidence demonstrating HLF's continued support for Hamas after its SDT designation in 1995, which included acts that took place before David Boim's murder in May 1996. *Id.* at 530. This evidence included: (1) HLF's distribution of over $75,000 to the Islamic Relief Agency/Committee, a Hamas intermediary organization, in 1995 and 1996 (a true and correct copy of the corresponding criminal trial exhibit is attached as Exhibit M, p. 7); (2) a February 1996 wiretap capturing an HLF-sponsored teleconference where one of the featured speakers spoke of support in Pakistan for the "Palestinians under the leadership of Hamas" and the non-recognition of Israel, followed by a solicitation for donations to HLF (a true and correct copy of the corresponding criminal trial exhibit is attached as Exhibit N); (3) a report from HLF's Special Events Department found at Infocom reporting that $18,500 was raised during a different February 1996 teleconference featuring Hamas leader Mohamed Siam (a true and correct copy of the corresponding criminal trial exhibit is attached as Exhibit O); and (4) a wiretapped call on February 25, 1996, where El-Mezain was recorded praising a suicide bombing on a bus in Jerusalem, saying, "It is good, by God" (a true and correct copy of the corresponding criminal trial exhibit is attached as Exhibit P).

75.     The criminal trial exhibit showing payments to the Islamic Relief Committee independently confirms that HLF made the two December 21, 1994 payments of $21,214 and $2,160 to the Islamic Relief Committee shown in HLF's Grants List, as discussed above in Statement of Fact ¶ 58. (Ex. M, pp. 6-7).

76.     The same sworn declaration of Abu-Baker used in this case, originally prepared in connection with the *Ashcroft* proceedings, was also submitted in the criminal trial. (A true and correct copy of the Abu-Baker Declaration submitted in the criminal trial is attached as Exhibit Q; *see also* Jury Charge, Ex. E, p. 9). The Fifth Circuit pointed to specific evidence

demonstrating how ranking Hamas leader Jamil Hamami's connection to Baker and El-Mezain contradicted Abu-Baker's disavowal that he and other HLF board members had any connection with Hamas. (*El-Mezain*, Ex. B, 664 F.3d at 534).

77.     The Fifth Circuit upheld the district court's application of a sentencing enhancement for each individual defendant based on evidence demonstrating their support of Hamas's terrorist mission, including statements made by the defendants at the 1993 Philadelphia meeting. (*Id.* at 570-71).

78.     The Fifth Circuit upheld the district court's adoption of the presentence report's inclusion of funds sent to non-Hamas charitable organizations in the total laundered funds calculation of $16.6 million given that "the sole purpose of HLF was to provide financial support for Hamas" and the legitimate funds "helped to hide its true agenda of supporting Hamas." (*Id.* at 572).

79.     The Fifth Circuit concluded from the review of the evidence that from its inception in the late 1980s, HLF was used on an ongoing basis as an apparatus by the individual defendants to raise and funnel money to Hamas through the zakat committees. (*Id.* at 483-84).

80.     As it did in the instant Boim suit, the expert testimony from Matthew Levitt in the criminal case established that support to Hamas's social wing allowed Hamas to "win the 'hearts and minds' of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in its ideology." (*Id.* at 485-96, 508-09 & n.9, 534 n.26; Appendix of Exhibits to Plaintiffs' IAP/AMS Rule 56.1 Statement, Vol. 1 (Docket # 291), Levitt Declaration, Ex. 2, ¶¶ 14-19) (*See also id.*, Vol. 4, Paz Declaration, Ex. 8, ¶ 6; Paz Suppl. Declaration, Ex. I, ¶ 12).

DATED:     June 7, 2012

Respectfully submitted,

STANLEY BOIM, INDIVIDUALLY AND AS THE ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM


/s/ Stephen J. Landes
            One of Their Attorneys

Stephen J. Landes
Matthew M. Garrett
Rana H. Janney
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive, Suite 2800
Chicago, IL 60606-1229
(312) 201-2000

Nathan Lewin
Alyza D. Lewin
LEWIN & LEWIN
1775 Eye Street, N.W.
Suite 850
Washington, D.C. 20036
(202) 828-1000

## PROOF OF SERVICE

The undersigned certifies that on June 7, 2012, a true and correct copy of the foregoing Plaintiffs' Rule 56.1 Statement in Support of Their Renewed Motion for Summary Judgment Against Defendant Holy Land Foundation for Relief and Development was electronically filed with the Clerk of the Court for the Northern District of Illinois using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. This filing may be accessed through the Court's CM/ECF system.

A courtesy copy of this filing was sent via Federal Express to the following:

John W. Boyd
Freedman Boyd Hollander Goldberg & Ives P.A.
20 First Plaza – Suite 700
Albuquerque, NM 87102

*/s/ Stephen J. Landes*
Stephen J. Landes (1567411)
Edwards Wildman Palmer LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois  60606-1229
Phone:  (312) 201-2000
Fax:     (312) 201-2555
One of the Attorneys for *Stanley Boim, Individually and as Administrator of the Estate of David Boim, deceased,* and *Joyce Boim*