UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STANLEY BOIM, Individually and as )
Administrator of the Estate of )
DAVID BOIM, deceased, and JOYCE )
BOIM, )
)
              Plaintiffs, )
)
          v. )   No. 00 C 2905
)
QURANIC LITERACY INSTITUTE, HOLY )
LAND FOUNDATION FOR RELIEF AND )
DEVELOPMENT, ISLAMIC ASSOCIATION )
FOR PALESTINE, AMERICAN MUSLIM )
SOCIETY, AMERICAN MIDDLE EASTERN )
LEAGUE FOR PALESTINE, UNITED )
ASSOCIATION FOR STUDIES AND )   Magistrate Judge
RESEARCH, MOHAMMED ABDUL HAMID )   Arlander Keys
KHALIL SALAH, MOUSA MOHAMMED ABU )
MARZOOK, AMJAD HINAWI, and THE )
ESTATE OF KHALIL TAWFIQ AL-SHARIF, )
)
           Defendants. )

## MEMORANDUM OPINION AND ORDER

This case arises out of the murder in Israel of a seventeen-year old American/Israeli citizen. The parents of the victim, David Boim, sued in federal court in Chicago under a little used statute that creates a private, civil right of action by the victims of terrorist acts and their families. The case is currently before the Court on the Boims' renewed motion for summary judgment against the Holy Land Foundation for Relief and Development. For the reasons explained below, the motion is granted.

A.    The Boim case: Factual Background & Procedural History[1]

On May 13, 1996, David Boim was killed in a Hamas terrorist attack in the West Bank. His parents, Joyce and Stanley Boim, filed suit in 2000 against numerous individuals and organizations under the Antiterrorism Act of 1990, 18 U.S.C.§ 2300 *et seq.* (West 2004), which creates a cause of action for United States nationals who are injured in their person, property, or business by reason of an act of international terrorism; the Act allows injured persons (or their estates, survivors or heirs) to recover threefold the damages sustained, as well as costs of suit, including attorney's fees. *See* 18 U.S.C. §2333. The Act does not specify who may or should be sued. But the Boims named as defendants two men who were directly involved in the murder, Amjad Hinawi and Khalil Tawfiq Al-Sharif. They also named several U.S.-based individuals and organizations they claim helped to support Hamas - namely, Mousa Abu Marzook, who the

---

[1]The procedural history of this case is actually much more complicated than this condensed synopsis suggests, and a more thorough recitation can be found in the Court's first summary judgment decision. *See Boim v. Quranic Literacy Institute, et al.*, 340 F. Supp. 2d 885, 890-892 (N.D. Ill. 2004). The case went to the Seventh Circuit on an interlocutory appeal, *see Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000 (7th Cir. 2002), then again after final judgment was entered, *see Boim v. Holy Land Foundation for Relief and Development*, 511 F.3d 707 (7th Cir. 2007)("Boim II"), with the Court providing guidance on the nuances and parameters of the relevant statutes each time, most recently in the *en banc* decision discussed herein, *see Boim v. Holy Land Foundation for Relief and Development, et al.*, 549 F.3d 685 (7th Cir. 2008)("Boim III").

2

Boims alleged served for many years as the admitted leader of Hamas' political wing in the United States; Mohammed Salah, who they alleged served as the United States-based leader of Hamas' military branch; the United Association for Studies and Research, which they alleged serves as Hamas' political command center in the United States; and the Quranic Literacy Institute, the Holy Land Foundation for Relief and Development, the Islamic Association for Palestine, the American Muslim Society, and the American Middle Eastern League for Palestine, which they alleged raise and launder money for Hamas and finance Hamas' terrorist activities.

The Court entered default judgments against Amjad Hinawi, UASR, and AMELP, and dismissed the case as to Mousa Abu Marzook and the estate of Khalil Tawfiq Al-Sharif. On November 10, 2004, the Court entered summary judgment against HLF, IAP/AMS and Mohammad Salah on the issue of liability; the judgment against HLF was predicated in part on this Court's determination that findings made in separate proceedings involving HLF's designation as a terrorist organization (discussed below) had a preclusive effect in this case. On December 1, 2004, the case went to trial on the two issues left unresolved by the proceedings up to that point: the question of whether the Quranic Literacy Institute was liable to the Boims under the statute, and the question of the amount of damages, if any, to be awarded to the Boims from the

3

liable defendants. In light of the Court's rulings on summary judgment, and because the United States Treasury Department's Office of Foreign Assets Control had seized and frozen the assets of HLF, counsel for that entity elected not to participate in – or even attend – the liability phase of the trial; counsel for IAP/AMS and Mr. Salah followed suit. Counsel for all three defendants informed the Court that they might attend and possibly participate in the damages portion of the trial, and the Court advised them that that was acceptable, yet none of them showed up. On December 8, 2004, the jury returned its verdict: it found QLI liable and awarded damages in the amount of $52 million against all Defendants; the Court then tripled the jury's award, as required by §2333, for a total award of $156 million.

The defendants appealed from the final judgment, and a three-judge panel of the Seventh Circuit vacated the judgment with instructions to redetermine liability (Judge Evans agreed with the reversal as to HLF, but otherwise dissented). The plaintiffs then petitioned for rehearing *en banc*, and the full court granted the petition. After analyzing the question of whether secondary liability is appropriately imposed under section 2333, Judge Posner, writing for the majority, held that "[i]n addition to providing material support after the effective date of section 2339A, a donor to terrorism, to be liable under section 2333, must have known that the money would be used in

4

preparation for or in carrying out the killing or attempted killing of, conspiring to kill, or inflicting bodily injury on, an American citizen abroad." *Boim v. Holy Land Foundation for Relief and Development, et al.,* 549 F.3d 685, 691 (7th Cir. 2008)(*en banc*). The Court then examined the history of the law on joint tortfeasor liability, and held that providing material support to a terrorist organization - even if you "earmark it for the organization's nonterrorist activities" - does not "get you off the liability hook . . . ." *Id.* at 698. Nor, the Court held, can donors to terrorism escape liability by funneling money through a chain or intermediate organization; as long as the donor "either knows or is reckless in failing to discover that donations to [the intermediate organization] end up with Hamas, [the donor] is liable." *Id.* at 702.

Applying these standards, the Seventh Circuit affirmed the entry of summary judgment against the bulk of the defendants and affirmed the judgment in all respects except two. First, the Court determined that, because Mohammad Salah was in jail in Israel from 1993 to 1997, he could not have provided material support to Hamas during the time period from 1994 (the effective date of the statute) through the time of David Boim's murder in 1996; because of this, the court determined that he could not be held liable under the statute and that the judgment against him must, therefore, be reversed. *Id.* at 691. The court indicated

5

that the same might be true of HLF, but vacated the judgment

against HLF on other grounds and so did not decide the question.

*Id.* Instead, the Court determined that this Court's reliance on

collateral estoppel was erroneous, and sent the case against HLF

back for further proceedings. *Id.* at 700-701.

B.    Other Proceedings Against HLF

    1.    The Terrorist Designation and *HLF v. Ashcroft*[2]

On January 23, 1995, President Clinton signed Executive

Order 12947, prohibiting transactions with terrorists who

threaten to disrupt the Middle East peace process. *See* Executive

Order No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995). Annexed to

the Order was a relatively short list (with just twelve entries)

of such terrorist organizations (thereafter referred to as

"Specially Designated Terrorists" or "SDTs"). *Id.*, 60 Fed. Reg.

at 5081.[3] Hamas (also known as the Islamic Resistance Movement)

was one of the organizations on the list. *Id.* Executive Order

---

[2]This section appears almost verbatim in the Court's initial
summary judgment decision. It is included here for context.

[3]In the wake of the September 11th attacks, President Bush signed
a similar order, Executive Order 13224, and created a new list of
individuals and organizations he dubbed "Specially Designated Global
Terrorists" or "SDGTs." *See* Executive Order No. 13224, 66 Fed. Reg.
49079 (Sept. 23, 2001). Neither Hamas, nor any of the defendants named
in this case was included on the list of SDGTs that was originally
annexed to Executive Order 13224. At one point or another, however,
Hamas, the Holy Land Foundation and Mohammed Salah have been added to
the list of SDGTs, as have other individuals and organizations whose
names appear in this opinion. *See* Alphabetical List of Blocked
Persons, Specially Designated Nationals, SDTs, SDGTs, Foreign
Terrorist Organizations & Specially Designated Narcotics Traffickers,
31 C.F.R. Ch. V, App. A (October 25, 2004).

12947, *inter alia*, prohibited donations to designated organizations, directed all agencies of the United States Government to take all appropriate measures within their authority to carry out the Order's provisions, directed the Federal Bureau of Investigation to handle the investigation of possible violations of the Order, and directed the FBI to timely notify the Department of the Treasury of any action taken on such investigations.

To that end, on November 5, 2001, Dale L. Watson, then Assistant Director of the Federal Bureau of Investigation's Counterterrorism Division, wrote an "action memorandum" to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), concerning HLF. Mr. Watson's memo described some of the history of Hamas, one of the frontrunner SDTs; it also described the history of HLF, HLF's organizational structure, and the results of various surveillance projects capturing and documenting the relationship between HLF and Hamas. Mr. Watson summed up his memo by recommending that OFAC add HLF (which he referred to as HLFRD) to the list of SDTs:

> FBI investigations of HAMAS activities in the United States have revealed that the HLFRD is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by the HLFRD are clearly being used by the HAMAS organization. The information provided in this document confirms that the HLFRD is acting for or on behalf of HAMAS. Further, senior members of HLFRD support HAMAS ideology and activities.

> These HAMAS activities interfere with the Middle East
> peace process and pose a threat to the national
> security, foreign policy, or economy of the United
> States. As such, HLFRD should be considered by OFAC
> for SDT designation as a HAMAS entity, subject to the
> prohibitions of the [International Emergency Economic
> Powers Act].

Watson Memorandum, p. 49 (Bates No. 0108) (attached to the

Declaration of Samuel A. Simon, Jr., at Exhibit 13 of Plaintiffs'

(HLF) Rule 56.1 Statement).[4] On December 4, 2001, Director

Newcomb issued a "Blocking Notice" to HLF, advising that OFAC had

blocked all of HLF's real and personal property, including

offices, furnishings, equipment, and vehicles, as well as all

funds and accounts in which HLF has any interest. *See* Exhibit 14

to Plaintiffs' (HLF) Rule 56.1 Statement.

On March 8, 2002, HLF sued then Attorney General John

Ashcroft and other federal officials and agencies, seeking a

declaration that the designation of HLF as an SDT and the seizure

of HLF's assets were unlawful; HLF alleged violations of the

United States Constitution, the Religious Freedom Restoration Act

("RFRA"), the International Emergency Economic Powers Act

("IEEPA"), and the Administrative Procedures Act ("APA"). HLF

lost its challenge of the SDT designation and blocking order,

both in the district court, *see Holy Land Foundation v. Ashcroft*,

219 F. Supp. 2d 57 (D. D.C. 2002), and on appeal to the United

---

[4]Unless otherwise noted, citations are to the Rule 56.1
Statement filed with the Boims' initial summary judgment motion.

States Court of Appeals for the D.C. Circuit, *see Holy Land Foundation v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (hereinafter "Ashcroft"). In rejecting HLF's appeal, the D.C. Circuit determined that "[t]he ample record evidence (particularly taking into account the classified information presented to the court *in camera*) establishing HLF's role in the funding of Hamas and of its terrorist activities is incontrovertible." 333 F.3d at 165. In addressing HLF's RFRA claim, the court held that "[t]here is no free exercise right to fund terrorists. The record clearly supports a conclusion that HLF did." *Id.* at 167. HLF filed a petition for *certiorari* to the United States Supreme Court; that petition was denied. *See Holy Land Foundation for Relief & Development v. Ashcroft*, — U.S. —, 124 S.Ct. 1506 (Mar. 1, 2004).

2. The Texas Criminal Proceedings

In its last summary judgment decision, the Court noted that, "[o]n July 26, 2004, the United States indicted HLF and seven of its principals (Shukri Abu-Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader, and Abdulraham Odeh) for, among other things, conspiring to provide and providing material support to a foreign terrorist organization - namely, Hamas - in violation of 18 U.S.C. §2339B(a)(1). The case is pending in the United States District Court in Dallas, Texas." *See Boim v. Holy Land Foundation et al.*,

340 F.Supp.2d 885, 894 (N.D. Ill. 2004).

That case is no longer pending. After an initial mistrial, the government re-tried the case and, on November 24, 2008, all of the principals were convicted; they are now serving substantial sentences (Ghassan Elashi and Shukri Abu Baker, who founded HLF, were each sentenced to 65 years in prison). The Fifth Circuit upheld the convictions and the sentences, and the defendants filed a petition for *certiorari* with the United States Supreme Court; to date, it appears that no action has yet been taken on that petition.

The upshot of all of this is that, at this point, HLF is defunct, its assets have been frozen since 2001, its principals are in prison, and the attorneys who have diligently represented HLF throughout proceedings here, just recently withdrew.[5] One might wonder what the plaintiffs hope to gain by continuing to press for a judgment against HLF. Indeed, one might think that, with the seizure of HLF's assets, even if they win, the Boims could not possibly collect on any judgment against HLF. But the Boims' attorney has represented that HLF's seized assets – which are apparently substantial – may still be at play, and the Court has no reason to doubt that counsel has a good faith basis for

---

[5]Before withdrawing, counsel represented that he had attempted to contact HLF's principals, but that he was unsuccessful, given that they were all in prison. He also represented that he would not be filing a response to the Boims' renewed summary judgment motion.

10

pursuing that claim. Accordingly, the Court considers the
substance of the Boims' renewed motion below.

## Discussion

Summary judgment is properly entered when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). The Supreme Court has instructed district courts to act
"with caution" in granting summary judgment; "where there is
reason to believe that the better course would be to proceed to a
full trial," the motion should be denied. *Anderson v. Liberty
Lobby*, 477 U.S. 242, 255 (1986). At this stage of the
proceedings, the Court makes no credibility determinations and
weighs no evidence; instead, the Court accepts the non-movant's
evidence and draws all justifiable inferences in its favor. *Id.*

The Boims have sued HLF for violation of 18 U.S.C. §2333,
which provides, in relevant part, that "[a]ny national of the
United States injured in his or her person . . . by reason of an
act of international terrorism, or his or her estate, survivors,
or heirs, may sue therefor . . . and shall recover threefold the
damages he or she sustains . . . ." 18 U.S.C. §2333(a). The
statute "clearly is meant to reach beyond those persons who
themselves commit the violate act that directly causes the

11

injury"; indeed, the statute is specifically drafted "to extend liability to all points along the causal chain of terrorism." *Boim*, 291 F.3d at 1011, 1020. Conduct that would give rise to criminal liability under §2339B(a), would give rise to civil liability under §2333. *Id.* at 1028. And 2339B provides that "[w]hoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. §2339B(a)(1).

The Boims have alleged that HLF conspired to provide, and provided, material support to Hamas. "Material support" would include, among other things, money and financial services, lodging, training, safehouses, and false documentation or identification. 18 U.S.C. §§2339A(b), 2339B(g). As the Seventh Circuit explained in its most recent opinion in this case, to prove that HLF provided material support to Hamas in violation of §2333, the Boims must show that HLF contributed money to Hamas – or to an intermediary organization – after the statute was enacted in 1994 and before David Boim was killed in 1996, and that HLF knew "that the money would be used in preparation for or in carrying out the killing or attempted killing of, conspiring to kill, or inflicting bodily injury on, an American citizen

abroad." *Boim III*, 549 F.3d at 691. The Seventh Circuit's *en banc* decision really guts two of the defenses HLF offered – (1) that they donated money, not to Hamas, but to *zakat* committees and other charitable agencies operating in the occupied territories; and (2) that they never intended to support terrorism, but only to fund the non-terrorist activities of those groups. As the Seventh Circuit explained, earmarking donations to the organization's nonterrorist activities does not "get you off the liability hook . . . ." *Id.* at 698. Nor can donors escape liability by funneling money through a chain or intermediate organization; as long as the donor "either knows or is reckless in failing to discover that donations to [the intermediate organization] end up with Hamas, [the donor] is liable." *Id.* at 702.

As explained, the last time around, the Court entered summary judgment based upon the finding made in the *Ashcroft* case that HLF funneled money to Hamas. The Seventh Circuit has ruled that those findings were not essential to the ruling upholding the blocking order. And so the Court starts again at square one. Thus, to win on summary judgment, the Boims must prove that Hamas was responsible for the murder of David Boim, that HLF knew the true character of Hamas and knowingly provided material support to Hamas, and that it did so during the relevant time period – that is, after the statute was enacted and before David Boim was

killed.

1. <u>Hamas was responsible for the murder of David Boim</u>

David Boim, a citizen of both the United States and Israel who was living in Israel with his parents, both United States nationals, was murdered on May 13, 1996. He was shot in the head while waiting for a bus in the West Bank. This was a terrorist attack, not some random drive-by shooting. And there is no question that Hamas was responsible for the attack.

David's father, Stanley Boim, testified at his deposition that, shortly after the attack, "it became public knowledge as reported in the media that Hamas was behind it." Transcript of Deposition of Stanley Boim, p. 14(attached as Exhibit 3 to Plaintiffs' (HLF) Rule 56.1 Statement). The official document reporting David's death indicated that David had died from a "Gunshot Wound; a victim of a terrorist attack as stated in Israeli death certificate issued by the Ministry of Interior at Jerusalem on June 3, 1996." See Report of the Death of an American Citizen Abroad (attached as Exhibit 2 to Plaintiffs' (HLF) Rule 56.1 Statement). And a 1997 article from the Jerusalem Post indicates that one of the men wanted for his involvement in the attack, "Khalil Ibrahim Tawfik Sharif," who went on to kill himself in a 1997 suicide bomb attack on a Jerusalem pedestrian mall, was a Hamas activist. See "3rd Ben-Yehuda Bomber Identified," Jerusalem Post, October 30, 1997

14

(attached as Exhibit 11 to Plaintiffs' Rule 56.1 Statement in support of its motion against HLF).

Another of the attackers, Amjad Hinawi, confessed to participating in the attack; he was charged by the Palestinian Authority with participating in a terrorist act and as an accomplice in the killing of David Boim. Despite his confession, Mr. Hinawi pled not guilty, but was tried and convicted on both counts, and sentenced to ten years of hard labor. *See* Notes of United States Foreign Service Officer Abdelnour Zaibeck, a representative from the Consulate General of the United States, who attended Mr. Hinawi's court proceedings (February 10, 12 and 14, 1998)(attached as Exhibit 6 to Plaintiffs' (HLF) Rule 56.1 Statement); Report of Sentence of Amjad Mu`hamad Rashid Al`hinawi (February 14, 1998)(attached as Exhibit 10 to Plaintiffs' (HLF) Rule 56.1 Statement). A September 22, 1997 press bulletin issued by the Government of Israel's Press Office states that Mr. Hinawi is a member of Hamas, and that the Government of Israel sought Mr. Hinawi's extradition because of his involvement with the Hamas attack that killed David. *See* Press Bulletin of September 22, 1997, p. 2 (attached as Exhibit 9 to Plaintiffs' (HLF) Rule 56.1 Statement).

Added to this evidence is the fact that a default judgment has been entered against Mr. Hinawi, which means, as a practical matter, that the Court accepts as true the well-pled allegations

in the Complaint about him - that is, that he is a Hamas terrorist and one of two Hamas agents who carried out the attack on David Boim. *See* Complaint, ¶¶13, 25-28; *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)("As a general rule, a 'default judgment establishe[s], as a matter of law, that defendants [are] liable to plaintiff as to each cause of action alleged in the complaint.' . . . Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true.")(quoting *Breuer Electric Mfg. Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir. 1982).

In short, all of the evidence in the record on this issue points to Hamas as the entity responsible for David's murder. Even now, HLF has offered no evidence that anyone other than Hamas was responsible for the attack. Accordingly, the Court finds that David Boim was murdered by Hamas activists, in a Hamas-sponsored attack, and that no reasonable jury could find otherwise.

2. <u>HLF knew the true character of Hamas and knowingly donated money - directly or indirectly - to it</u>

Under the circumstances, HLF could hardly argue that it didn't know Hamas would use its donations and support to finance its campaign of terror against American citizens in Israel. Judge Posner recognized as much when he wrote, in the *en banc* opinion, that it was "implausible" to think that HLF did not know

Hamas was a terrorist organization. *Boim III*, 549 F.3d at 702. Indeed, the evidence shows that this was precisely the point and precisely the mission HLF desired to advance.

HLF, originally known as the Occupied Land Fund, was incorporated as a tax-exempt organization in California on January 11, 1989. *See* Articles of Incorporation of the Occupied Land Fund (attached as Exhibit J to Plaintiffs' (HLF) Rule 56.1 Statement). On September 16, 1991, it changed its corporate name to The Holy Land Foundation for Relief and Development and moved to Texas. *See* Certificate of Amendment of Articles of Incorporation of the Occupied Land Fund (attached as Exhibit J to Plaintiffs' (HLF) Rule 56.1 Statement). An HLF brochure submitted with the Boims' motion for summary judgment indicates that HLF was "established in 1987 and had since grown to become prominent among relief organizations that serve the humanitarian needs and promote the well-being of the Palestinian people in the West Bank, Gaza Strip, and beyond." *See* Exhibit V to Plaintiffs' (HLF) Rule 56.1 Statement. The D.C. Circuit noted that HLF "describes itself as 'the largest Muslim charity in the United States.'" *Ashcroft*, 333 F.3d at 160.

The record evidence establishes a clear link between HLF and Hamas. Deposition transcripts and documentary evidence show that, in the years after the United States designated Hamas as an SDT, HLF provided significant funding (hundreds of thousands of

dollars) to the following organizations: the Islamic Charity Association (a.k.a. Islamic Charitable Society in Hebron), Ramallah Zakat Committee, Jenin Zakat Committee, Nablus Zakat Committee, Tolkarem Zakat Committee, Orphan Care Association in Bethlehem, Qalqiliyah Zakat Committee, Hebron Zakat Committee (a.k.a. Hebron Tithing and Alms Committee), Dar El Salam Hospital, Islamic Aid Committee (a.k.a. Islamic Relief Agency), Sanabil Association for Relief and Development, and the Human Appeal International-Jordan. *See* Transcript of Deposition of Shukri Abu-Baker, pp. 170-76; *see also* AR 1209-15 (attached as Exhibit 4 to Plaintiffs' (IAP/AMS) Rule 56.1 Statement). The evidence further shows that all of these organizations are either known fronts for Hamas, known supporters of Hamas, or entities whose funding is known to benefit the Hamas agenda. *See* Watson Memorandum, pp. 0087-88, 0091-0105; *see also, e.g.*, AR 0856-63, 1252-61, 1271-78.

The record also contains a report of a statement from Mohamed Anati, the Executive Director of the Holy Land Foundation, Jerusalem, the sole agency of HLF in the West Bank and Israel (at least as of 1994). *See* Accord between HLF and HLF-Jerusalem (attached as Exhibit 4 to Plaintiffs' (IAP/AMS) Rule 56.1 Statement, pp. 0759, 0764, 0810). In the statement, Mr. Anati admits being a Hamas activist, and admits that some of HLF's money was channeled to Hamas. *See* AR 1263-1278.

The record also includes a videotape from a 1989 IAP conference showing a veiled speaker who is identified as a Hamas terrorist and who specifically thanks the Occupied Land Fund (the entity that came to be known as HLF) for its support. *See* Exhibit T to Plaintiffs' (HLF) Rule 56.1 Statement; Declaration of Reuven Paz, Exhibit A (attached as Exhibit M/A to Plaintiffs' (HLF) Rule 56.1 Statement). Mr. Abu-Baker admitted that he attended that conference. *See* Responses to Requests for Admission, ¶4 (attached as Exhibit U to Plaintiffs' (HLF) Rule 56.1 Statement). The record also includes brochures and other literature designed, in whole or in part, to promote Hamas' agenda and all of these items include a solicitation to send funds for the cause to HLF (or the Occupied Land Fund, depending on the publication date). *See* Group Exhibit P to Plaintiffs' (HLF) Rule 56.1 Statement; Transcript of Deposition of Shukri Abu-Baker, pp. 105-115.

Mr. Abu-Baker, who served as HLF's President and Chief Executive Officer, *see* Answers to Interrogatories, Nos. 2, 5 (attached as Exhibit 21 to Plaintiffs' (HLF) Rule 56.1 Statement); Deposition of Shukri Abu-Baker, p. 10, testifying as HLF's Rule 30(b)(6) designee, admitted that HLF frequently received donations from people who wanted their money to go to the family or children of a "shaheed" or "martyr," and that HLF made it a practice to try to accommodate the requests of those

donors. *See* Abu-Baker Deposition, p. 168. According to the Boims, a "shaheed" or "martyr" is someone who dies while serving Hamas' agenda, whether in a suicide bombing or some other terrorist attack, or at the hands of an Israeli soldier. *See, e.g.,* Exhibit E to Plaintiffs' (HLF) Rule 56.1 Statement (translation of The Khaled Mishaal Interview, describing terrorist acts as "martyrdom operations"); Exhibit E to Plaintiffs' Reply Memorandum, ¶¶5d, 5e (and attached exhibits E and F)(Reuven Paz' translations of Palestinian Authority and Hamas website publications characterizing Mr. Al-Sharif, one of David Boim's murderers, who subsequently died in a suicide bombing, as a "martyr"). Mr. Abu-Baker testified that a broader meaning may be ascribed to these terms, such that they can refer to anyone who dies as a result of the Israeli occupation and the Palestinian uprising. Deposition of Shukri Abu-Baker, pp. 162-63, 167-68. But, in either case, it is clear that HLF targeted the families of martyrs to receive its money.

In his capacity as a 30(b)(6) witness, Mr. Abu-Baker also testified that, in 1992, HLF received a $210,000 contribution from Mousa Abu Marzook. *See* Deposition of Shukri Abu-Baker, pp. 75-76, 79. Mr. Abu-Baker testified that he knows Mr. Marzook, and that Mr. Marzook is married to the first cousin of Ghassan Elashi, who served first as HLF's Treasurer and Secretary, and later as the Chairman of HLF's Board of Directors, *see* Answers to

Interrogatories, No. 2 (attached as Exhibit 21 to Plaintiffs'
(HLF) Rule 56.1 Statement); HLF's Responses to Requests for
Admission, ¶6 (attached as Exhibit C to Plaintiffs' Reply
Memorandum). According to the Boims - and according to Dale
Watson and the FBI - Mr. Marzook served for many years as the
head of Hamas' political bureau; he was designated as an SDT on
August 25, 1995. *See* Complaint, ¶¶12, 34; Watson Memorandum, pp.
0073-74 (attached as Exhibit B to Plaintiffs' (HLF) Rule 56.1
Statement). The Watson Memorandum details Mr. Marzook's $210,000
contribution, and relies upon it to link HLF to Hamas. Watson
Memorandum, pp. 0074. And the administrative record upon which
Mr. Watson relied contains copies of checks written by Mr.
Marzook and made payable to HLF. *Id.*, pp. 0684-87.

Additionally, when deposed as fact witnesses, both Mr. Abu-
Baker and Ghassan Elashi declined to answer substantive
questions, invoking the Fifth Amendment. *See* Transcript of Oral
and Videotaped Deposition of Shukri Abu-Baker, pp. 6-127
(attached as Exhibit A to Plaintiffs' Supplement to the HLF
Summary Judgment Record Based on the Testimony of Shukri Abu-
Baker); Transcript of Deposition of Ghassan Elashi, pp. 6-91.
Because Mr. Abu-Baker and Mr. Elashi chose to remain silent at
their depositions, the Court is entitled to draw a negative
inference that the answers they would have given, had they
answered the questions posed and answered them truthfully, would

have tended to subject them to criminal liability. *See, e.g., In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663 (7th Cir. 2002); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). This is just one more bit of admissible evidence against HLF on the question of whether it knew about Hamas' terrorist activities and knew its money would ultimately fund terrorism.

In contrast to this evidence, the record contains a July 27, 2004 declaration from HLF's attorney, John Boyd. *See* Exhibit A to HLF's Rule 56.1 Statement).[6] Attached to that declaration is another declaration from Mr. Boyd, this one signed on June 15, 2002 and prepared in response to the motion for summary judgment filed by the government in the *Ashcroft* case. *See* Exhibit A/1 to HLF's Rule 56.1 Statement. And attached, in turn, to Mr. Boyd's 2002 declaration are declarations from Shukri Abu-Baker, then HLF's CEO, Dalell D. Mohmed, an HLF donor and an Emergency Relief Coordinator for HLF, and Mohammed Abumoharram, the manager of HLF's Gaza office. *See* Exhibits A/2, A/3, and A/4 to HLF's Rule 56.1 Statement. All three declarations testify to a vast amount of admirable, charitable work done by HLF – all totally unrelated to Hamas – and all three declarants adamantly disavow any ties to Hamas, and any condonation of Hamas' activities. *See* Exhibit A/2, §§3, 7, 30, 31; Exhibit A/3, §§2, 5-30, 32, 35-51; Exhibit

---

[6]Citations are to HLF's initial Rule 56.1 Statement of Facts; HLF did not file anything in response to the Boims' renewed motion.

A/4, §§5-7, 12. For example, in his declaration, Shukri Abu Baker represents that "[n]either I nor, to my koweldge, any of the other founders of this charity [HLF] have had any connection whatever to Hamas, or to any terrorist groups or to terrorism." Declaration of Shukri Abu Baker, ¶7. He further represented that "HLF, even before Hamas was banned by the Israeli government, did not provide any funds to Hamas or devote any of its funds to support Hamas." *Id.*, ¶23.

The first time around, the Court noted that "these declarations might be enough to create a genuine issue of fact as to the connection between Hamas and HLF," though the Court also noted that self-serving affidavits without support in the record may not be enough to preclude summary judgment. *Boim*, 340 F.Supp.2d at 898 (citing Anderson, 477 U.S. at 255; *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 923 (7th Cir. 2001)). In light of the Texas proceedings, however, these affidavits no longer hold water; the jury's findings there have utterly eviscerated the representations made in those affidavits, and, to the extent they ever were enough to preclude summary judgment, they no longer have that effect. There is not a single piece of evidence in the record to back up the representations made in these affidavits; on the contrary, every piece of evidence – and there is an abundance – proves just the opposite. The Seventh Circuit has said that conclusory, self-serving testimony, lacking factual

support in the record, cannot defeat a summary judgment motion. *See, e.g., Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001); *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 709 (7th Cir. 1995); *Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir. 1994). The findings of the Texas jury and the Fifth Circuit Court of Appeals establish, beyond a reasonable doubt, that HLF and its principals supported Hamas' agenda and financed Hamas' activities through donations to Hamas-controlled organizations and committees. Although those findings cover donations made after 1996, the fact remains that these declarations, signed in 2002, were false when sworn. Accordingly, the Court finds that HLF knew the true character of Hamas and, despite that knowledge (or because of it), provided material support to Hamas.

3. HLF donated money to Hamas during the relevant time period

In light of the evidence detailed above, and the findings and conclusions coming out of the Texas proceedings, there can be no doubt that HLF provided material support (money) to Hamas. Nor, based on the record before the Court, can there be any doubt that it did so during the relevant time period – that is, after 1994 when the statute was enacted, and before 1996, when David was killed. The Texas jury determined that HLF and its principals donated money to Hamas through direct donations to

zakat committees and other organizations run by Hamas. And, although those findings do not specifically correlate to the period of time at issue here, there is plenty of evidence in the record that does. For example, as explained above, the record evidence shows that, in the years after the United States designated Hamas as an SDT in 1995, HLF provided significant funding (hundreds of thousands of dollars) to *zakat* committees and other "charitable" organizations that were either known fronts for Hamas or known supporters of Hamas.

In fact, evidence submitted by the Boims shows that HLF provided material support to Hamas in 1995, the year before David Boim was killed. Along with their renewed motion, the Boims submitted a supplemental declaration from Reuven Paz, who has served as an expert throughout these proceedings and who describes himself as "an expert on Terrorism and Counter-Terrorism, Islamic movements in the Arab and Islamic world, Palestinian Islamic groups and Palestinian society and politics," *See* Supplemental Declaration of Reuven Paz, ¶3 (attached as Exhibit I to the Boims' Rule 56.1 Statement of Facts submitted in support of their Renewed Motion for Summary Judgment). In his supplemental declaration, he summarizes his translation of certain documents identified during the deposition of Shukri Abu Baker that detail donations made on behalf of HLF:

> The first page is a report signed by Sheykh Abd al-Khalq al Natshe, as chairman of the welfare

committee, dated March 13, 1995, detailing that 75 food packages were given to the families of prisoners, and 25 food packages were given to the families of orphans. Al-Natshe, a ranking Hamas leader, was the head of the Islamic Charitable Society of Hebron, of which the Muslim Youth Society in Hebron was a sub-group.

Paz Supplemental Declaration, ¶8. He further represents that:

> "[t]he next report lists the sum of money (in Israeli New Shekel currency) distributed to relatives of *shuhada* (martyrs) on behalf of HLF. The money was disbursed by the Muslim Youth Society to groups of beneficiaries on three separate dates. The first series of transactions (document headed "No. 1") took place on April 2, 1995; the second series ("No. 2") on April 3, 1995; and the third series ("No. 3") on April 11, 1995. Each report shows the "name of the martyr," beneficiary, the beneficiary's identification number, their relationship to the martyr, the sum of money allotted, and a signature acknowledging receipt.

*Id.*, ¶9. Mr. Paz goes on to explain, as he did in his initial declaration, that the term "martyr" is "commonly used by Hamas and its supporters to describe someone who was killed or wounded following terrorism operations, including suicide bombings." *Id.*, ¶10. And he notes, for example, that Hamas used the term on its website publications to describe Al-Sharif, one of David Boim's murderers. *Id.* Along similar lines, he represents that he was able to identify specifically "many of the individuals listed [in the report] as Hamas martyrs because their names correspond with those appearing in internal Hamas communications listing those same individuals as "martyrs." *Id.*, ¶11. Significantly, he notes that the fact that the organization reported back to HLF

26

about its distributions and disbursements to designated "martyrs" "is consistent with HLF's desire to target its support to those directly connected with the Hamas terrorist mission." *Id.*, ¶10. Mr. Paz's supplemental declaration tracks specific disbursements and distributions made directly to the families of Hamas "martyrs" in 1995, the year after the statute was enacted and the year before David was killed.

## Conclusion

For the reasons explained more fully above, the Court finds that HLF knew about the character of Hamas and that it provided material support to Hamas during the relevant time period – that is, after the statute was enacted and before David Boim was murdered. Accordingly the Court grants the Boims' Renewed Motion for Summary Judgment against HLF [#872].

Dated: August 31, 2012

ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge